UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JANET W. ROBERSON,<br>   3310 Wooden Valley Court<br>   Alexandria, Virginia 22310,<br><br>      Plaintiff,<br><br>v.<br><br>MARTIN J. GRUENBERG,<br>   Acting Chairman,<br>   Federal Deposit Insurance Corporation,<br>   550 17th Street, N.W.<br>   Washington, D.C. 20429,<br><br>      Defendant. | Civil Action No. _____ |

**COMPLAINT**
**(Employment Discrimination and Retaliation)**

**Introduction**

1.     Plaintiff Janet W. Roberson, brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. §§ 2000e *et seq.*, and as further amended by section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, and the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 633a, to remedy acts of employment discrimination perpetrated against her by the defendant on account of her sex and age and in retaliation for her having maintained her claims of sex and age discrimination. Plaintiff contends that defendant discriminated against her, *inter alia*, when she was detailed involuntarily from her position as Deputy Director for Information Technology Management, Division of Information Resources Management, at the Federal Deposit Insurance Corporation, based on false and unsubstantiated allegations of serious performance failures and for allegedly creating a "hostile work environment" for some unidentified subordinates and other Division employees and when she was denied a recommended bonus and a salary increase. Plaintiff also contends that defendant retaliated against her for continuing to complain of this sex/age discrimination by, *inter alia*, creating a hostile

work environment for her -- having found no legitimate grounds on which to terminate her and having contrived to place her in an Executive Level position in the Federal Deposit Insurance Corporation's Division of Finance -- when plaintiff did not dismiss or withdraw her initial sex and age discrimination complaint.

### Jurisdiction

2. This Court has jurisdiction over the subject matter of this civil action pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. §§ 2000e et seq., and as further amended by section 102 of the Civil Rights Act of 1991 (hereinafter "Title VII"), and the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 633a (hereinafter the "ADEA"), plaintiff having exhausted her available administrative remedies on each of the claims made herein.

### Venue

3. Venue is proper in this judicial district under 28 U.S.C. Section 1391(b) and 42 U.S.C. Section 2000e-5(f)(3), as the decisions which are at issue were made by defendant in this district and plaintiff's employment records are maintained in this district.

### Parties

4. Plaintiff Janet W. Roberson is a female citizen of the United States who is now 55 years of age. Plaintiff is currently, and was at the time of the events giving rise to this Complaint, employed by the Federal Deposit Insurance Corporation at an Executive Level.

5. Defendant Martin J. Gruenberg is the acting Chairman of the Federal Deposit Insurance Corporation ("FDIC"), an independent corporation in the Executive Branch of the Government of the United States that has had more than 500 employees in 20 or more calendar weeks during the past year. It is managed by a five-member board of directors appointed by the President and confirmed by the Senate. As acting Chairman of the FDIC, Mr. Gruenberg is the head of the FDIC and is responsible for the personnel actions, omissions and practices thereof. As such, Mr. Gruenberg is here sued only in his official capacity as head of the FDIC.

**Statement of Facts**

6.      Ms. Roberson will have 28 years of federal service on April 26, 2006, and has been with the FDIC (and the now-defunct Resolution Trust Corporation ("RTC") which was merged with the FDIC a decade ago) since Aug. 25, 1991. She became an Executive Level employee (FDIC's equivalent to the Senior Executive Service ("SES")) when competitively promoted on March 29, 1998 to an Executive Level 1 ("E-1") position. Her career field is management and administration, and she has a Masters in Public Administration from American University (1980), as well as a MS in Library Science from Catholic University (1976) and a BA in Theatre Arts and English Literature from Dickinson College (1972). Plaintiff obtained her position as Deputy Director for Information Technology Management, in FDIC's Division of Information Resources Management ("DIRM"), on January 14, 2001, based on a merit selection process. This was a promotion for plaintiff to Executive Level 2 ("E-2"). As a Deputy Director of DIRM, plaintiff initially worked for Donald Demitros, then the Division Director.

7.      Upon Mr. Demitros' retirement, his general deputy, Carol Heindel, was temporarily named to the division director's position in early September 2001. Plaintiff's performance appraisals were outstanding from both Mr. Demitros and Ms. Heindel. In fact, plaintiff consistently received outstanding performance reviews throughout her government career and received bonuses, awards, and merit pay increases accordingly.

8.      However, on January 24, 2003, plaintiff was called in to see John Bovenzi, Deputy to the Chairman and Chief Operating Officer of FDIC, who was accompanied by Arleas Upton Kea, an attorney and the FDIC's Director, Division of Administration. Mr. Bovenzi told plaintiff (as he had told her immediate superior, acting Director Carol Heindel, on the previous day) that a report had been submitted and an oral briefing had been presented to him and other senior officials on a study of DIRM management. Mary Boyd, a young journeyman level bank examiner specializing in information technology who was on detail to the Office of the Chief Operating Officer, wrote this "DIRM IT Briefing Report" ("Report"), which concluded that senior DIRM management --

specifically, plaintiff and Ms. Heindel, both females -- were essentially incompetent. Until Mr. Bovenzi's disclosure, neither plaintiff nor Ms. Heindel had been aware of this secret investigation. In short, they were ambushed. Mr. Bovenzi also told plaintiff that a group of DIRM employees (whom he declined to identify) had made allegations (which he declined to specify) that she had created a "hostile work environment" in DIRM. Actually, Mr. Bovenzi had not spoken to any such complaining DIRM employees. Rather, Vijay Deshpande, the male Director of FDIC's Office of Internal Control Management, had reported to Bovenzi that six employees had spoken to him about such allegations -- none of which had been validated. Mr. Deshpande had recommended that a "management inquiry" be conducted concerning misconduct allegations against plaintiff and that she be removed from DIRM during such an inquiry. Mr. Bovenzi told plaintiff that these were serious allegations and that, as a consequence, Ms. Heindel would be returned to her position as the principal deputy in DIRM and plaintiff would be moved out of her position immediately -- by an involuntary, "directed" detail -- and placed into another job outside DIRM, a job to be specified by Ms. Kea later that same day. He also said that a "management inquiry" would be conducted into the "charges" made against plaintiff (as reported by Vijay Deshpande). Mr. Bovenzi further stated that the new acting DIRM director would be Vijay Deshpande and that plaintiff would be replaced in the position of DIRM Deputy Director for Information Technology Management by Bovenzi's own special assistant, James Collins, who would serve in that job on detail.

        9.      During the same January 24, 2003 meeting, Mr. Bovenzi told plaintiff to clear out her office that day and that she would be told where she was to report before these forced changes were publicly announced. This never happened, and plaintiff was further embarrassed when the widely distributed email announcement of her (directed) detail to a temporary position in the Division of Finance -- effective the very next business day -- was made and plaintiff still had not been advised to which office she was to report or into what position she was being detailed. In fact, this directed detail placed plaintiff in a non-supervisory position (though one still at an executive pay level) under the supervision of Thomas Peddicord, a male executive level employee in the Division of Finance

(DOF) who, being a subordinate of a deputy division director (Steven Anderson at the time), was below the organizational level of plaintiff's permanent position as a deputy division director in DIRM. Plaintiff was given office space in DOF that was equivalent to that generally assigned to journeyman level employees who hold non-supervisory positions -- *i.e.*, smaller than that usually provided to first line supervisors and mid-level managers. During the entire course of the directed detail, which lasted for slightly more than a year, plaintiff was not invited to the DOF Director's meetings with his executive and management staff, did not receive any assignments at the executive level, was frequently without assignments, and was isolated from contact with her peers and superiors. In short, she was never treated as an executive level member of DOF by its upper management and was ignored by DIRM senior management, who removed functions from her position of record as a deputy director without notice or consultation.

10. During the first few weeks of her directed detail to DOF, plaintiff responded in writing to the "DIRM IT Briefing Report," the report resulting from the secret investigation headed by Mary Boyd, a copy of which had been provided to her by John Bovenzi at the January 24, 2003 meeting. [Ms. Heindel had received a copy of this "Report" in a separate meeting with Mr. Bovenzi (and Ms. Kea) on January 23, 2003.] Believing at the time that the deeply flawed "Report" had merely misled Bovenzi and that they should respond to clear their names and restore their reputations, both plaintiff and Ms. Heindel wrote separate responses and provided them to Mr. Bovenzi on Feb. 10th and 6th, respectively. Plaintiff subsequently briefed Mr. Bovenzi, with Ms. Kea present, on Feb. 27, 2003. Despite comprehensive and compelling responses from both female executives, provided at his invitation, Mr. Bovenzi never provided any feedback to either Ms. Heindel or Ms. Roberson.

11. In any event, it should be noted that Mr. Bovenzi replaced two competent female executives, Carol Heindel and Janet Roberson, with two unqualified male executives, Vijay Deshpande and James Collins, neither of whom had the requisite knowledge of information technology nor the executive level management experience for the DIRM jobs into which they were detailed. In fact, Mr. Deshpande was supervising a staff of only 16 auditors and management

analysts at the time he was detailed to lead DIRM -- which had about 400 employees, most serving in specialized, high technology jobs. Moreover, Mr. Collins was not a manager at the time of his detail to DIRM, had only an auditing background, and had not supervised anyone in about 10 years, although plaintiff's job as Deputy Director for Information Technology Management in DIRM involved supervising some 80 information technology and administrative personnel.

12. Just prior to being confronted by John Bovenzi with unsubstantiated and false allegations on January 24, 2003, plaintiff was informed by Carol Heindel, her (female) supervisor from early September, 2001 through Jan. 24, 2003, that an Executive Bonus recommended by Ms. Heindel for plaintiff had not been approved by the FDIC's Executive Review Board ("ERB"). Plaintiff's was the only recommended bonus denied by the ERB in its entirety. Ms. Heindel had recommended plaintiff for a $10,678 (7.5% of basic pay) Executive Bonus for her work in 2002 in meeting all of the Chairman's objectives assigned to her as well as all divisional goals. The FDIC's three-member ERB, which included both John F. Bovenzi, Deputy to the Chairman and Chief Operating Officer ("COO") of the FDIC, and Steven App, Deputy to the Chairman and Chief Financial Officer ("CFO") of the FDIC, denied plaintiff a bonus despite the fact that she had met the criteria established by the FDIC's Chairman for the awarding executive bonuses. When Ms. Heindel asked her supervisor, John Bovenzi, why plaintiff's bonus had been disapproved, he indicated the denial had something to do with problems in information security, one of plaintiff's areas of responsibility, and an expected finding of a "reportable condition" by the General Accountability Office ("GAO") with regard to FDIC's IT security for 2002. While Ms. Heindel did not receive a bonus for 2002, either, Ned Goldberg, a male executive who reported to plaintiff and who was the Assistant Director for Information Security -- and, therefore, the Executive Level official in DIRM most directly responsible for IT security at FDIC -- received an Executive Bonus of $8,549 (7.5% of salary) from the same ERB for the same 2002 performance year. Mr. Bovenzi, to whom DIRM reported, also received an Executive Bonus for his work in 2002 -- a bonus of $22,356. Moreover, although "reportable conditions" in IT security at FDIC predated plaintiff's selection as a deputy in

DIRM in 2001, none of the male executives responsible for such reportable conditions in information security from 1995 through 2002, including John Bovenzi and Donald Demitros, had ever been penalized for such reportable conditions -- through the denial of a bonus or otherwise.  In fact, they had been rewarded despite the existence of reportable conditions on their "watch."  Moreover, the very next performance year (2003), when alleviation of the GAO reportable condition in IT security was one of the Chairman's goals for FDIC (which it had not been in 2002) and substantial additional resources were allocated to DIRM for the specific purpose of ending this reportable condition, the GAO again issued a reportable condition finding in IT security.  Notwithstanding this fact, the males who replaced plaintiff and Ms. Heindel -- James Collins and Vijay Deshpande -- were rewarded as were other male executives who had responsibility for information security:  Ned Goldberg, Michael Bartell, and John Bovenzi.  All of these male executives received pay increases ranging from 4% to 6% and, with the exception of Mr. Goldberg, each received a bonus ranging from $4,700 to $7,800, and Mr. Bartell was elevated from his position as the Deputy Director for Technical Infrastructure to the dual positions of Chief Information Officer and Director, DIRM, effective Nov. 30, 2003 -- all in the teeth of a GAO reportable condition in IT security for 2003.

       13.     At Mr. Bovenzi's direction, a "management inquiry" of the allegations first made by several DIRM employees to Vijay Deshpande was initiated by Miguel Torrado, Associate Director, Human Resources Branch, Division of Administration.  On Feb. 4, 2003, Mr. Torrado signed a memorandum which the contract investigator engaged to conduct this management inquiry, Ellen Delany, showed to each FDIC employee who was interviewed.  It stated that Delany was authorized to "conduct a management inquiry into allegations of hostile work environment, suppression of whistleblower activities and prohibited management practices within the Division of Information Resources Management."  Plaintiff was mortified by the memorandum and by the fact that she had been singled out for a type of investigation that she had never witnessed in her federal career, one for which there were no written policies or rules, and in which plaintiff had no rights.  Ms. Delany would not identify the employees and their specific complaints during her interviews with plaintiff and she

refused to make complainants' affidavits available for plaintiff's review and rebuttal. Plaintiff did not receive the affidavits and learn the identity of her accusers until after Ms. Delany released her report to the FDIC on March 21, 2003. In fact, plaintiff provided her completed affidavit to Ms. Delany on March 28, 2003, not knowing that the report had already been shared with senior FDIC officials -- thereby denying plaintiff any real opportunity to rebut any of the statements made against her. Ms. Delany's report found that Ms. Roberson had committed no ethics violations and that her conduct had apparently not raised any EEO issues. The subject of suppression of whistle-blowers was not addressed. Ms. Delany concluded the plaintiff had very high management analyst skills of value to the FDIC and successfully motivated staff she trusted, while not doing as well with staff in whom she placed less trust. She recommended that plaintiff undertake HR training and concluded that lines of communication in DIRM needed to be more open. The Delany report contained no findings that merited any disciplinary action against plaintiff. As with plaintiff's detail away from her position of record in DIRM (*i.e.*, DIRM's Deputy Director for IT Management), the "management inquiry" was done to pressure plaintiff into leaving FDIC's employ by taking an early retirement, and to advance Vijay G. Deshpande's career at plaintiff's expense.

        14.    Mr. Bovenzi's decisions to detail plaintiff from her permanent position as the Deputy Director for Information Technology Management in DIRM and deny her a $10,678 bonus would not have been made had she been a male Executive Level employee or had she been a younger female Executive Level employee at the time. Nor, but for her age and/or her sex, would she have been subjected to the hostile work environment of a "management inquiry" -- a "process" that has no published rules, no known procedures or standards, nor any regulatory basis whatsoever, and thus amounted to a virtual "Star Chamber" in which plaintiff was made the target of an inquisition without provision for any degree of fundamental fairness or even regular process -- concerning the "allegations" of misconduct reportedly made by a small group of DIRM employees to Vijay G. Deshpande (who then reported such "allegations" to John Bovenzi). The process by which the directed detail came to be and successive unexplained extensions of that detail were handled (in a way

calculated to maximize plaintiff's embarrassment and personal and professional humiliation), damage her career as an executive at FDIC and make it difficult for her to find an executive position elsewhere. All of this constitutes a hostile work environment and would not have happened but for her age and/or her sex. All of these negative employment actions and decisions impacting plaintiff were intended to drive her from FDIC's employment, and her age and/or her sex were critical, motivating factors in this treatment accorded plaintiff by FDIC's upper management.

15. Moreover, even after the "management inquiry" was concluded on March 21, 2003, and upper management at FDIC knew that there were no grounds on which to justify an adverse personnel action against plaintiff based on the "allegations" of misconduct brought to John Bovenzi by Vijay Deshpande in January 2003, Mr. Bovenzi continued plaintiff on the directed detail to the non-supervisory job in FDIC's Division of Finance ("DOF") for almost eleven additional months, thereby leaving her without real duties and without any role on the DOF management team, and causing her to suffer public humiliation. This was intentionally done by upper management at FDIC in an effort, as with the directed detail itself, to force her to leave the corporation's employ and, further, to otherwise punish her for having lodged an EEO complaint concerning the directed detail, denied bonus, and the "management inquiry."

16. Also while on the directed detail to DOF, plaintiff was denied a bonus for her work in 2003, though she did everything asked of her, and did it in an outstanding manner. In addition, she was denied a salary increase in 2004 for the excellent work she had done on those few jobs to which she was assigned in 2003. These actions were both a product of the sex/age-based directed detail and intended to vex plaintiff because she had lodged an EEO compliant concerning the directed detail (etc.).

17. Several months after the "management inquiry" concluded, and while plaintiff was continued on the by then duty-less directed detail to DOF by upper management, John Bovenzi expressly directed plaintiff on short notice to attend a month-long out-of-town training course on getting along with others, threatening her with a future adverse action if her "problems" in dealing

with others was not corrected. This was done as a face-saving device, the discriminatory "management inquiry" having been unable to conclude that plaintiff had engaged in any misconduct while in her permanent deputy director position at DIRM. It was intended to vex plaintiff for her having lodged an EEO complaint regarding the "management inquiry" in the first place, and to provide management with a defense in that EEO complaint process.

18.     After sequestering her for more than a year in a non-supervisory position in DOF essentially without duties or responsibilities, almost eleven months of which were after the conclusion of the "management inquiry" (the conducting of which was the justification for the directed detail to DOF to begin with), FDIC upper management failed to return plaintiff to her permanent deputy director position DIRM, instead engineering a vacancy in a deputy director position in DOF and directing her permanent transfer into it. As with requiring her to take training in getting along with others (see paragraph 17 above), this was all done as a face-saving device, the discriminatory "management inquiry" having been unable to conclude that plaintiff had engaged in any misconduct while in her permanent deputy director position at DIRM. Similarly, this placement of plaintiff in a deputy director job in DOF rather than returning her to the one she had held in DIRM was intended to vex plaintiff for her having lodged an EEO complaint regarding the "management inquiry" in the first place, and to provide management with a defense in that EEO complaint process.

19.     Once plaintiff was permanently assigned as a deputy director in DOF, upper management falsely accused her of improperly providing "confidential management information" to the union that represents FDIC employees and, without warning or a protection of rights, subjected her to another Star Chamber-type inquiry into this false allegation. This was done on June 25, 2004, before a court reporter and without benefit of counsel or adequate information as to the subject of the "inquiry." This was engineered by FDIC Chief Operating Officer John Bovenzi, with the aid of the Deputy Director of the Division of Administration, Glen Bjorklund, Mr. Torrado, James Lawrence, Senior Counsel in the Legal Division, and the DOF Director, Fred Selby, who is plaintiff's supervisor in DOF. Upper management conducted the interrogation, even though a report by the

FDIC's Office of Inspector General, which was issued on May 13, 2004, concluded that plaintiff had developed a spreadsheet reflecting executive pay and bonus data on her home computer and had sent the spreadsheet to a friend's home computer, that the spreadsheet did not contain nonpublic information, and that plaintiff did not have access to any FDIC systems containing the information in question. In other words, there was no need for any "inquiry" because upper management already knew that plaintiff had done nothing wrong. The "inquiry" was intended to harass plaintiff and to try to entrap her in a lie. A male Executive Level employee would never have been subjected to an allegation of this type, nor would he have been subjected to a "management inquiry" on account of such an allegation. Moreover, subjecting plaintiff to this second "management inquiry" was undertaken as an act of retaliation against her because she did not dismiss or withdraw her earlier discrimination complaints once the directed detail was ended and she was placed in a permanent Executive Level (as deputy director position in DOF).

20.     When the second "management inquiry" came to the inescapable conclusion that plaintiff had not provided "confidential management information" to the FDIC employees' union, John Bovenzi nevertheless had plaintiff's supervisor, Fred Selby, Director of DOF (who is not in Mr. Bovenzi's chain of command), issue plaintiff a counseling letter based on this same false release-of-management-information-to-the-union allegation. This was the first time during his FDIC career that Mr. Selby had issued such a letter. This action was undertaken to vex plaintiff in retaliation for her continuing to prosecute her initial EEO complaint.

21.     Despite the fact that plaintiff has performed well in all her assignments and has made positive contributions to the Chairman's goals since being permanently reassigned to the deputy director position in DOF, on Feb. 13, 2004, she was given a lower-than-average pay raises in 2005 and did not receive a bonus at all for her 2004 job performance. Of all the managers in DOF, plaintiff received the lowest increase in compensation in 2005, even though she had met all of her goals, some of which she had initiated herself, and had far surpassed the achievements of her male predecessor and two of his male managers who now reported to her. As in 2003 and 2004, John Bovenzi and

Steven App as members of the ERB (and now Fredrick Selby) made the decision to deny plaintiff compensation commensurate with her achievements. Decisions regarding her annual salary increases and bonuses were products of sex/age bias. Further, these salary increase and bonus decisions were undertaken by upper management to vex plaintiff in retaliation for her continuing to prosecute her EEO complaint.

22.     In 2005, Fred Selby, the Director of DOF and plaintiff's immediate supervisor, at the urging of upper management and otherwise, contrived to harass her with a knowingly false claim that she engaged in misconduct toward some of her subordinates in DOF, and by threatening her with a performance improvement plan ("PIP") if her "leadership" did not improve. He issued to plaintiff a "performance warning memorandum" based on these false and baseless allegations, most of which were directly attributable to Richard Cywinski, a subordinate manager who reported to plaintiff. This was undertaken to provide cover for a male subordinate who had documented performance and conduct problems and who Mr. Selby had noncompetitively placed in a position for which he did not qualify after ousting the competent female manager who had held the position and placing her on an employee surplus list. This was sex-based discrimination, intended to further vex plaintiff in retaliation for her continuing to prosecute her EEO complaint. Also, a male supervisor under Fred Selby who actually had engaged in misconduct that vexed his subordinates was never so much as admonished by Selby though he well knew of the misconduct. Thus, Mr. Selby engaged in sex-based discrimination in so accusing and threatening plaintiff.

### Statement of Claims

**Count I -- Sex/Age Discrimination:**

23.     The treatment accorded plaintiff by FDIC management, as specified in paragraphs 6 through 22 above, occurred because of plaintiff being a female Executive Level employee in DIRM and/or one who was over 50 years of age. As such treatment violates Title VII of the Civil Rights Act of 1964, as amended, and/or the ADEA in that it constitutes intentional discrimination against plaintiff on account of or based on her sex and/or her age in willful violation of the law.

24.     As a direct and proximate result of the unlawful discrimination against her, plaintiff's career has been irrevocably damaged, quite apart from lost pay and bonuses. In addition, plaintiff has suffered and continues to suffer emotional distress and personal and professional humiliation and embarrassment which, *inter alia*, has severely diminished her enjoyment of life and caused her other pain and suffering. Further, she has, as a consequence of the unlawful discrimination, suffered and continues to suffer economic loss in the form of lost pay and bonuses and other benefits of employment that has limited her salary growth, and thus adversely affected the amount she will be paid ultimately in Civil Service retirement benefits.

**Count II -- Retaliation:**

25.     The treatment accorded plaintiff by FDIC upper management, as specified in paragraphs 6 through 22 above, occurred in whole or in part because plaintiff had lodged the claims of discrimination she had made (starting with the one in regard to her removal as the Deputy Director Information Technology Management in DIRM, the denial of her earned and recommended bonus for 2002, and her being subject to the Star Chamber "management inquiry," etc.) and, more particularly, because she continued to press those discrimination claims after upper management ended her directed detail and permanently transferred her to a position as a Deputy Director in DOF. Accordingly, the post-lodging-of-her-initial-EEO-complaint treatment accorded plaintiff by FDIC upper management, including the Director of DOF, was undertaken in violation of Title VII's provision against reprisal of Title VII of the Civil Rights Act of 1964, as amended.

26.     As a direct and proximate result of the unlawful retaliation/reprisal actions taken against her, plaintiff's career has been irrevocably damaged, quite apart from lost pay increases and bonuses. In addition, plaintiff has suffered and continues to suffer emotional distress and personal and professional humiliation and embarrassment which, *inter alia*, have severely diminished her enjoyment of life and caused her other pain and suffering. Further, as a consequence of the unlawful retaliation/reprisal, plaintiff suffered and continues to suffer economic loss in the form of lost pay and

bonuses and other benefits of employment that have limited her salary growth, and thus adversely affected the amount she will be paid ultimately in Civil Service retirement benefits.

### Prayer for Relief

WHEREFORE, plaintiff prays that this Court advance this cause on its calendar and enter judgment in her favor and against defendant on all claims brought herein and provide her with the following relief:

(a) award plaintiff compensatory damages against defendant in the amount awarded by the jury (to the maximum extent permitted by law) for the injuries she suffered as a result of FDIC's discrimination based on her sex (with interest thereon);

(b) award plaintiff compensatory damages against defendant in the amount awarded by the jury (to the maximum extent permitted by law) for the injuries she suffered as a result of FDIC's retaliation against plaintiff for her having lodged and continued to prosecute her initial claims of employment discrimination (with interest thereon);

(c) find that defendant discriminated against plaintiff on account of her age and that such action was in willful violation of the ADEA;

(d) award plaintiff liquidated damages against defendant in the amount equal to the back pay awarded to her (see ¶(i) *infra*) for the injuries she suffered as a result of FDIC's willful violation of the ADEA in discriminating against plaintiff on account of her age (with interest thereon);

(e) order defendant to place plaintiff in deputy director position equivalent to the Executive Level position she currently holds that is both safe (*i.e.*, discrimination/retaliation free) and provides interesting work for which she qualifies and is within her commuting area;

(f) order defendant to retroactively provide plaintiff with the $10,678 performance bonus for her performance in 2002 for which she was recommended (with interest thereon);

(g) order defendant to retroactively provide plaintiff with performance bonuses for each year after 2002 in amounts equal to the highest amount provided to an Executive Level employee in FDIC's Division of Finance for the applicable year (with interest thereon);

(h) order defendant to retroactively provide plaintiff with an annual salary increase for each year from 2004 onward at a percentage rate equal to the highest one provided to an Executive Level employee in FDIC's division in which she actually worked the year immediately previous to the applicable salary increase (*i.e.*, the 2004 salary increase to be based on the highest percentage increase provided to an Executive Level employee serving in the Division of Information Resources Management in 2003, and the 2005 salary increase to be based on the highest percentage increase provided to an Executive employee serving in the Division of Finance (all with interest thereon);

(i) order defendant to provide plaintiff with full back pay and benefits (*e.g.*, pension and 401(k) contributions, retirement credit) with regard to the bonuses and annual salary increases awarded hereunder (with interest thereon);

(j) order defendant to provide plaintiff with such additional funds as will serve to mitigate any adverse tax consequences attributable to her receiving payments currently to remedy past improper denials or withholdings of benefits of employment (*e.g.*, bonuses) to the maximum extent such additional funds are provided to others by the FDIC in settlement of employment claims.

(k) order defendant to void *ab initio*: the report of the "management inquiry" on the allegations made to Vijay Deshpande (and passed on to John Bovenzi) regarding plaintiff's job performance, ability, style or conduct while at DIRM; the Letter of Counseling given to plaintiff by Fredrick Selby; and the Performance Warning Memorandum given to plaintiff by Fredrick Selby; and order defendant to destroy all copies of these documents and any documents that reference them;

(l) order the FDIC's Chief Operating Officer and Chief Financial Officer to formally commend plaintiff for her work as an Executive Level employee since 2002 and to provide her with a written reference containing such commendation;

(m) order FDIC to correct its records, including, *inter alia*, plaintiff's OPF, to reflect the relief accorded by this Court;

-16-

(n) order defendant to restore to plaintiff 205 hours of sick leave and 244 hours of annual leave, which leave was taken in 2003 primarily because of depression plaintiff suffered as a consequence of the original acts of discrimination and retaliation;

(o) order FDIC to pay all costs associated with retaining a Career Coach for plaintiff (one of her own choosing) for a one year period;

(p) enjoin defendant from discriminating or retaliating against plaintiff in the future;

(q) award plaintiff the costs of bringing and litigating this civil action and the administrative charges that preceded it, including reasonable attorneys' fees, pursuant to, *inter alia*, 42 U.S.C. 2000e-5(k); and,

(r) award plaintiff such other and further relief as the interests of justice may require.

### Jury Demand

Plaintiff hereby requests a jury trial on all issues of fact and on the amount to be awarded in compensatory damages concerning the Title VII claims. Plaintiff also requests that the jury render an advisory verdict with regard to issues of fact and damages concerning the ADEA claims.

Respectfully submitted,

_____

David H. Shapiro
D.C. Bar No. 961326
SWICK & SHAPIRO, P.C.
1225 Eye Street, N.W.,
Suite 1290
Washington, D.C. 20005
Tel. 202-842-0300
Fax 202-842-1418
email - dhshapiro@swickandshapiro.com

Attorneys for Plaintiff