# Transcript of: Janet Roberson

**Date:** October 4, 2006
**Volume:**

**Case:** Janet Roberson v. FDIC

Neal R. Gross & Co., Inc.
Phone: 202-234-4433
Fax: 202-387-7330
Email: info@nealrgross.com
Internet: www.nealrgross.com

Exhibit 6

1    A    I don't know.

2    Q    Is it customary procedure for the
3 FDIC executives to take certain files home and
4 keep them there?

5    A    I don't know.

6    Q    Have you ever done this before?

7    A    Have I don't what before?

8    Q    Take files home and keep them there.

9    A    When you say "before" --

10    Q    Before this situation with Ed
11 Mahaney's files, and Mr. Bolick's file.

12    A    Not that I recall.

13    Q    Did you do it because you thought
14 this could help you in your EEO litigation?

15    A    I'm not sure I understand your
16 question.

17    Q    Did you take this file home because
18 you thought it was something you could use in
19 your EEO litigation?

20    A    I think that the file shows that men
21 who were similarly situated at the FDIC are
22 treated very differently than women.

Exhibit 6

Page 106

 1     Q    Did you take the file home because
 2 you thought it would help you in your EEO
 3 litigation?
 4     A    I believe I just answered your
 5 question.
 6     Q    No, you didn't.  Did you take it
 7 home because you thought it would help you in
 8 your EEO litigation?
 9     A    It shows that a similarly situated
10 male executive was treated very differently
11 than I was.
12     Q    That's your interpretation of the
13 file.  Correct?
14     A    That's correct.
15     Q    And if that is what the file shows,
16 do you believe that would help you in your EEO
17 litigation?
18     A    When discrimination occurs, one of
19 the things, I believe, it's incumbent upon the
20 complainant to show, is that similarly
21 situated people, unlike themselves, are
22 treated more favorably.

Exhibit 6

 1     Q    So you thought this file would help
 2 you to prove that you were treated less
 3 favorably than men.  Is that what you think?
 4     A    I believe that, yes.
 5     Q    And that's why you took it home.
 6     A    Yes.
 7     Q    Did that file include the Groome Law
 8 report?
 9          MR. SHAPIRO:  Which file, Edward
10 Bolick file?
11          MS. BIBLIN:  The Edward Bolick file,
12 did that include the Groome Law report?
13          THE WITNESS:  It did not.
14          BY MS. BIBLIN:
15     Q    Did Ed Mahaney's travel files -
16 actually, there's a misprint here, tiles - but
17 including legal opinions on taxable travel, is
18 that referring to the Groome Law report?
19     A    Yes.
20     Q    And you took that home, also.
21     A    I'm not sure what you're referring
22 to when you say "that".

Exhibit 6

1    Q    Who put them in the box?

2    A    I did.

3    Q    And when did you do that?

4    A    At various points in time.

5    Q    Did you pack those while you were at
6 your office at Theater One Building?

7    A    Yes.

8    Q    Did you do it prior to the
9 depositions that you took of FDIC witnesses in
10 this case last fall?

11    A    I'm not sure I had all the files
12 then.

13    Q    Okay.  But the ones referring to the
14 Cottrell Webster, Ed Mahaney's travel files,
15 and the Ed Bolick file, and the Groome Law
16 report, you had assembled those prior to the
17 depositions last fall, had you not?

18    A    I don't know that I had all of those
19 files at that time.

20    Q    Where would they have been, if you
21 didn't have them?

22    A    They may have still been in Ed

Exhibit 6

1 Mahaney's old office.  We didn't move to

2 Virginia Square until January, 2006.  And the

3 depositions occurred --

4    Q    Between September and December.

5    A    Right.  So I don't know that all of

6 these files would have been at my home at that

7 time.

8    Q    But at some point during that period

9 of time in the fall, you took them home.

10    MR. SHAPIRO:  Objection.  She said

11 the move was the essential feature of the --

12    MS. BIBLIN:  That's not what she

13 said.

14    MR. SHAPIRO:  Yes.

15    MS. BIBLIN:  Mr. Shapiro, I ask you

16 not to testify for your client or coach her.

17    MR. SHAPIRO:  I'm not testifying.

18 She said -- I'm not coaching anybody.  She

19 said January was when the move was, 2006.

20 That's after the fall of 2005.  No?

21    MS. BIBLIN:  That has nothing to do

22 with this issue.

Exhibit 6

```
 1          MR. SHAPIRO:  Ahh.  Okay.
 2          MS. BIBLIN:  At least not according
 3 to her testimony.
 4          MR. SHAPIRO:  That's debatable.  Ask
 5 away.  You have a question?  Ask it.
 6          BY MS. BIBLIN:
 7     Q    I asked you previously why you took
 8 these documents home, and you said it was to
 9 help you with your EEO complaint.  Is that
10 correct?
11     A    That's not what I said.  You're
12 putting words in my mouth that I didn't say.
13     Q    Okay.  Why did you take these
14 documents home?
15     A    Why did I take which documents home?
16     A    The Groome Law report, the Cottrell
17 Webster file, Ed Bolick's file on Cottrell
18 Webster's relocation and travel, the legal
19 opinions, why did you take those home?
20     A    I was cleaning out his office, and I
21 had to put things somewhere, and some of them
22 I just decided to take home with me.
```

Exhibit 6

 1     Q    So it wasn't because of the move to
 2 Virginia Square, was it?
 3     A    We had to clean out.  I think I've
 4 said this several times now.  We had to clean
 5 out our files to the extent possible so that
 6 we would not be bringing much paper with us
 7 when we moved.  Ed Mahaney turned over all of
 8 his files to me.  I didn't ask him for the
 9 files, he gave me the files.
10     Q    He didn't direct you to take the
11 files home, did he?
12     A    I don't believe I said that.
13     Q    I'm just asking you if he asked you
14 to take the files home.
15     A    I'm sorry.  What's your question?
16     Q    Did Ed Mahaney tell you to take the
17 files home?
18     A    No, he did not.
19     Q    You made that decision.
20     A    That's correct.
21     Q    And you made that decision only with
22 respect to certain files that you thought

Exhibit 6

 1 would help you with your EEO litigation.
 2 Isn't that correct?
 3     A    I made the decision to take some
 4 files home, that's correct.
 5     Q    You could have packed those files
 6 along with the rest of Ed Mahaney's files and
 7 given them to the appropriate people in DOF
 8 who have responsibility for those areas.
 9     A    And I did give a number of those
10 files to people.
11     Q    But not all of them.
12     A    Well, in some cases there were
13 multiple copies of files.
14     Q    But you didn't give all of them to
15 the other people, did you?
16     A    When you say --
17     Q    You selected certain ones, and you
18 took those home.
19     A    Well, in some cases there was more
20 than one copy.
21     Q    That's not what I'm asking.  I'm
22 just saying, you didn't take all of them and

Exhibit 6

1 give them to the people who had responsibility
2 for that area, did you?
3     A     I don't -- maybe I'm not making
4 myself clear in answering your question.  Ed
5 Mahaney had been filing papers for many years,
6 and there were multiple copies of many
7 documents.  And in some cases, documents were
8 given to other people, but there were multiple
9 copies, and I kept a copy for myself.
10    Q     Why didn't you just shred these
11 multiple copies instead of taking them home?
12    A     I did discard some of the multiple
13 copies.
14    Q     Which ones did you discard?
15    A     They're just too numerous to
16 mention.
17    Q     Did you discard any copies of the
18 Groome Law report?
19    A     To my knowledge, there was only one
20 copy.  I don't recall there being any other
21 copies.
22    Q     Was there more than one copy of the

Exhibit 6

Page 122

1 Bolick file that Wanda Thompson gave you?

2    A   I don't know.

3    Q   The only file that you know of is
4 the one that she gave you.  Right?

5        MR. SHAPIRO:  You want to stop
6 cutting her off?  You want to stop cutting her
7 off.

8        MS. BIBLIN:  She said she didn't
9 know.

10       MR. SHAPIRO:  No, no, no, excuse me.
11 She was still talking, and you cut her off.
12 Now, Dina, you made a great big deal at every
13 one of my depositions about that when it
14 happened, and when you imagined it happened.
15 I'd expect you to show a little courtesy.
16 That's all I'm asking.  You've been repeatedly
17 cutting her off.

18       MS. BIBLIN:  The record will reflect
19 what's going on.

20       MR. SHAPIRO:  Just let her finish
21 her answer.  Okay?

22       MS. BIBLIN:  She's been finishing

Exhibit 6

1 her answer.

2        MR. SHAPIRO:  No, she has not been
3 finishing her answer.  You've been cutting her
4 off, and the record doesn't reflect that at
5 all.  How can it?  You cut her off, and start
6 talking.  The court reporter's record will
7 just show that you're talking.

8        MS. BIBLIN:  Are you done?

9        MR. SHAPIRO:  Let her - no.  Let her
10 finish.  Okay?  Just let her finish.  That's
11 all I'm saying.

12        MS. BIBLIN:  I heard it.

13        MR. SHAPIRO:  Ahh, now do it.

14        MS. BIBLIN:  I'll ignore your
15 comments, Mr. Shapiro.  The record will speak
16 --

17        MR. SHAPIRO:  If you keep ignoring
18 that comment, that you're not going to let her
19 finish, and you're going to repeatedly cut her
20 off, we're not going to have this deposition
21 continue, so I trust that you'll let her
22 finish her answers.  See, it's a simple thing,

Exhibit 6

Page 124

1 Dina.  You ask the questions, she answers the
2 questions.  Thank you.
3          MS. BIBLIN:  Thank you for your
4 lesson on deposition taking, Mr. Shapiro.
5          MR. SHAPIRO:  Oh, I didn't intend
6 that.
7          MS. BIBLIN:  I'm sure you didn't.
8          BY MS. BIBLIN:
9      Q   Ms. Roberson, was there more than
10 one copy of Ed Bolick's file that Wanda
11 Thompson gave you?
12         MR. SHAPIRO:  Asked and answered.
13         MS. BIBLIN:  You told me she hadn't
14 finished answering it, so go ahead.
15         THE WITNESS:  To my knowledge, this
16 was a file that was Ed Bolick's particular
17 file, and I don't know if anything else exists
18 like it.  I have no idea.
19         BY MS. BIBLIN:
20     Q   So you just took it home.
21     A   That's correct.
22     Q   You didn't ask anybody else to see

Exhibit 6

 1 if they had a copy of it.

 2     A    There are many, many copies of

 3 reports dealing with Cottrell Webster's

 4 relocation, and his regular duty travel.

 5 There are probably more copies than anyone

 6 will ever need.

 7     Q    That's not the question I asked, Ms.

 8 Roberson.

 9     A    There are --

10     Q    The question I asked was--

11          MS. BIBLIN:  Let's read back the

12 question I asked.

13          COURT REPORTER:  Certainly.

14              (Playback.)

15          BY MS. BIBLIN:

16     Q    Did you ask anybody else if they had

17 a duplicate of Ed Bolick's file on Cottrell

18 Webster's relocation and travel?

19     A    Did I ask anyone if they had a copy

20 of Ed Bolick's file?  No.

21     Q    So you just took it home.

22     A    That's correct.

Exhibit 6

1    Q    And you thought it was helpful to
2 your EEO complaint.  Would that be correct?
3    A    What is your question?
4    Q    Did you think that file is helpful
5 to your EEO complaint?
6    A    I believe that it shows a similarly
7 situated male executive has been treated far
8 more favorably than I, yes.
9    Q    Would you agree that Mr. Bolick's
10 file on Cottrell Webster's relocation and
11 travel was something Mr. Bolick did in the
12 course of his employment at the FDIC working
13 for the Division of Finance?
14    A    I don't know.
15    Q    Did it look to you like its contents
16 contained work that he was doing at the
17 Division of Finance?
18    A    I would need to review that folder.
19 I don't really remember the contents at this
20 point.
21    Q    I guess when we get a hold of it,
22 we'll have to resume this line of questioning.

Exhibit 6

1          MR. SHAPIRO:  That's maybe your
2 opinion.  Depends how much time you have left
3 on your seven hours.
4          MS. BIBLIN:  We'll discuss that
5 later.
6          MR. SHAPIRO:  I'm not going to
7 discuss it at all.
8          BY MS. BIBLIN:
9     Q    Did you confirm with Vanessa Hester
10 that the other legal opinions that were
11 contained in Ed Mahaney's travel files were
12 also part of her files, that she had a copy of
13 them?
14     A    No.
15     Q    What was the purpose of your
16 memorandum to Fred Selby dated April 30th,
17 2004 on regular duty travel, Cottrell Webster,
18 2002 to present?  What was the purpose of that
19 memo?
20     A    As I recall, Tom Peddicord, who is
21 one of my colleagues in the Division of
22 Finance, is responsible for budget, and he

Exhibit 6

1 materials were shared at employee meetings,

2 with all the employees.  I don't think there

3 was anything --

4     Q    How do you know that?  You say you

5 think that, how do you know that?

6     A    I just think I remember that there

7 were briefings, hearing about briefings that

8 were being done for all employees.

9     Q    When you say you heard about this,

10 how did you hear about it?

11    A    From employees in DIRM.

12    Q    Which employees in DIRM?

13    A    It was just pretty much a general -

14 it was a big project there.

15    Q    Well, you claim that you were,

16 again, left out of the loop during 2003, so

17 how were you getting this information?

18    A    I was left out of the loop by senior

19 management.  I wasn't left out of the loop by

20 my friends.

21    Q    So who were your friends in DIRM

22 that were giving you information in 2003?

Exhibit 6

```
 1     A    I have a lot of friends in DIRM.
 2     Q    Let's name them one-by-one.  Who are
 3 the people giving you information in 2003 in
 4 DIRM?
 5     A    About what?
 6     Q    We're just discussing it.  You tell
 7 me who the people were that were giving you
 8 this information in 2003.
 9     A    I don't really under -- first of
10 all, I told you that I'm not really sure how
11 I got this information.
12     Q    Well, then you just tell me who the
13 people are that you believe are your friends
14 in DIRM in 2003.
15          MS. BIBLIN:  Let the record reflect
16 that Mr. Shapiro is whispering to his client.
17          MR. SHAPIRO:  How inappropriate for
18 a lawyer to talk to his client.
19          MS. BIBLIN:  While a question is
20 being asked.
21          MR. SHAPIRO:  Let the record reflect
22 - my goodness, do you want an answer to your
```

Exhibit 6

1 question?  Do you want an answer to your
2 question?
3           MS. BIBLIN:  I'm asking questions.
4           MR. SHAPIRO:  Yes, do you want an
5 answer, or do you just want to ask?
6           MS. BIBLIN:  All right.  Do you have
7 an objection to make here?
8           MR. SHAPIRO:  I want to know if you
9 want to ask a question, instead of talking to
10 me.  Talk to her.  Ask a question.
11          MS. BIBLIN:  I have been talking to
12 her, and you interrupted.
13          MR. SHAPIRO:  I didn't interrupt
14 anything.  Ask a question.  You made the
15 comment.  Just ask the question.
16          BY MS. BIBLIN:
17     Q    I want you to name the people who
18 were your friends in 2003 at DIRM, who were
19 giving you information about what was going on
20 in DIRM.
21     A    Okay.  Well, I can give some
22 examples;  Gloria Turner, Doreen Fulton.

Exhibit 6