# Transcript of:**Janet Roberson**

**Date:** October 4, 2006
**Volume:**

**Case:** Janet Roberson v. FDIC

Neal R. Gross & Co., Inc.
Phone: 202-234-4433
Fax: 202-387-7330
Email: info@nealrgross.com
Internet: www.nealrgross.com

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


|-------------------------+
                          |
JANET W. ROBERSON         |
                          |
     Plaintiff            |
                          |
     v.                   |  Case No. 06-0282
                          |
SHEILA BAIR, CHAIRMAN,    |  Judge Roberts
FEDERAL DEPOSIT           |
INSURANCE CORPORATION     |
                          |
     Defendant            |
|-------------------------+


                    Wednesday,
                    October 4, 2006


DEPOSITION OF:


            JANET W. ROBERSON


Called for examination by counsel for the

Defendant, pursuant to notice of deposition in
the headquarters of the Federal Deposit
Insurance Corporation, 3501 Fairfax Drive,
Room D7095, Arlington, Virginia, when were
present on behalf of the respective parties:

Page 2

APPEARANCES:

On Behalf of the Plaintiff:

DAVID SHAPIRO, ESQ.

of:  Swick & Shapiro, P.C.
1225 Eye Street, N.W.
Suite 1290
Washington, D.C. 20005
(202) 842-0300
FAX 842-1418

On Behalf of the Defendant:

DINA L. BIBLIN, ESQ.
Federal Deposit Insurance
    Corporation
3501 Fairfax Drive

Arlington, Virginia 22201
(703) 562-2372

Page 4

1      P-R-O-C-E-E-D-I-N-G-S
2              (9:37 a.m.)
3        MS. BIBLIN:  Good morning.  We're
4  here to conduct a deposition of Janet Roberson
5  pursuant to a Notice of Deposition Deuces
6  Tecum, which was issued in August.  The date
7  was originally set for September 8th, I
8  believe, and then we've reset it since that
9  time to today.
10       Could you please state your name.
11       MS. ROBERSON:  Janet White
12  Roberson.
13       MS. BIBLIN:  And would the
14  reporter swear Ms. Roberson in.
15  WHEREUPON,
16       JANET WHITE ROBERSON
17  was called as a witness and, after having been
18  first duly sworn, was examined and testified
19  as follows:
20       DIRECT EXAMINATION
21    BY MS. BIBLIN:
22  Q    Ms. Roberson, do you still reside

Page 3

## CONTENTS

WITNESS:        DIRECT   CROSS

Janet Roberson

By Ms. Biblin        4

EXHIBITS

NO.     DESCRIPTION        MARK

1   Plaintiff's Initial Disclosures    67

2   Roberson's SF-171            296

Page 5

1  in Alexandria at, what is it, Wooden Valley
2  Court or something like that?
3  A    Yes.
4  Q    Okay.  And are you currently
5  married?
6  A    No.
7  Q    Okay.  Have you been married in
8  the past?
9  A    Yes.
10  Q    How many times?
11  A    Once.
12  Q    And your prior husband's name?
13  A    Joseph Oscar Roberson, III.
14  Q    Okay.  Are you divorced from Mr.
15  Roberson?
16  A    Yes.
17  Q    Okay.  And when was the divorce?
18  A    I think it was finalized in 1996.
19  Q    And how long were you married?
20  A    Twelve years.
21  Q    And are there any children of that
22  marriage?

Page 6

1    A    Yes.
2    Q    And what is her name?
3    A    Megan Welsh Roberson.
4    Q    And do you have any other
5 children?
6    A    No.
7    Q    How old is your daughter, Megan?
8    A    Twenty.
9    Q    And is she attending a school?
10    A    Yes.
11    Q    Where?
12    A    She's currently in a Study Abroad
13 program with Boston University in London.
14    Q    And is that her normal -- the
15 school that she's intending to graduate from,
16 or is she going to another school?
17    A    Her home school is the College of
18 William and Mary.
19    Q    In Virginia?
20    A    In Williamsburg, Virginia.
21    Q    Okay.  And when is she expected to
22 graduate?

Page 7

1    A    2008.
2    Q    And that would be in May or June?
3    A    Yes.
4    Q    Okay.  The normal education
5 schedule.  Did she graduate high school?
6    A    Yes.
7    Q    Where, and when did she graduate?
8    A    She went to St. Stephen's and St.
9 Agnes School.
10    Q    In Alexandria?
11    A    In Alexandria.  She graduated
12 2004.
13    Q    And from which school did she
14 graduate?
15    A    St. Stephen's and St. Agnes.
16    Q    Oh, it's combined?
17    A    Yes.
18    Q    When did she start her education
19 at the College of William and Mary?
20    A    The fall of 2005.
21    Q    MS. Roberson, did you read
22 anything to prepare for the deposition today?

Page 8

1    A    No.
2    Q    I'd like to go over your
3 educational background, and let's start with
4 high school.  Where did you attend high
5 school, and when did you graduate?
6    A    I graduated in 1968 from North
7 Hagerstown High School.
8    Q    And is that in Maryland?
9    A    That is in Maryland.
10    Q    Is that where you grew up?
11    A    Yes.
12    Q    Do you have any siblings?
13    A    Yes.
14    Q    That are alive?
15    A    Yes.
16    Q    And could you name them, please?
17    A    Bruce Edward Styers.
18    Q    How do you spell Styers?
19    A    S-T-Y-E-R-S.
20    Q    And how old is he?
21    A    Fifty-three.
22    Q    And are there any other siblings?

Page 9

1    A    No.
2    Q    And where is Mr. Styers,
3 presently?
4    A    I think the name of the town is
5 Newburg.
6    Q    What state?
7    A    Pennsylvania.
8    Q    And what does Mr. Styers do?
9    A    He is a computer specialist with
10 the Army.
11    Q    Does your ex-husband, Mr.
12 Roberson, live nearby?
13    A    Yes.
14    Q    Where is he located?
15    A    He is Alexandria, Virginia.
16    Q    Is he remarried?
17    A    I'm not sure I understand your
18 question.
19    Q    Is he remarried to someone else?
20    A    He's currently single.
21    Q    Okay.  And how would you describe
22 his relationship with your daughter?

Page 10

1    A    Very positive.
2    Q    So they see each other on a
3    regular basis?
4    A    Yes.
5    Q    How would you characterize your
6    relationship with your ex-husband?
7    A    Very positive.
8    Q    Now resuming to your educational
9    background, where did you go to college?
10   A    Dickinson College.
11   Q    In Pennsylvania?
12   A    Yes.
13   Q    And when did you graduate?
14   A    1972.
15   Q    What was your major course of
16   study at Dickinson?
17   A    I had a double major in English
18   and Theater.
19   Q    So what degree did you attain
20   there?
21   A    Bachelor of Arts.
22   Q    In the course of your study at

Page 11

1    Dickinson College in English and Theater, did
2    you take any courses in Information
3    Technology, or did that exist back then?
4    A    The college did not offer courses
5    in that study, in that area.
6    Q    Okay.  I only say that because I
7    graduated around the same time, and I know we
8    didn't have it very much either.  Did you take
9    any other graduate courses after you attended
10   Dickinson?
11   A    Yes.
12   Q    Where did you attend?
13   A    I have two graduate degrees, one
14   from Catholic University.
15   Q    And when did you attain that
16   degree?
17   A    I think it was either 1976 or
18   1977.
19   Q    And you said you had another
20   graduate degree?
21   A    From American University.
22   Q    And when was that?

Page 12

1    A    1979.
2    Q    Okay.  Let's start with Catholic
3    University, what degree did you attain there,
4    and what was the area of study?
5    A    My degree is a Master of Science
6    in Library Science, and Library Science was my
7    main course of study.
8    Q    Okay.  And what about at American
9    University in 1979?
10   A    I have a Masters of Public
11   Administration.  That was my major area of
12   study.
13   Q    And that was from American
14   University?
15   A    Yes.
16   Q    What did you do between your
17   degree in the Master of Science and Library
18   Science at Catholic, and your attending
19   American University?  Did you work during that
20   time?
21   A    Yes.
22   Q    Where did you work?

Page 13

1    A    Are you asking for the period of
2    time between when I graduated from Catholic
3    and when I graduated from American?
4    Q    Yes.
5    A    I worked for the Montgomery County
6    Public Library system.
7    Q    Was that a full-time job?
8    A    Yes.
9    Q    Did you have any other jobs in the
10   area of Library Science in your early career?
11   A    I only worked in Library Science
12   with Montgomery County Public Libraries.
13   Q    And what were the dates when you
14   worked there?
15   A    I think 1973 to 1978.
16   Q    And was it full-time that entire
17   time?
18   A    Yes.
19   Q    So you were going to school,
20   getting your degree in Library Science, while
21   you were working at the Montgomery County
22   Public Library?

**Page 14**

1    A    That's correct.

2    Q    Prior to 1973, did you have other

3    jobs?

4    A    **Yes.**

5    Q    What were you doing prior to 1973?

6    A    **Are you asking about full-time**

7    **jobs, part-time?**

8    Q    Any kind of job.

9    A    **From starting at what time?**

10   Q    Any time prior to 1973. You

11   indicated you graduated college in `72. Why

12   don't we start with while you were in college.

13   A    **While I was in college, I worked**

14   **for the Washington County Board of Education.**

15   Q    What did you do for them?

16   A    **I was a secretary.**

17   Q    Okay. When were you doing that?

18   A    **In the summers. I think the**

19   **summer of `68, `69, and `70. Yes.**

20   Q    Okay. Did you have any other jobs

21   while you were in college?

22   A    **Yes. I worked at a shoe store**

**Page 15**

1    **during my senior year.**

2    Q    Where was the shoe store?

3    A    **I don't remember. I mean, it was -**

4    **-**

5    Q    Remember the state?

6    A    **Oh, it was in Carlisle,**

7    **Pennsylvania.**

8    Q    Okay. Where the college was?

9    A    **I don't remember the name of the**

10   **shoe store.**

11   Q    And were you in sales at the shoe

12   store?

13   A    **Yes.**

14   Q    Okay. Subsequent to your -- was

15   that all the jobs that you did during your

16   college years?

17   A    **Yes.**

18   Q    Okay. And subsequent to

19   graduating in 1972, what was your next job?

20   A    **Well, I didn't -- yes, I missed**

21   **one. The summer of 1971, while I was still in**

22   **college, I worked for the National Park**

**Page 16**

1    Service.

2    Q    And what did you do for them?

3    A    **I was a park aide.**

4    Q    What does that involve?

5    A    **It involves clerical work, working**

6    **in the Visitor Center, contact with the**

7    **public.**

8    Q    Was there any special training for

9    that job?

10   A    **No.**

11   Q    Have we exhausted the jobs that

12   you had prior to your graduation from college?

13       MR. SHAPIRO: In college. You

14   didn't touch on what she might have been doing

15   in high school, but you wanted in college, so

16   prior to the graduation from college, but just

17   in college.

18       MS. BIBLIN: Yes, I understand.

19       MR. SHAPIRO: Okay.

20       MS. BIBLIN: That's okay.

21       THE WITNESS: Yes.

22       BY MS. BIBLIN:

**Page 17**

1    Q    Was there anything significant

2    about your high school education that you feel

3    is worth noting about in terms of your jobs in

4    high school?

5    A    **No.**

6    Q    Did you have jobs in high school?

7    A    **Babysitting.**

8    Q    Now subsequent to graduating from

9    Dickinson College in 1972, what was your next

10   employment?

11   A    **National Park Service.**

12   Q    That was the park aide job?

13   A    **Yes.**

14   Q    Or was there a second job?

15   A    **I worked as a park aide with the**

16   **National Park Service for two summers.**

17   Q    Okay.

18   A    **The summer of 1971 and the summer**

19   **of 1972.**

20   Q    Okay. And subsequent to that,

21   what was your next place of employment?

22   A    **I worked for the American**

Page 18

1  **Enterprise Institute for Public Policy**
2  **Research.**
3      Q    When did you do that?
4      **A    From 1972 to 1973.**
5      Q    And what did you do there?
6      **A    I was a personal assistant to**
7  **Samuel Crutchfield.**
8      Q    Who is that?
9      **A    He was in charge of**
10  **administration, and some research activities**
11  **for the American Enterprise Institute.**
12      Q    And as a personal assistant, what
13  were your job duties?
14      **A    They were pretty wide-ranging,**
15  **from clerical work and getting coffee and**
16  **donuts for people, to going up to Capitol Hill**
17  **and attending hearings.  I attended a lot of**
18  **the Rules of Evidence hearings for Mr.**
19  **Crutchfield, and took notes, and prepared**
20  **documents for him.**
21      Q    You said the Rules of Evidence
22  hearings?

Page 19

1      **A    Yes.**
2      Q    You mean for the Federal Rules of
3  Evidence?
4      **A    Yes.**
5      Q    So you took notes for him, and
6  brought them back to the office?
7      **A    Yes.  And I also helped them with**
8  **events when they brought speakers into the**
9  **institute.**
10      Q    What did you do in terms of the
11  events? I'm sorry for interrupting.
12      **A    I would make sure things were**
13  **organized, and that the coffee was there, and**
14  **that the speaker arrived and knew where to go,**
15  **things of that nature.**
16      Q    So it was mostly administrative
17  tasks.
18      **A    Yes.**
19      Q    Okay.  You said you were there
20  from 1972 to 1973.  Did you ever do anything
21  in the theater subsequent to your degree at
22  Dickinson?

Page 20

1      **A    I was a volunteer usher at Wolf**
2  **Trap.**
3      Q    When did you do that?
4      **A    1972-73.**
5      Q    Okay.  And that would be the
6  extent of your theater-related experience in
7  your career?
8      **A    Yes.**
9      Q    Okay.  Why did you leave the job
10  at the American Enterprise Institute in 1973?
11      **A    My boss left.**
12      Q    Okay.
13      **A    And he offered me a job at his new**
14  **assignment, but at that point, I decided to go**
15  **to graduate school.**
16      Q    Okay.  And what was his new
17  assignment?
18      **A    It was with the Postal Rate Board.**
19      Q    What job did he offer you?
20      **A    Personal Assistant.**
21      Q    What made you decide to get a
22  degree in Library Science?

Page 21

1      **A    I went back to Dickinson College**
2  **for an event and talked to some of my**
3  **professors, and I was encouraged to go on to**
4  **graduate school.**
5      Q    But why in that particular field
6  of Library Science?
7      **A    Because it was interesting to me.**
8      Q    What is it about Library Science
9  that is interesting to you, or was at the
10  time?
11      **A    I love the world of books.**
12      Q    I can appreciate that.  Was there
13  anything about the research aspect of it, at
14  all, that was attractive to you, or was it
15  just simply because you liked working in
16  books?
17      **A    Just all aspects of that**
18  **particular occupation were appealing.**
19      Q    When you worked at the Montgomery
20  County Public Library from 1973 to 1978, what
21  did you do there?
22      **A    I started as a library clerk, and**

Page 22

1  **I was promoted twice to Librarian-1, and then**
2  **to a Librarian-2 position.**
3      Q    When you were a Librarian-1, that
4  was prior to getting a degree in Library
5  Science.  Is that correct?
6      A    **No, that was subsequent to my**
7  **degree.**
8      Q    Okay.  You said you got your
9  degree in Library Science in 1977.  Correct?
10  At Catholic University?
11      A    **I did get the Librarian-1.  I**
12  **hadn't recall that.  I did get the Librarian-1**
13  **position before I got my degree.  I got it**
14  **while I was in graduate school.**
15      Q    Okay.  So you were -- when you
16  started at Montgomery County Public Library --
17  let's go back for a second.
18          From 1972 to `73 you worked for
19  the American Enterprise Institute.  You
20  indicated you left there when your boss left,
21  and you had decided to go to graduate school.
22  According to your prior testimony, you didn't

Page 23

1  go to graduate school until 1976.
2      A    **No.**
3      Q    You said you got your degree in
4  Library Science - oh, did you start it earlier
5  than 1976?
6      A    **No, I didn't state, I don't**
7  **believe, when I started my graduate studies.**
8      Q    Okay.
9      A    **I went to school at night, and I**
10  **think it took me about two and a half years.**
11      Q    Okay.  So you started in 1973?
12      A    **I don't remember exactly when I**
13  **started.**
14      Q    Do you remember if you started
15  your degree prior to, or concurrent with
16  working at the Montgomery County Public
17  Library?
18      A    **I started it sometime after I**
19  **began my library job. I just don't remember**
20  **exactly when.**
21      Q    Okay.  So you were working for the
22  library, and at the same time going to school

Page 24

1  to get a degree in Library Science.
2      A    **That's correct.**
3      Q    Was your first job at the library
4  a librarian job, or did you do other tasks?
5      A    **No, my first job was a library**
6  **clerk position.**
7      Q    Okay.
8      A    **Because I had no experience.**
9      Q    Okay.  And how long were you in
10  that position?
11      A    **A year, two years, I don't**
12  **remember.**
13      Q    Okay.  And then how did it come
14  about that you moved on to a Librarian-1
15  position?
16      A    **I applied for a job, and I**
17  **interviewed, and I was offered a job.**
18      Q    At the same library?
19      A    **In the same library system.**
20      Q    Different library branch?
21      A    **Actually, I moved from a branch**
22  **library to headquarters.**

Page 25

1      Q    Okay.  Where was headquarters, in
2  Rockville?
3      A    **In Rockville, Maryland.**
4      Q    Okay. So you said you then --
5  around what year was it that you were
6  selected for this job as a Librarian-1?
7      A    **I don't remember.**
8      Q    Okay.  And then you say you moved
9  to a Librarian-2 position?
10      A    **Yes.**
11      Q    Was that another competitive job
12  that you were selected for?
13      A    **Yes, it was competitive.**
14      Q    Okay. And when was that, sometime
15  before 1978?
16      A    **Yes.**
17      Q    Okay.  And was it while you were
18  still at the university, at Catholic, or had
19  you already graduated?
20      A    **Are you asking me if I --**
21      Q    Became a Librarian-2 prior to
22  graduating with your degree in Library Science

Page 26

1  from Catholic? I'm trying just to get a
2  relative perspective of your job.
3      A    I don't remember.
4      Q    Okay.  And when you stopped
5  working at the Montgomery County Public
6  Library system in 1978, was that the highest
7  level you had achieved there as Librarian-2?
8      A    Yes.
9      Q    Why did you leave the Montgomery
10 County Public Library system as a librarian?
11     A    I decided that I wanted to embark
12 on a different career path.
13     Q    And what was that?
14     A    I decided that I wanted to move
15 into management.
16     Q    What type of management?
17     A    Initially, I was thinking about
18 library management because one of my
19 professors at Catholic University, who worked
20 at the Library of Congress, encouraged me to
21 move into that field.  But he also encouraged
22 me not to take any more classes in the Library

Page 27

1  Science Department, but to consider going to
2  school at either George Washington or American
3  University and taking management courses at
4  one of those schools.  So initially, I thought
5  I'd take some management classes, and perhaps
6  stay in the library field.
7      Q    Did that change later on as you
8  were going through the school to come to a
9  different idea of where your goals were?
10     A    Yes.  After I started school at
11 American, I decided that I was very interested
12 in pursuing a job with either state, local, or
13 federal government.
14     Q    And a job in government, are you
15 saying that would not include Library Science?
16 Just any type of job?
17     A    Yes.
18     Q    Okay.  What made you switch from
19 the Library Science area to generally
20 government?
21     A    I took, I think it was called the
22 PACE exam at the time, and I had a very high

Page 28

1  score on it, and I was offered a job by the
2  Navy.
3      Q    And this is while you were in
4  graduate school?
5      A    At American University.
6      Q    Okay.  Do you know approximately
7  when that was?
8      A    It was in 1978, in the summer.
9      Q    Okay.
10     A    And I believe I started working in
11 the early fall.
12     Q    Started working where?
13     A    For the U.S. Navy.
14     Q    On your service history, it
15 indicates you started working for the Navy
16 September 27th, 1978.  Does that sound right
17 to you?
18     A    That does sound correct.
19     Q    Okay.  And that's the job you were
20 referring to just now, when you said after you
21 took the Pace exam, you got a job with the
22 U.S. Navy.

Page 29

1      A    That's correct.
2      Q    Okay.  What was your first job
3  with the U.S. Navy?
4      A    I think the title might have been
5  Personnel Specialist.
6      Q    And what did that involve?
7      A    I worked in staffing and
8  classification, personnel staffing and
9  classification.
10     Q    Now were you doing this
11 simultaneously or concurrently with pursuing
12 your  graduate degree at American University?
13     A    Yes.
14     Q    Okay.  So were you working full
15 time?
16     A    Yes.
17     Q    And were you attending school
18 during the day or at night, or how were you
19 doing that?
20     A    I was attending school at night.
21     Q    Okay.
22     A    And sometimes on the weekends.

Page 30

1    Q    Okay.  Approximately how long did
2  it take for you to complete your Masters in
3  Public Administration at American?
4      A    I think about two years.
5    Q    So would it be accurate to state
6  you started that in 1977, or did you start
7  that in 1978?
8      A    I don't remember.
9    Q    Okay.  You indicated you graduated
10 in 1979.  You're certain that was the year you
11 graduated?
12     A    It was either the very end of `79,
13 or the beginning of `80.
14    Q    Now going back to your degree in
15 Library Science at Catholic University, while
16 you were there, did you take any courses in
17 Computer Science or computer-related activity
18 and research?
19     A    I don't remember.
20    Q    Okay.  When you were at American
21 University getting your Masters in Public
22 Administration, did you take any courses that

Page 31

1  were in information technology?
2      A    I don't remember.
3    Q    And any courses in any type of
4  other Computer Science?
5      A    I don't remember.
6    Q    What was the focus of your course
7  work during your degree, getting the Masters
8  of Public Administration?
9      A    It was a general, fairly general
10 course of study. It touched on many areas,
11 Political Science, Administrative Law,
12 Management.  It's a variety of classes.  I
13 wouldn't say that any of them were --
14 Statistics.  I took two Statistics courses
15 there.  I don't recall that it was
16 specifically aimed toward a specialization.
17    Q    Would it be fair to characterize
18 it as a general management type of degree?
19     A    Yes.
20    Q    What is your understanding of how
21 the degree in Public Administration at
22 American compares to something like a Masters

Page 32

1  of Business Administration?
2      A    I have no frame of reference.
3    Q    Okay.  So you don't know how they
4  compare.
5      A    No.
6    Q    You indicated that a former
7  professor from Dickinson, who was a professor,
8  or excuse me, was working at the Library of
9  Congress, had recommended you to get the
10 Public Administration degree.
11     A    No, that's not correct.
12    Q    Okay.
13     A    The professor who made that
14 recommendation to me was one of my professors
15 at Catholic University.
16    Q    Oh, excuse me.  Was he the one
17 that also worked at the Library of Congress?
18     A    That's correct.
19    Q    Okay.  What was his name?
20     A    Kurt Cylke.
21    Q    How do you spell the last name?
22     A    C-Y-L-K-E.

Page 33

1    Q    Okay.  And what did he do at the
2  Library of Congress?
3      A    He was in charge of the library's
4  program for hearing impaired, and I think
5  perhaps that group also encompassed - yes, it
6  was the blind and hearing impaired.
7    Q    Did he encourage you to apply for
8  any jobs at Library of Congress at the time?
9      A    I don't recall.
10    Q    Did you ever apply for jobs at
11 Library of Congress?
12     A    I don't recall ever applying for a
13 job there.  It was never really an area of
14 interest.
15    Q    Even when you were going to school
16 at Catholic?
17     A    I never considered a job there,
18 that I can recall.
19    Q    And when you were having the
20 discussions with Mr. Cylke about going to get
21 a degree in Public Administration, was there
22 any -- do you have any recollection of why you

Page 34

1  chose Public Administration versus Business
2  Administration in the course of those
3  discussions?  Was there any discussion of a
4  comparison between the two, for example?
5      **A    Well, typically, I was still kind**
6  **of oriented toward, perhaps, working in**
7  **Library Management, and typically, libraries**
8  **are non-profit, so it didn't occur to me to**
9  **seek a business degree.**
10     Q    Well, the non-profit aspect
11  wouldn't be the issue there?  Would it matter?
12         MR. SHAPIRO:  Well, wait a minute.
13  You're asking her to think back why she did
14  things.  She answered why.  It's not a
15  debatable point.  She's giving you a factual
16  answer as best as her recollection.  I mean,
17  I don't know what this line of questioning is
18  about.  I don't care what it's about, but it's
19  just questions and answers.  Right?  Not a
20  debate.
21         MS. BIBLIN:  I was starting to ask
22  her a question.

Page 35

1         MR. SHAPIRO:  I'm not sure you
2  were.  What I heard was - well, isn't it so,
3  such and such.  She's giving you an answer
4  about things that happened 20 years ago.
5         MS. BIBLIN:  So what's your
6  objection, Mr. Shapiro?
7         MR. SHAPIRO:  I mean, well,
8  relevance, number one.  But two, ask a
9  question, not a debate.  This is not a debate.
10  It's questions, questions/answers,
11  questions/answers.  That's my objection.
12         MS. BIBLIN:  Okay.
13         BY MS. BIBLIN:
14     Q    Is it your understanding that if
15  you want to work for "a not-for-profit
16  organization", that an MBA would not be
17  appropriate?
18     **A    I never gave any consideration to**
19  **any of the issues you're raising.**
20     Q    Okay.  Is the issue for you at the
21  time that the library was a government agency,
22  as opposed to a not-for-profit?

Page 36

1      **A    Well, it had been my experience,**
2  **working for Montgomery County Public Libraries**
3  **to work for County government, that that was**
4  **really my frame of reference.**
5      Q    Okay.  So it was really more the
6  fact that it was government, and not that it
7  wasn't profitable.  Would that be accurate?
8  That helped you determine that you were going
9  for the Public Administration degree, rather
10  than the MBA?
11         MR. SHAPIRO:  Objection.  You've
12  morphed not-for-profit, which is an
13  organization, to not profitable, which is a
14  different concept entirely.  Now if this is a
15  trick question, why don't you put your cards
16  on the table.  If it's not, then let's get the
17  terms right.
18         MS. BIBLIN:  Was that an
19  objection?
20         MR. SHAPIRO:  Yes.
21         MS. BIBLIN:  To the form of the
22  question?

Page 37

1         MR. SHAPIRO:  Yes.
2         MS. BIBLIN:  Then I'll ask you to
3  phrase it that way.
4         MR. SHAPIRO:  You could ask.
5         BY MS. BIBLIN:
6      Q    Ms. Roberson, was the issue for
7  you, in pursuing the Public Administration
8  degree, as opposed to Business Administration,
9  that you were interested in working in the
10  area of Library Science at the time in some
11  sort of library management, which would be in
12  the area of government?
13         MR. SHAPIRO:  Objection to the use
14  of the term "issue".  There's been no
15  determination that she had an issue.
16         MS. BIBLIN:  Can you answer the
17  question?
18         THE WITNESS:  Would you repeat the
19  question, please.
20         MS. BIBLIN:  Would you read-back
21  the question?
22         COURT REPORTER:  Certainly.

Page 38

1      (Playback.)
2      THE WITNESS: I really don't
3  understand your question.
4      MS. BIBLIN: I'm just trying to
5  understand your motivation, Ms. Roberson, for
6  pursuing Public Administration, as opposed to
7  Business.
8      THE WITNESS: Well, I didn't compare
9  options, so I didn't look at going to business
10 school. I didn't look to going to med school
11 or law school, I just chose to go to a
12 university offering a course of study in
13 Public Administration.
14     BY MS. BIBLIN:
15     Q   Okay. And you indicated previously
16 that it was your intent when you initially
17 started that degree to pursue a degree, or to
18 pursue a career in Library Management, at the
19 time, but that changed.
20     **A   That's correct.**
21     Q   Okay. I'm going to switch gears for
22 a moment. Did you make any efforts to locate

Page 39

1  the documents that were requested by the FDIC
2  that were listed in your initial disclosures
3  in this case?
4      **A   I'm not sure I understand your**
5  **question.**
6      Q   Okay. I made a request to your
7  attorney last Monday to locate the documents
8  that you were relying on indicated in your
9  initial disclosures, the documents on which
10 you relied, and I asked to get your copy of
11 them. Were you asked to locate any of these
12 by your attorney?
13     **A   I need a point of clarification.**
14 **When you talk about disclosure, what document**
15 **are you talking about?**
16     Q   I'm talking about Plaintiff's
17 Initial Disclosure. Let the record reflect
18 I'm showing you a copy of a pleading that was
19 filed on your behalf in June of 2006 in this
20 case.
21     **A   Yes.**
22     Q   It would be the document that

Page 40

1  indicates the testimony on which you intend to
2  rely for your case, and the documents that you
3  believe are -- documents you'd rely on.
4      MR. SHAPIRO: I don't think that's
5  what initial disclosures are.
6      MS. BIBLIN: Okay. In any event,
7  you understand what the document is I'm
8  referring to.
9      THE WITNESS: Yes.
10     BY MS. BIBLIN:
11     Q   Did you make any attempt to locate
12 these documents prior to today?
13     **A   My attorney requested - conveyed**
14 **your request to me yesterday morning, when I**
15 **was at the office, and the documents that are**
16 **listed in the document you just showed to me**
17 **are at my home.**
18     Q   All of them?
19     **A   All of them, so I was not able to**
20 **really even get to the documents to start**
21 **finding what you were requesting until late**
22 **last night.**

Page 41

1      MR. SHAPIRO: But we do have one.
2      MS. BIBLIN: Okay.
3      MR. SHAPIRO: I'd like a copy of it.
4  You said to bring it whether we copied it or
5  not, you said you would copy it, so here it
6  is. You'll make a copy for me, I'm sure.
7      MS. BIBLIN: Let the record reflect
8  that Mr. Shapiro has produced for me a copy of
9  the noveletta, Why Government Is Not Perfect,
10 by Frip Chissom.
11     MR. SHAPIRO: Well, that was one of
12 the documents that you specified in the email
13 that you sent me last Friday.
14     MS. BIBLIN: I have no question
15 pending to you, Mr. Shapiro.
16     MR. SHAPIRO: No, no, I understand,
17 but I'm just saying - well, that's right. And
18 you made a statement on the record about what
19 I provided you, and I'm going to make a
20 statement saying on Friday evening at 7:15,
21 this past Friday evening, I received from
22 counsel an email containing documents that she

Page 42

1  would like produced as soon as possible from
2  the list of documents, apparently given in the
3  initial disclosures. And most of those
4  documents was the document that I just handed
5  her, which is called Why Government Is Not
6  Perfect: The Memoirs of A Government
7  Bureaucrat, by Frip Chissom. And my client
8  looked for these documents, all of them, and
9  this is what she provided me this morning, so
10 I'm giving it you. And you told me yesterday
11 that you would be delighted to copy them. In
12 fact, you said that on Friday, as well, that
13 you'd be delighted to copy them, and you may
14 not even want to copy them, you may just want
15 to just take a look at what she has, so here's
16 one.
17      MS. BIBLIN: And, Mr. Shapiro, I'm
18 going to ask Ms. Roberson a question.
19      BY MS. BIBLIN:
20   Q   Did Mr. Shapiro convey to you that
21 on Monday, September 25th, I asked him to
22 produce a copy of all of Ms. Roberson's copies

Page 43

1  of the documents she listed in her initial
2  disclosures prior to the deposition? Did he
3  ever convey that to you?
4      MR. SHAPIRO: She's not going to
5  answer that question. She's not going to tell
6  you what my discussions with her are. It's a
7  privileged communication, and she's not going
8  to discuss that.
9      MS. BIBLIN: I understand that.
10     MR. SHAPIRO: Okay, good. Then
11 don't ask questions like that, if you
12 understand, unless you're trying to be
13 particularly shifty and tricky. I mean, if you
14 are, just tell us, and we'll --
15     MS. BIBLIN: I really resent your
16 characterization here, Mr. Shapiro.
17     MR. SHAPIRO: Well, why would you
18 ask a question like that, Dina, really. I
19 mean, you know it's privileged, did your
20 attorney tell you. Well, come on.
21     MS. BIBLIN: The record will reflect
22 that she previously stated the first time she

Page 44

1  was requested to locate these documents was
2  yesterday.
3      MR. SHAPIRO: Yes, yes.
4      MS. BIBLIN: And on Monday,
5  September 25th, 2006, I requested from you a
6  set of her documents listed in the initial
7  disclosures, and I asked for them prior to the
8  deposition, so that was --
9      MR. SHAPIRO: Eight days ago.
10     MS. BIBLIN: -- more recently than
11 yesterday.
12     MR. SHAPIRO: Yes, eight days ago.
13 We were both out - you and I were both out for
14 a holiday on Monday, a religious holiday.
15     MS. BIBLIN: We're not going to have
16 the argument here.
17     MR. SHAPIRO: I'm not arguing
18 anything. I'm just saying --
19     MS. BIBLIN: Okay. Then there's no
20 reason for you to be talking. Let's move on.
21     MR. SHAPIRO: Well, that's why I
22 asked her yesterday, which is what I said in

Page 45

1  our conversation, and what I think our emails
2  reflect, that I was going to talk to her
3  Tuesday morning about this.
4      MS. BIBLIN: That would be your
5  characterization, and that's fine.
6      MR. SHAPIRO: Are you going to make
7  a copy of this, by the way, or you don't need
8  it?
9      MS. BIBLIN: I'm not on the record
10 right now. We'll discuss this later.
11     MR. SHAPIRO: I'll take it back.
12 It's my only copy, so I'm asking - you told me
13 you would make a copy. You told me the other
14 day that you may not even need a copy, you may
15 just want to look at it. Do you want to look
16 at it, or do you want to make a copy of it?
17     MS. BIBLIN: David, let's discuss
18 this off the record later.
19     MR. SHAPIRO: Sure.
20     BY MS. BIBLIN:
21   Q   I'm going to go through the list of
22 documents that were requested of you in your

Page 46

1  initial disclosures, Ms. Roberson, and ask you
2  some questions about them.
3       Number one, your recorded session
4  with Carol Dell'Amore, Ph.D., National
5  Leadership Institute, I understand this is a
6  tape?
7       **A   That's correct.**
8       Q   Okay.  And your counsel has
9  indicated that you would be making a copy of
10 that audio tape for us.
11      **A   That's correct.**
12      Q   Okay.  When do you expect that that
13 will be received by us?
14      **A   I need to make arrangements for**
15 **someone to copy it.**
16      Q   Do you know when that will happen?
17      **A   I haven't started that process.**
18      Q   Okay. Do you have an objection to
19 having it copied at the FDIC?
20      **A   That would violate the chain of**
21 **custody.**
22      Q   Oh, okay.  Is that what your

Page 47

1  attorney told you?
2       **A   No, that's --**
3       MS. BIBLIN:  I withdraw that
4  question.
5       BY MS. BIBLIN:
6       Q   You have a document listed,
7  "Complainant's Leadership and 360 Degree
8  Assessment Results", scored by the National
9  Leadership Institute, and interpreted by Carol
10 Dell'Amore.  Is that a written document?
11      **A   Could you ask that question again?**
12      Q   One of the documents you listed was
13 "Complainant's Leadership and 360 Degree
14 Assessment Results, scored by National
15 Leadership Institute, and interpreted by Carol
16 Dell'Amore during coaching session on August
17 5th, 2003.  Is that a written document?
18      **A   There are really two pieces to that.**
19 **There is the actual scored instrument that**
20 **reflects the -- how my peer and subordinates**
21 **rated me for different areas, and the other**
22 **piece to that is Carol Dell'Amore's discussion**

Page 48

1  **of those ratings with me on the recorded tape.**
2       Q   Okay.  So the tape is one of the
3  aspects, and the second item would be a
4  written document.
5       **A   Yes.**
6       Q   Okay.  How long is that written
7  document?
8       **A   Well, it's an evaluation instrument,**
9  **and it's - I believe it's one page.**
10      Q   Oh, okay.
11      **A   She interpreted this one-page**
12 **instrument during our discussion, which was**
13 **taped.**
14      Q   Okay.  And you indicate that this is
15 a document that may be used to support your
16 claims in this litigation.  You understand
17 what that means, right?
18      MR. SHAPIRO:  Why don't you show her
19 the document that you're reading from?  I
20 mean, the disclosures.
21      MS. BIBLIN:  Your document, the
22 disclosures are a list of these documents, Ms.

Page 49

1  Roberson.  And in there, you indicate that
2  these are documents that may be used to
3  support your claims.
4       THE WITNESS:  Okay.
5       BY MS. BIBLIN:
6       Q   Could you explain to me how your
7  recorded sessions with Ms. Amore, or Dr.
8  Amore, and these leadership and assessment
9  results support your claims?
10      **A   One of the ways that it supports my**
11 **claims is that the people who responded to the**
12 **360 evaluation of my management style**
13 **responded very positively.**
14      Q   Were there any of them that
15 responded negatively?
16      **A   No.**
17      Q   Who selected the people that were
18 interviewed by Dr. Amore?
19      **A   Well, she didn't interview anyone.**
20      Q   She selected them for making a
21 contribution or evaluation for you, who
22 selected those?

Page 50

1    A  The process calls for the person
2  who's being evaluated to have their superior,
3  peers, and subordinates respond to a series of
4  questions, and so after some discussion with
5  Glenn Bjorklund, in particular, we agreed that
6  the people would respond to the survey
7  instrument would be people who either were my
8  superiors, peers, or subordinates.
9    Q  And who selected them?
10    A  And the people - we identified the
11  people who fell within those categories, and
12  then Glenn Bjorklund and I agreed to the
13  people who would be responding.
14    Q  So you selected them with an
15  agreement with Mr. Bjorklund?
16    A  Well, the word "select" is kind of
17  misleading, because I didn't select the people
18  who I report to, or who are my peers. It just
19  is.
20    Q  Okay. Was every one of the people
21  that you report to utilized, or was that the
22  broad range from which you could select who

Page 51

1  would respond to this survey?
2    A  Well, I identified the people who
3  fell within those categories.
4    Q  And was every one of the people that
5  you identified surveyed?
6    A  They were all requested to respond
7  to the survey.
8    Q  Okay. And these were all the people
9  that you identified.
10    A  Well, these were their positions of
11  record.
12    Q  Did you identify 100 percent of the
13  people that fell into these definitions that
14  you've just referred to, or a subset of the
15  100 percent of people that fell into that
16  definition?
17    A  I don't --
18    Q  For your 360 degree assessment, you
19  had number one, supervisors. Correct?
20    A  That's correct.
21    Q  Did you identify 100 percent of the
22  people that supervised you, or was there only

Page 52

1  one person that was identified in that group?
2    A  Well, at that point in time, my
3  supervisor of record would have been Vijay
4  Deshpande, because he was the Acting Director
5  of DIRM. However, I never worked for him, so
6  he was eliminated, even though he was on paper
7  my supervisor. He was not included, because
8  I had never worked for him.
9    Q  And since you were working -- were
10  you working for Mr. Peddicord at the time?
11    A  I was working for Tom Peddicord at
12  the time, but I'd only worked for him for a
13  few months.
14    Q  So he was not included, either?
15    A  Well, the program requests that it
16  be people that know you well, and I think the
17  benchmark they have is six months.
18    Q  How long had you known Mr. Peddicord
19  in 2003?
20    A  I had never worked for Tom
21  Peddicord.
22    Q  That's not the question I asked, Ms.

Page 53

1  Roberson. How long had you known Mr.
2  Peddicord in 2003?
3    A  I believe I met him in 1981.
4    Q  Would it be fair to say that he knew
5  you in 2003 longer than six months?
6    A  It would be accurate to state, for
7  the purposes of the exercise, benchmark in the
8  survey, in the survey he was asked to assess
9  my management style. He was not asked to
10  assess what he knew about me personally. He
11  would not have been in a position to assess my
12  management style, because I wasn't serving in
13  a management capacity when I was reporting to
14  him.
15    Q  Did you have anybody respond to the
16  survey that in a supervisory capacity over
17  you?
18    A  Yes.
19    Q  Who?
20    A  Carol Heindel.
21    Q  Okay. But she was not your
22  supervisor at the time.

Page 54

1    A   She was not my supervisor at the
2    time, and she responded as a peer, rather than
3    as a supervisor.
4    Q   Okay.  So you had nobody responding
5    in the capacity, and I say this in quotes, "as
6    a supervisor" for that 360 degree assessment.
7    A   That is correct.
8    Q   Okay.  And would you agree that your
9    knowledge of Mr. Peddicord for the almost 20
10   years prior had been in some degree in a work
11   context, that you had worked with him prior to
12   2003, both at the FDIC, and at the RTC, and at
13   prior jobs?
14   A   Well, we only really worked together
15   at the Department of Housing and Urban
16   Development.
17   Q   And what years were those?
18   A   We worked on a project together in
19   maybe 1981, `82, 83.
20   Q   Okay.  So he had worked with you.
21   A   We had worked as peers, yes.
22   Q   As peers.  And you had also worked

Page 55

1    with him as a peer, or in some capacity, when
2    you were at the RTC.  Wouldn't that be true?
3    A   I really had very little interaction
4    with him at RTC.  We were in very different
5    parts of the organization, and we were
6    geographically separated.
7    Q   Okay.  Now in this leadership, this
8    360 degree assessment result that you did, you
9    said you had peers, supervisors, and there
10   were peers.
11   A   That's correct.
12   Q   How many peers did you select?
13   A   I didn't select.
14   Q   How many peers did you identify?
15   A   Well, at that point in time, I only
16   had - let's see - my peers were Carol Heindel
17   and Michael Bartell, at that point in time.
18   Q   Did you identify those?
19   A   Yes.  But Michael Bartell had only
20   been my peer for a few months, and so he
21   didn't meet the criteria of having known me
22   for a long time, long enough to observe my

Page 56

1    management style.
2    Q   So the only peer that was ultimately
3    selected for this assessment was Carol
4    Heindel.
5    A   I know that Carol -- I asked Carol
6    to respond.  I can't remember whether we asked
7    Mike Bartell to respond or not.  I don't think
8    we did, but I'm not sure.
9    Q   Okay.  Was there anybody other than
10   Carol Heindel who was asked to respond as a
11   peer, other than Mr. Bartell, possibly?
12   A   No.
13   Q   Okay.  And then what were the other
14   definitional categories for your assessment?
15   A   There was one remaining category,
16   and that was people who had a direct reporting
17   relationship to me.
18   Q   Okay.  And who did you identify for
19   that?
20   A   Everyone on the organization chart
21   who had reported to me.
22   Q   At DIRM.

Page 57

1    A   Yes, when I was -- that was my
2    position of record at that time.
3    Q   Everyone.
4    A   Yes.
5    Q   Okay.  And of those, how many, if
6    you know, were actually responding to the
7    survey?
8    A   I know that I sent an email to
9    everyone, but because it's an anonymous
10   response, I know there was one person who did
11   not respond, but because of the anonymity, I
12   don't know who that one person was.
13   Q   Okay.  Now you were indicating that
14   when you went over the names and the list of
15   who was in these definitional groups, you said
16   you discussed those with Glenn Bjorklund?
17   A   That's correct.
18   Q   When you discussed those with Glenn
19   Bjorklund at the time, did you go through the
20   actual names of the people who were going to
21   be asked to respond?  Did you identify the
22   names or just say the group of everybody at

Page 58

1   IT?
2       A   Well, we talked about what the
3   National Leadership Institute process was, and
4   what --
5       Q   I'm asking specifically with respect
6   to identifying the people to do the 360 degree
7   assessment, did you and Mr. Bjorklund go over
8   specific names for the people that worked
9   below you?
10      A   I know that we sent some emails back
11  and forth to each other, because there had
12  been some difficulties with Mr. Torrado, who
13  was originally --
14      Q   But my question again --
15          MR. SHAPIRO:  Well, why don't you
16  let her answer the question.  She's trying --
17          MS. BIBLIN:  She's not answering my
18  question.
19          MR. SHAPIRO:  -- to answer the
20  question, so give her a chance, she'll answer
21  it.  If you don't want her to answer it, just
22  keep interrupting, and she won't answer.  Give

Page 59

1   her a chance.  She's trying to tell you -
2   answer the question.  Do you want an answer?
3   Let her have a chance to answer.
4           MS. BIBLIN:  I want you to stop
5   interrupting.
6           MR. SHAPIRO:  I'm not interrupting.
7   You were interrupting her answer.  Now if you
8   want to hear it played back, you were
9   beginning to interrupt a person who was trying
10  to answer your question.  If you want an
11  answer, let her answer.  If you don't want an
12  answer, interrupt away.
13          BY MS. BIBLIN:
14      Q   The question I'm asking, Ms.
15  Roberson, is did you and Mr. Bjorklund discuss
16  the actual names of the people?
17      A   I don't recall that we had a verbal
18  conversation.  We may have, but I don't recall
19  that.
20      Q   Okay.
21      A   What I recall is that we sent
22  several emails back and forth to each other.

Page 60

1       Q   And in those emails, did you discuss
2   the actual names of these people?
3       A   Yes.
4       Q   And in the course of that, was there
5   a discussion, let's say communication of any
6   type, through email or whatever, about which
7   of the names were going to be used for your
8   360 degree assessment?
9       A   The agreement was that we would use
10  the people who fell into one of the three
11  categories, and met the criteria for
12  responding to the survey instrument.
13      Q   Okay.  So there was no dispute
14  between you and Mr. Bjorklund that the range
15  of people who would be defined as people that
16  worked for you was the group that came from
17  DIRM.
18      A   That's correct.
19      Q   So you both agreed with that.
20      A   There was no dispute.
21      Q   Okay.  Now a third item on your
22  list, the memorandum to Arlese Kea regarding -

Page 61

1   this is the OIG "Distribution of Executive
2   Pay" information.  Is this the document that
3   we provided to you relating to the 2004
4   management inquiry?
5       A   I'm not sure what this document is.
6       Q   Okay.  But you have a copy of it at
7   home.  Is that correct?
8       A   I think I know which document this
9   is.  I believe this is the document that Russ
10  Rowe sent to Arlese Upton Kea in response to
11  her request to investigate whether I had sent
12  an email and a spreadsheet to Martha Solt.
13      Q   Yes.  This is regarding the 2004
14  management inquiry.  And my question is, is
15  this a copy that the FDIC provided to you?
16      A   Yes.
17      Q   Okay.  Now the next document that's
18  on the list is "FDIC Information Security -
19  improvements made, but weaknesses remain,
20  report to the Board of Directors for the GAO,
21  July 2002."
22          MR. SHAPIRO:  This is not the

Page 62

1  documents that you sent to me, that I sent on
2  to her.
3       MS. BIBLIN: I'm asking a question,
4  Mr. Shapiro.
5       MR. SHAPIRO: Well, you said the
6  list. You're saying the list, the list that
7  I thought you were using was the list you sent
8  to me.
9       MS. BIBLIN: I'm going through a
10  list, as I stated earlier, of everything
11  that's in your initial disclosures.
12       MR. SHAPIRO: Ahh, this is not the
13  list then that you sent to me on Friday
14  evening that you wanted today. Okay. Fine.
15  Sorry, using the wrong list. Apologize, was
16  confused. Will you give us a copy of that so
17  we can follow along?
18       MS. BIBLIN: No.
19       MR. SHAPIRO: Ahh, okay.
20       MS. BIBLIN: This is your document.
21       MR. SHAPIRO: Listen carefully to
22  what she says then, because we don't have it

Page 63

1  in writing in front of us.
2       BY MS. BIBLIN:
3       Q  Mr. Roberson, this is the GAO
4  Report, July 2002, on FDIC Information and
5  Security. Did you get that off of the GAO
6  website, or from some other source?
7       A  I believe from the GAO website.
8       Q  Okay. And do you know what that has
9  to do with your claim in this litigation?
10       A  Could you repeat the name of the
11  document again?
12       Q  "FDIC Information Security -
13  improvements made but weaknesses remain, July
14  2002." So this is a report to the Board of
15  Directors.
16       A  And it's July, 2002.
17       Q  Correct.
18       A  I believe in that document the GAO
19  noted that although there was a reportable
20  condition, that there had been improvements
21  since their last audit.
22       Q  Okay. And the relevance to your

Page 64

1  claim is what?
2       A  That during my tenure as the Deputy
3  for Information Technology Management, I made
4  improvements in the security area.
5       Q  Okay. You also referenced in your
6  initial disclosures a June, 2003 GAO report to
7  the Board of Directors at FDIC, called "FDIC
8  Information Security - progress made, but
9  existing weaknesses place data at risk."
10       A  Yes.
11       Q  Did you receive that from the GAO
12  website?
13       A  I believe I did.
14       Q  Okay. What is your explanation of
15  how this supports your claims?
16       A  During 2002, I made significant
17  progress in the area of information security,
18  and there were a lot of issues that needed to
19  be resolved. However, it became increasingly
20  challenging during the fall of 2002 to
21  maintain the momentum, because the - well, I'm
22  not sure who made the decision - but, at any

Page 65

1  rate, a team was formed to look at information
2  security with the goal of eliminating a
3  reportable condition for the 2002 audit.
4  Although the team was well rewarded for its
5  efforts, and the team leader received the
6  Chairman's Award in 2003, nevertheless, the
7  GAO determined that a reportable condition
8  continued to exist.
9       Q  The next document you list in your
10  initial disclosures was a March, 2003 GAO
11  report to Congress, called "Financial Audit -
12  FDIC Funds - 2002 and 2001 Financial
13  Statements." What is the significance of this
14  with respect to your claims in this
15  litigation?
16       A  I believe, although I'd have to
17  reference the document because there are so
18  many, but I believe, again, this document
19  reflects the progress that was made in the
20  security area during my tenure in DIRM.
21       MS. BIBLIN: This is a good time to
22  take a short break, if we could. And I think

Page 66

1  what I'm going to do to make this go a little
2  faster is to copy the list of these documents
3  for you so we can continue with this.
4      MR. SHAPIRO:  This is on the record.
5  Yes?
6      MS. BIBLIN:  Yes, it is.
7      MR. SHAPIRO:  Thank you.  And would
8  you like to make a copy of this?
9      MS. BIBLIN:  Not right this moment.
10     MR. SHAPIRO:  Okay.  This, being the
11 document, the "Why Government Is Not Perfect."
12     MS. BIBLIN:  Why don't we take - is
13 five minutes enough?
14     MR. SHAPIRO:  I didn't ask for the
15 break.  If you want a break, five minutes is
16 satisfactory to you, it's satisfactory to us.
17     MS. BIBLIN:  Five minutes.  Okay.
18     (Whereupon, the proceedings went off
19 the record at 10:42:45 a.m. and went back on
20 the record at 10:52:22 a.m.)
21     MS. BIBLIN:  I'd like the record to
22 reflect that over the break I made a copy of

Page 67

1  pages 34-37 of the Plaintiff's Initial
2  Disclosures in this case, and they've been
3  marked as Exhibit 1 for this deposition.  And
4  a copy is now before Ms. Roberson and her
5  counsel.
6      (Whereupon, Exhibit No. 1 was
7          marked for identification.)
8      BY MS. BIBLIN:
9      Q    Okay.  Referring to the top of the
10 list on page 34 of Exhibit 1, do you recognize
11 what that document is, "Information
12 Security/Information System Controls"?
13     A    I believe that that would be the
14 GAO's report for the 2003 audit.
15     Q    Okay. So that was as of May, 2004.
16     A    Yes.  They issue the report the year
17 subsequent to the audit year.
18     Q    Okay.  And you received this from
19 the GAO website, or did you receive it from
20 another source?
21     A    I believe I probably got that from
22 the GAO website.

Page 68

1      Q    Okay.  And, again, how does this
2  relate to your claims?
3      A    When the GAO did their 2003 audit,
4  which occurred after I had been detailed to
5  the Division of Finance, a significant amount
6  of money had been allocated to the
7  corporation's information security program.
8  The security chief had been permitted to hire
9  people, in addition to what he had had in the
10 previous year.  I guess to summarize,
11 significant resources had been allocated to
12 the security area in order to eliminate a
13 reportable condition.
14     Also, the Vice Chairman for the
15 FDIC, John Reich, convened regular meetings
16 with the COO, John Bovenzi, and the CFO, Steve
17 App, and the people in the Division of
18 Information Resources Management to try to get
19 the security program to a place where there
20 would no longer be a reportable condition.
21 However, their efforts failed, and in 2003 the
22 GAO determined that once again, the

Page 69

1  corporation had a reportable condition, and
2  the people associated with that reportable
3  condition were rewarded, despite their
4  failure.
5      Q    Okay.  The report itself doesn't
6  talk about rewards to these individuals, does
7  it?  It just talks about the reportable
8  condition.
9      A    It talks about the fact that there
10 continued to be a reportable condition.
11     Q    Okay.  But it doesn't refer to the
12 rewards of the people.  Is that correct?
13     A    Not to my recollection.
14     Q    Okay.  Now the next document on the
15 list, "Financial Audit for the FDIC Funds,
16 2003 and 2002 Financial Statements - report to
17 Congress by the GAO, February 2004."  How did
18 you obtain this document?
19     A    I believe I obtained that from the
20 GAO website.
21     Q    Okay.  And what is the significance
22 of the report on the 2003 and 2002 financial

Page 70

1    statements, the significance to your claims?
2    **A    It shows what progress was being**
3    **made in the security area.**
4    Q    Okay.  So there's a reference in
5    these reports to IT security?
6    **A    That's correct.**
7    Q    Okay.  Next item, "Financial Audit
8    FDIC Funds, 2005 and 2004 Financial Statements
9    - report to Congress by the U.S. GAO, March
10    2006."  That would be this year's report.
11    Correct?
12    **A    They published several different**
13    **reports, but this particular report did cover**
14    **both 2004 and 2005.**
15    Q    Yes.  And where did you receive this
16    document?
17    **A    I believe I received this from the**
18    **GAO website.**
19    Q    Okay.  And what is the significance
20    of the 2004 and 2005 financial statements and
21    this report to your claims in this case?
22    **A    The audit finding for 2004 did not**

Page 71

1    **result in a reportable condition, but in 2005,**
2    **the GAO again found that there was a**
3    **reportable condition in the Information**
4    **Security area.**
5    Q    Okay.  The next item, "Financial
6    Audit, 1993 and 1992 Financial Statements -
7    report to Congress by the GAO."  What is the
8    significance of the financial statements in
9    1992 and 1993 to your claims?
10    **A    The relevance is that reportable**
11    **conditions at the FDIC preceded my tenure as**
12    **the Deputy Director for Information Security -**
13    **I'm sorry - the Deputy Director for**
14    **Information Technology Management with**
15    **responsibility for Information Security.**
16    Q    Okay.  Now with respect to the next
17    one, two, three, four, five items --
18    MR. SHAPIRO:  Down to which one?
19    MS. BIBLIN:  Down through "Financial
20    Audit FDIC's 2000 and 1999 financial
21    statements."
22    BY MS. BIBLIN:

Page 72

1    Q    Would your answer be the same for
2    those, that there's a reference to a
3    reportable condition?  Is that what you're
4    stating is the significance of these
5    documents?
6    **A    The way I would -- I would**
7    **characterize it somewhat differently.**
8    Q    Okay.
9    **A    I believe during this period of**
10    **time, there may have been, perhaps, one year**
11    **when there was no reportable condition, but**
12    **there is a chain over a fairly long period of**
13    **time for reportable conditions in Information**
14    **Security during the tenure of Dennis Geer, and**
15    **John Bovenzi, and Donald Demitros preceding my**
16    **selection for the Deputy for Information**
17    **Technology Management in DIRM.**
18    Q    Okay.  Now the next item, the
19    "FDIC's EEO Program Status Report for Fiscal
20    Year 2004 to the EEOC", dated January, 2005.
21    What is the significance of that document with
22    respect to your claims?

Page 73

1    **A    As I recall, that document reflects**
2    **statistical data on the number of women in**
3    **various job categories, and it's a statistical**
4    **reference point in my case.**
5    Q    Okay.  Would your answer be the same
6    for the next document at the top of page 35,
7    the "EEO Program Status Report for Fiscal Year
8    2005", dated January, 2006?
9    **A    Yes.**
10    Q    Okay.  Is there any other
11    significance to that document from your
12    standpoint?
13    **A    I think that's what I would consider**
14    **most significant.**
15    Q    Okay.  Now the next document,
16    "Letter to Chairman FDIC, Donald Powell, from
17    Dexter Brooks, EEOC", dated September 6, 2005.
18    Where did you get that document?
19    **A    Someone anonymously mailed it to my**
20    **home.**
21    Q    Someone anonymously mailed it to
22    your home?

Page 74

1    **A   I don't know who mailed it to me,**
2    **but this report was sent to me at home, to my**
3    **home address.**
4    Q    Do you have the envelope in which it
5    came?
6    **A   No, I do not.**
7    Q    What did you do with that envelope?
8    **A   When I take mail out of envelopes, I**
9    **throw the envelopes away.  There would be no**
10   **need for me to keep an envelope.**
11   Q    When did you receive this document?
12   **A   I don't recall.  But, certainly, I**
13   **didn't receive it any earlier than September**
14   **6, 2005.**
15   Q    And when you received it, did you
16   read it at your home?
17   **A   Yes, I did.**
18   Q    And what was your reaction to that
19   document?
20   **A   My reaction to that document was**
21   **that our Office of Diversity and Economic**
22   **Opportunity is not well-managed.**

Page 75

1    Q    Did you ever do any inquiries to
2    determine from anybody you knew how you got
3    that document?
4    **A   No.**
5    Q    Did it have a postmark on it, the
6    envelope?
7    **A   I don't recall.**
8    Q    You never looked to find out?
9    **A   I don't recall.**
10   Q    So you received this anonymous
11   document concerning a letter to the Chairman,
12   and it never occurred to you to ask where it
13   came from, or to look and see where it might
14   have come from?
15   MR. SHAPIRO:  Objection.  It wasn't
16   a document concerning a letter, as I
17   understand it, it was a letter.  It was a copy
18   of a letter.
19   MS. BIBLIN:  Yes.
20   MR. SHAPIRO:  Yes.
21   BY MS. BIBLIN:
22   Q    And it never occurred to you to find

Page 76

1    out where this came from?
2    **A   It doesn't really matter.**
3    Q    Did it occur to you to find out
4    where it came from?
5    **A   No.**
6    Q    Did you ask anybody in EEOC, one of
7    your peers in the executive level, whether
8    this was a public document, or a private
9    document?
10   **A   No.**
11   Q    What did you do with the document
12   when you received it?
13   **A   I filed it.**
14   Q    Where did you file it?
15   **A   In my home.**
16   Q    Did you give copies of it to anybody
17   else?
18   **A   No.**
19   Q    Did you give a copy of it to your
20   attorney?
21   MR. SHAPIRO:  Don't answer that
22   question; attorney/client privilege.

Page 77

1    Communication between client/attorney.
2    BY MS. BIBLIN:
3    Q    Other than your attorney, did you
4    give it to any other person?
5    **A   No.**
6    Q    Did you talk to anybody in the
7    Office of Diversity and Economic Opportunity
8    about this document?
9    **A   Not that I recall.**
10   Q    Do you know a woman by the name of
11   Christine Holcomb?
12   **A   Yes, I do.**
13   Q    How do you know her?
14   **A   We've worked together at the RTC.**
15   Q    How long have you known her?
16   **A   I'd say maybe since 1993, 1994.**
17   Q    How would you characterize your
18   relationship with her?
19   **A   We've very good friends.**
20   Q    How often do you talk to her?
21   **A   Several times a week.**
22   Q    Have you ever discussed with her the

Page 78

1  fact that you have this particular series of
2  claims against the FDIC?
3      A   When you say "claims", what are you
4  referring to?
5      Q   The claims that are the subject of
6  this litigation.
7      A   Yes.
8      Q   Have you discussed with her the fact
9  that you both share the same attorney?
10     A   Yes.
11     Q   Had you told Ms. Holcomb around
12  September or October of 2005 that you were
13  involved in taking depositions in this
14  particular - the underlying litigation?
15     A   I probably did.
16     Q   Did you ever discuss with Ms.
17  Holcomb this letter to Chairman Powell from
18  Dexter Brooks at the EEOC?
19     A   Not that I recall.
20     Q   Did you ever discuss with Ms.
21  Holcomb what you characterized as
22  mismanagement in the Office of Diversity and

Page 79

1  Economic Opportunity?
2      A   Yes.
3      Q   When did you discuss that?
4      A   It's a topic of frequent discussion.
5      Q   Is there anybody else in the Office
6  of Diversity and Economic Opportunity, besides
7  Ms. Holcomb, that you have this type of
8  discussion with?
9      A   Yes.
10     Q   Who?
11     A   Gay Walker.
12     Q   Gay Walker?
13     A   Yes.
14     Q   Anybody else?
15     A   No.
16     Q   Did you ever discuss with Ms. Walker
17  this particular letter to Don Powell from
18  Dexter Brooks?
19     A   Not that I recall.
20     Q   Are you aware of whether Ms. Walker
21  has EEO or Title 7 complaints against the
22  corporation?

Page 80

1      A   I'm not aware of any.  I don't know
2  if she does or not.
3      Q   Have you discussed your complaint
4  with Ms. Walker?
5      A   Yes.
6      Q   And in what capacity did you discuss
7  it with Ms. Walker?
8      A   She was the counselor for my
9  informal complaints.
10     Q   Was there anybody else from the
11  Office of Diversity and Economic Opportunity
12  that you discussed these matters with?
13     A   Not that I can recall.
14     Q   Okay.
15     A   Oh, no.  There is another person;
16  Ophelia Jones.
17     Q   And is Ophelia Jones one of the EEO
18  counselors?
19     A   Yes.
20     Q   Did you ever discuss the contents of
21  this letter with Ms. Jones?
22     A   No.

Page 81

1      Q   Did you ever show this letter to
2  Christine Holcomb?
3      A   It hasn't left my house.
4      Q   Okay.  For the record, I'm going to
5  ask that you maintain this particular letter
6  as confidential and not distribute it to
7  others.  You can certainly share it with your
8  attorney.
9          MR. SHAPIRO:  I don't understand why
10  you want it to be -- it's in her hands.  It's
11  not a document that you provided her.  You're
12  not disclosing it in discovery, so what's
13  going on here?
14         MS. BIBLIN:  I'm asking her not to
15  distribute it further, other than she can talk
16  to you.
17         MR. SHAPIRO:  Sure, your informal
18  request.
19         MS. BIBLIN:  That's my request on
20  the record.  Well, I'm just making a record of
21  the fact that this is not a public document,
22  and I'm asking that you not distribute it

Page 82

1  further.
2      MR. SHAPIRO:  Your request is noted.
3      MS. BIBLIN:  You could do what you
4  want with it, but that's --
5      MR. SHAPIRO:  Your request is noted.
6      BY MS. BIBLIN:
7      Q    Did you ever obtain a copy of a
8  response written to that letter, the 2005
9  letter from the Office of Diversity and
10  Economic Opportunity to the EEOC?
11      A    I don't recall a response.
12      Q    Okay.  The next document, a
13  memorandum to Martin Gruenberg from Fred
14  Selby, dated November 16th, 2005, Assurant
15  statement - how did you obtain a copy of that
16  document?
17      A    I believe that it may have been
18  shared with all of the Deputy Directors, but
19  I'm not positive.
20      Q    By Mr. Selby?
21      A    Yes.
22      Q    Okay.  Is there any other way you

Page 83

1  would have received it, other than from Mr.
2  Selby?
3      A    My staff prepared the memorandum.  I
4  don't really recall how it was distributed.
5  It's not a confidential document.
6      Q    Why do you say that?
7      A    Why do I say it's not a confidential
8  document?
9      Q    Yes.
10      A    At no point on the document does it
11  state that it's confidential.
12      Q    That's your only reason for stating
13  that.
14      A    I have no reason to believe that it
15  would be confidential.
16      Q    Do you know whether documents like
17  that are shared with the public?
18      A    I have no idea.
19      Q    What about the memorandum below that
20  to Fred Selby from Janet Roberson that you
21  prepared, do you think that that's a
22  confidential document?

Page 84

1      A    No.
2      Q    Is that something that you would
3  share with the public?
4      A    I don't think it's a confidential
5  document.
6      Q    I'm asking you if you would have any
7  problems with sharing that with the public?
8      A    No.
9      Q    Have you distributed either the
10  memorandum to Mr. Gruenberg or the one to Fred
11  Selby with other people, other than your
12  attorney?
13      A    I'm not sure I understand your
14  question.
15      Q    Have you shared those documents, you
16  personally, with anybody other than your
17  attorney?
18      A    Well, these documents are held by
19  many people in the Division of Finance.
20  They're copies, many people have copies.
21      Q    Really?  How many people?
22      A    Everyone who's a manager, I believe,

Page 85

1  would have a copy.
2      Q    So how many people is that?
3      A    In DOF, maybe 20, 30 people.
4      Q    And you don't think that the
5  document from Mr. Selby to Mr. Gruenberg was
6  restricted only to the deputies?
7      A    No.
8      Q    Okay.  Have you shared it, either of
9  these, with other people yourself?
10      A    With people outside of the division?
11      Q    Outside of DOF, other than your
12  attorney.
13      A    No.
14      Q    And where are your copies of these
15  documents at present?
16      A    I have copies in the office, and I
17  have copies at home.
18      Q    And what is the significance, in
19  your mind, of these documents relative to your
20  claims in this case?
21      MR. SHAPIRO:  These documents being
22  the November 16th, and the November 15th.

Page 86

1    MS. BIBLIN:  Yes.  These are the
2  internal documents - well, I would
3  characterize them as internal - on the
4  assurant statement.
5    THE WITNESS:  They're important to
6  my case because, once again, there are
7  significant information security problems that
8  have not been resolved.
9    BY MS. BIBLIN:
10    Q   Information security problems where?
11    A   **In this particular case, with the**
12  **new financial environment system, automated**
13  **system.**
14    Q   Now the problems that you're
15  referring to are problems that you wrote about
16  in your memorandum dated November 15th, 2005
17  to Mr. Selby?
18    A   **That's correct.**
19    Q   Okay.  Were any of those problems
20  that you identified with the new financial
21  environment repeated in Mr. Selby's memorandum
22  to Mr. Gruenberg?

Page 87

1    A   **Yes.**
2    Q   All of them, or a portion of them?
3    A   **The ones that were most significant**
4  **were.**
5    Q   Most significant to whom?
6    A   **The problems that appear to place**
7  **the corporation at greatest risk were**
8  **reflected in Mr. Selby's memo to Mr.**
9  **Gruenberg.**
10    Q   Who made the decision of what was
11  included from your memorandum on the assurant
12  statement to Mr. Selby's memorandum to Mr.
13  Gruenberg?
14    A   **I was on vacation when that**
15  **memorandum was prepared.  I would assume it**
16  **was Mr. Selby's decision, since he signed the**
17  **document.**
18    Q   Were you on vacation on November
19  15th, when your memorandum was prepared?
20    A   **No.**
21    Q   So you went on vacation the
22  following day, November 16th?

Page 88

1    A   **I just recall that I was not**
2  **present, and I was not involved in preparing**
3  **the memorandum.  I don't know - I would**
4  **imagine that the dates on the memorandums were**
5  **dates when things were signed, but when the**
6  **memo was prepared, I wasn't involved in the**
7  **preparation of the memo.  My staff was**
8  **involved in it, but I was not.**
9    Q   Okay.  How do you know your staff
10  was involved in the preparation of the memo
11  from Selby to Gruenberg?
12    A   **Because Connie Brindle, one of the**
13  **managers who reports to me, told me that one**
14  **of her employees, Larry Choates, was very**
15  **involved in putting this memorandum together.**
16    Q   What is Mr. Choates' job?
17    A   **I'm not quite sure what his title**
18  **is, but he is a Grade 14.  I believe he might**
19  **be an accountant, and his job, primarily, is**
20  **involved in the internal control program for**
21  **the Division of Finance.**
22    Q   Was there anybody other than you -

Page 89

1  well, let's go back.
2    Did you have a chance to read the
3  assurant statement memos from other deputies
4  in DOF to Mr. Selby?
5    A   **I believe that I read Karen Hughes',**
6  but I did not read any others.
7    Q   Why did you read Karen's, and not
8  the other two deputies?
9    A   **I don't know why.  I saw it.  I**
10  **don't have a copy of it, but to my knowledge -**
11  **I don't remember the circumstances.**
12    Q   Were you particularly interested in
13  what Karen had to say, as opposed to what
14  Steve Black or Tom Peddicord had to say?
15    A   **Well, I was more concerned that we**
16  **be consistent in terms of how we were**
17  **characterizing our security, or our risk**
18  **concerns.  And we were -- in fact, her memo**
19  **and my memo were very similar in terms of the**
20  **risks that we were assessing.**
21    Q   Were you not concerned about
22  consistency with Steve Black, or Tom

Page 90

1    Peddicord?
2        A    Steve Black does not really have
3    much of a role with NFE, so I would imagine he
4    would be more focused on other areas.  And I
5    can't -- I'm not even sure that Tom Peddicord
6    wrote an assurant statement.  I don't
7    remember.
8        Q    Okay.  The next item on the list is
9    the memorandum to William Kroener, III from
10   Ian Lanoff and Lou Mazawey, the Groome Law
11   Group, dated September 11th, 2002.  "Subject:
12   FDIC Examination of Edgar Bolick claims."  How
13   did it come about that you got this document?
14       A    I was responsible for the corporate
15   travel program, and Edward Mahaney, who was
16   previously with the FDIC, turned over all of
17   his travel files to me, and this report was
18   included in those travel files.
19       Q    When did he turn his travel files
20   over to you?
21       A    I can't remember the exact date.
22       Q    Was it in 2004?

Page 91

1        A    It might have been 2004, it might
2    have been some point in 2005.  I don't
3    remember.
4        Q    Okay.  And at that point, the issue
5    that is the subject of this memorandum, had
6    already been resolved by the corporation.
7    Would that be accurate?
8        A    I think that would be subject to
9    interpretation.
10       Q    You weren't involved in the analysis
11   that was the subject of the Groome Law report
12   in the context of your present job, were you?
13       A    That's correct.
14       Q    So at the time Mr. Mahaney turned
15   his files over to you, why was he turning his
16   files over to you?
17       A    Because he was no longer going to be
18   working in the travel area.
19       Q    Okay.
20       A    And since I had responsibility for
21   travel, he just turned all of his files over
22   to me.  And I took what he gave me, and there

Page 92

1    were many, many, many file drawers.
2        Q    And what did you do with them?
3        A    Some of them I just very gradually
4    went through the drawers, and either threw
5    things out, or gave files to people who I
6    thought might need them for their jobs, and
7    then I kept some of the files.
8        Q    Which files did you keep?
9        A    I kept a lot of files.
10       Q    Which ones?
11       A    I mean, there are a lot of them, but
12   I kept files relating to taxable travel
13   issues.
14       Q    What else?
15       A    To Cottrell Webster.
16       Q    What else?
17       A    I think those are probably the key
18   areas.
19       Q    Why did you choose those to keep?
20       A    For the taxable travel, I also have
21   responsibility for tax policy at the FDIC.
22       Q    You did at the time.

Page 93

1        A    I continue to have that
2    responsibility.
3        Q    For tax policy?
4        A    Yes.
5        Q    Wasn't the tax policy unit turned
6    over to another deputy through a
7    reorganization in 2005?
8        A    No.
9        Q    Oh, that's right.  I'm sorry, I'm
10   confusing that with travel.  My mistake.  Is
11   there somebody who handles the tax issue for
12   you?
13       A    Vanessa Hester is the corporate
14   manager.
15       Q    Did you turn these files over to
16   Vanessa Hester?
17       A    No, I did not.
18       Q    Why not?
19       A    I just didn't.
20       Q    Why didn't you, Ms. Roberson?
21       A    I don't know.
22       Q    Well, let's just think about it.

Page 94

1      MR. SHAPIRO: Well, I don't know is
2  not a think about question.  I don't recall
3  might be, but I don't know is a definitive
4  answer.  What do you want her to think about?
5      MS. BIBLIN: I want her to think
6  about - the only person who knows why she did
7  this, is her.
8      MR. SHAPIRO: She said she doesn't
9  know why.  She said she didn't have a reason,
10  she just didn't.
11      BY MS. BIBLIN:
12      Q    What did you do with the files?
13      A    **They're at my home.**
14      Q    So you never kept them in the
15  corporation offices.
16      A    **Well, I did for some period of time.**
17      Q    And then you moved them to your
18  home?
19      A    **That's correct.**
20      Q    When did you move them to your home?
21      A    **I don't recall the date.**
22      Q    Was it in 2005?

Page 95

1      A    **I don't recall the date.**
2      Q    You don't recall the specific date,
3  but can you come down with a year?  You say
4  Mr. Mahaney gave these files to you sometime
5  in 2005.  Right?
6      A    **That's correct; 2004 or 2005, I
7  don't remember.**
8      Q    Okay.  And you say for some period
9  of time, you kept them physically in the FDIC
10  offices.  Were they kept in your office, or in
11  somebody else's office?
12      A    **They were in Mr. Mahaney's office.**
13      Q    So when he turned the files over to
14  you, he didn't physically bring them to your
15  office.  You left them in his office and said
16  here you go, something to that effect.
17      A    **That's correct.**
18      Q    Okay.  So you went into his office
19  and looked through those files to see what was
20  there?
21      A    **That's correct.**
22      Q    Would that be accurate?

Page 96

1      A    **Yes, that's accurate.**
2      Q    And would that have been around the
3  time that Mr. Mahaney left the corporation, or
4  left working in that area?
5      A    **Probably about the time he stopped
6  working in that area.**
7      Q    Okay.  And that would be some time
8  in 2005?
9      A    **I don't recall.**
10      Q    Okay.  So you went through, and
11  there were documents you threw out.  Why did
12  you throw certain documents out, certain files
13  out?
14      A    **They didn't seem to be relevant.
15  They were very dated.  He had a lot of -- I
16  don't know how many drawers of files, and it
17  was a very slow process going through them.
18  And the only reason I really went through them
19  was because we were going to be moving to a
20  new building, so we were in the process
21  throughout the Division of Finance of trying
22  to decrease the amount of paper that would be**

Page 97

1  **moved with us.**
2      Q    Okay.  Were there any files -- when
3  you say some of them were dated, what would be
4  - what would you consider dated, how old?
5      A    **I would consider if something had
6  been superseded by a new policy, or later
7  event.  I mean, if something is outdated, if
8  it was no longer relevant.  I don't know.  I
9  mean, it was just -- I didn't have a
10  scientific system.  I just used my own
11  discretion in determining what to discard.**
12      Q    Well, if a policy had been created
13  by the corporation as a result of work that
14  had been in Mr. Mahaney's files, would it have
15  been generally your decision at that time to
16  discard the old file because there's been a
17  policy that superseded it?
18      A    **I would have to have reference to a
19  specific example to answer that question.**
20      Q    Okay.  Why don't you give me an
21  example, because you just told me that if
22  something had been superseded, you would have

Page 98

1 thrown it out. Can you give me an example of
2 that?
3    **A   Not off the top of my head.**
4    Q   Okay. Now the things, other than
5 these files that you say you kept, and then
6 took home, were there other files that Mr.
7 Mahaney had in his office that you kept for
8 the corporation, and kept within the DOF files
9 somewhere?
10    **A   Yes.**
11    Q   What were those?
12    **A   I can't remember specifically, but
13 there were files that I gave to either Connie
14 Brindle, or to Rick Cywinski, which appeared
15 to me to be files that should be maintained.**
16    Q   Were Mr. Mahaney's files on the
17 taxable travel and Cottrell Webster files that
18 you thought should be maintained by the
19 corporation?
20    **A   Well, there are many files on those
21 issues that are maintained at headquarters.**
22    Q   But the specific files that you took

Page 99

1 are not maintained at headquarters. Is that
2 correct?
3    **A   Actually, much of that information
4 is maintained here at headquarters.**
5    Q   By whom?
6    **A   Unless he's thrown it out, Rick
7 Cywinski and the travel group should have many
8 of those files.**
9    Q   Do you know whether Rick Cywinski
10 and the travel group have the files that you
11 took home?
12    **A   I don't know.**
13    Q   Did you ever ask Rick Cywinski if he
14 had these?
15    **A   No, but he was in charge of tax, so
16 I would assume that he has them.**
17    Q   But you never thought to talk to him
18 about it, did you?
19    **A   No, I didn't.**
20    Q   And did you ever ask Vanessa Hester
21 if she had those files?
22    **A   No.**

Page 100

1    Q   And you never gave them to Vanessa
2 Hester and said hey, this is your area - take
3 these.
4    **A   No.**
5    Q   Were there other files regarding tax
6 that you did maintain and turned over to
7 Vanessa Hester from Mr. Mahaney's files?
8    **A   I don't recall.**
9    Q   Were there other files on travel
10 that you found in Mr. Mahaney's office that
11 you turned over to Rick Cywinski?
12    **A   Yes.**
13    Q   Did you have anybody besides
14 yourself go through those files?
15    **A   No.**
16    Q   So you did this yourself.
17    **A   Yes.**
18    Q   When you went through the files,
19 let's talk, for example, this Groome Law
20 report, was that contained in Mr. Mahaney's
21 files on the examination of Ed Bolick claims?
22    **A   I don't know where it was in his**

Page 101

1 **files. It was just in his files.**
2    Q   Well, did you pull this document out
3 of an existing file, or did you take the whole
4 file?
5    **A   I don't recall.**
6    Q   The document two down from that,
7 Regular Duty Travel - Cottrell Webster, June
8 30th, 2002 to Present.
9       MR. SHAPIRO:  That's two down,
10 right?
11       MS. BIBLIN:  Two down.
12       BY MS. BIBLIN:
13    Q   That's a memorandum prepared by you
14 for Fred Selby, April 30th, 2004.
15    **A   That's correct.**
16    Q   Was that a file that was in
17 Mahaney's office, or was that a separate
18 document?
19    **A   That's a document that I prepared.**
20    Q   Okay. The one below that, Ed
21 Bolick's file on Cottrell Webster's relocation
22 and travel, is that one of the files that Mr.

1  Mahaney turned over to you?

2  **A  No.**

3  Q  Where did you get that file?

4  **A  Wanda Thompson.**

5  Q  Who's Wanda Thompson?

6  **A  She reports to Rick Cywinski.**

7  Q  How did it come about that she gave

8  you that file?

9  **A  There were some questions about Mr.**

10 **Webster's travel, and Wanda Thompson brought**

11 **that file to me.  I did not request the file**

12 **of her, she gave it to me.**

13 Q  Do you know what the purpose was for

14 her giving it to you?

15 **A  She didn't share that with me.**

16 Q  What, so she just came into your

17 office and gave you a file, and said here?

18 **A  Yes, basically.**

19 Q  So did you ask her why are you

20 giving this to me?

21 **A  No.**

22 Q  What did you do with the file?

1  **A  I kept it.**

2  Q  And what did you do with it?

3  **A  It's at my home.**

4  Q  So Ms. Thompson gave you a file from

5  Ed Bolick.

6  **A  Yes.**

7  Q  Was this an official file of the

8  FDIC?

9  **A  I don't know.  She just --**

10 Q  An FDIC DOF file, wasn't it?

11 **A  I don't know.  It was an Ed Bolick**

12 **file.  I don't know if it had been considered**

13 **a corporate file, or just a file that Mr.**

14 **Bolick was maintaining.  I don't know.**

15 Q  And who is Mr. Bolick?

16 **A  Mr. Bolick was an employee at the**

17 **FDIC.**

18 Q  In what division?

19 **A  In the Division of Finance.**

20 Q  And who did he work for?

21 **A  I don't know, because I didn't work**

22 **in the Division of Finance when he was there.**

1  Q  Did he work for Ed Mahaney before

2  you got there?

3  **A  I believe he did.**

4  Q  Okay.  Was this a file that was also

5  contained in Ed Mahaney's files that you

6  reviewed, or is this something else?

7  **A  No, it was an Ed Bolick file.  I**

8  **don't know any more about it than that.**

9  Q  Did you ask Ms. Thompson where it

10 came from?

11 **A  She told me that it was Ed Bolick's**

12 **file.**

13 Q  What was she doing with it, do you

14 know?

15 **A  I don't know.**

16 Q  And you have no idea why she gave it

17 to you.

18 **A  She knew that we were looking at**

19 **Cottrell Webster's travel, and she said that**

20 **she -- that Mr. Bolick had asked her to hold**

21 **on to this file.**

22 Q  For what purpose?

1  **A  I don't know.**

2  Q  Is it customary procedure for the

3  FDIC executives to take certain files home and

4  keep them there?

5  **A  I don't know.**

6  Q  Have you ever done this before?

7  **A  Have I don't what before?**

8  Q  Take files home and keep them there.

9  **A  When you say "before" --**

10 Q  Before this situation with Ed

11 Mahaney's files, and Mr. Bolick's file.

12 **A  Not that I recall.**

13 Q  Did you do it because you thought

14 this could help you in your EEO litigation?

15 **A  I'm not sure I understand your**

16 **question.**

17 Q  Did you take this file home because

18 you thought it was something you could use in

19 your EEO litigation?

20 **A  I think that the file shows that men**

21 **who were similarly situated at the FDIC are**

22 **treated very differently than women.**

Page 106

1   Q   Did you take the file home because
2   you thought it would help you in your EEO
3   litigation?
4   **A   I believe I just answered your**
5   **question.**
6   Q   No, you didn't. Did you take it
7   home because you thought it would help you in
8   your EEO litigation?
9   **A   It shows that a similarly situated**
10  **male executive was treated very differently**
11  **than I was.**
12  Q   That's your interpretation of the
13  file. Correct?
14  **A   That's correct.**
15  Q   And if that is what the file shows,
16  do you believe that would help you in your EEO
17  litigation?
18  **A   When discrimination occurs, one of**
19  **the things, I believe, it's incumbent upon the**
20  **complainant to show, is that similarly**
21  **situated people, unlike themselves, are**
22  **treated more favorably.**

Page 107

1   Q   So you thought this file would help
2   you to prove that you were treated less
3   favorably than men. Is that what you think?
4   **A   I believe that, yes.**
5   Q   And that's why you took it home.
6   **A   Yes.**
7   Q   Did that file include the Groome Law
8   report?
9   MR. SHAPIRO: Which file, Edward
10  Bolick file?
11  MS. BIBLIN: The Edward Bolick file,
12  did that include the Groome Law report?
13  THE WITNESS: It did not.
14  BY MS. BIBLIN:
15  Q   Did Ed Mahaney's travel files -
16  actually, there's a misprint here, tiles - but
17  including legal opinions on taxable travel, is
18  that referring to the Groome Law report?
19  **A   Yes.**
20  Q   And you took that home, also.
21  **A   I'm not sure what you're referring**
22  **to when you say "that".**

Page 108

1   Q   You took Edward Mahaney's travel
2   files, including legal opinions on taxable
3   travel, delays in changing FDIC policies to
4   comply with IRS guidelines, et cetera. You
5   took that home.
6   **A   I took some of his travel files**
7   **home.**
8   Q   Those files that you're referring to
9   in that bullet on page 35, does that include
10  the Groome Law report?
11  **A   Yes, it does.**
12  Q   Okay. Are you aware that the Groome
13  Law report is a legal opinion to the FDIC's
14  legal division from another lawyer?
15  **A   Yes.**
16  Q   And is it your understanding that
17  this is a confidential document?
18  **A   Yes.**
19  Q   Is it your understanding that it is
20  a privileged document belonging to the FDIC?
21  **A   No. I didn't - I don't really**
22  **understand that terminology.**

Page 109

1   Q   Well, you understand that if you and
2   your attorney, Mr. Shapiro, have
3   conversations, that your conversations are
4   privileged. You have what's called an
5   attorney/client privilege. You understand
6   that concept, don't you?
7   **A   Yes.**
8   Q   Would you agree that the FDIC, when
9   they consult with an outside lawyer, has a
10  similar attorney/client privilege? I realize
11  you're not a lawyer.
12  **A   No, I'm not a lawyer.**
13  Q   I know you're not, but you
14  understand the concept, don't you, Ms.
15  Roberson?
16  **A   Yes.**
17  Q   And do you understand that the
18  Groome Law report is a legal opinion solicited
19  by the legal division to assist them with
20  resolving an internal matter?
21  **A   Yes.**
22  Q   And that that is attorney/client

Page 110

1  privileged.
2    A   Yes.
3    Q   And it's not your privilege, but
4  it's the FDIC's privilege, isn't it?
5    A   Yes.
6    Q   Does an executive at the FDIC, in
7  your understanding, have a right to take
8  privileged documents of the FDIC home to use
9  for your EEO complaint?
10   A   I don't know.
11   Q   Did you make copies of the Groome
12 Law report, or any of these other documents?
13   A   No.
14   Q   Did you ever show them to other
15 people, besides your attorney?
16   A   No.
17   Q   Did you quote them to other people?
18   A   No.
19   Q   The copies that you took to your
20 house and the files that you took to your
21 house from Mr. Mahaney's travel files on these
22 issues, were they the original copies that Mr.

Page 111

1  Mahaney had?
2    A   There were many, many copies of
3  these documents.  There weren't just one or
4  two.  They aren't even, necessarily,
5  originals.
6    Q   That's not the question I'm asking.
7  The copies that you took to your house, they
8  were actually physically the files that were
9  in Mr. Mahaney's office.  You didn't make
10 another copy of them and take them home, you
11 just took those particular files and took them
12 home.
13   A   That's correct.
14   Q   So you did not make a copy of those
15 for anybody else in DOF.
16   A   That's correct.
17   Q   And that includes anybody else who
18 would have had responsibility for that area,
19 including Rick Cywinski or Vanessa Hester.
20   A   That's correct.
21   Q   You indicated in the document where
22 you describe Edward Mahaney's travel files,

Page 112

1  including legal opinions on taxable travel,
2  other than the two legal opinions contained in
3  the Groome Law report, were there any other
4  legal opinions in that file?
5    A   Yes.
6    Q   What were those?
7    A   I remember that there was one
8  dealing with spousal travel.
9    Q   That was part of the Groome Law
10 report, or was that a separate one?
11   A   It was a separate tax opinion.
12   Q   Who wrote that one?
13   A   I don't recall.
14   Q   Any others?
15   A   I can't recall.  There are other tax
16 opinions, a lot of them are opinions that we
17 have in our files in the accounting and tax
18 policy area.
19   Q   Why didn't you give those files to
20 Vanessa Hester if they were involving tax
21 opinions?
22   A   I believe she already has them.

Page 113

1    Q   Did you ask her if she already had
2  them?
3    A   Well, I didn't ask her.  I assumed
4  she did, because they were written by her -
5  her employee was involved in these - he was
6  either copied, or he was involved in some way
7  in the correspondence.  It didn't occur to me
8  to ask her.
9    Q   Where in your home are these
10 documents maintained?
11   A   In a room.
12   Q   One particular room?
13   A   That's correct.
14   Q   How would you describe that room in
15 your house, is it an office?
16   A   It's just a room.
17   Q   Are they locked, are the documents
18 locked?
19   A   No.
20   Q   Are they in a file?
21   A   Yes, like a file cabinet, file
22 cabinet things.

Page 114

1    Q    How thick a file are these documents
2   that include Ed Mahaney's travel files, Ed
3   Bolick's file, the regular duty travel file of
4   Cottrell Webster, and the Bolick claims, how
5   big a group of documents is that, that's
6   maintained in your house?
7    **A    I'd say that they probably fit in**
8   **something that would be maybe 12 X 10 X 8.**
9    Q    Are they in a file folder that size?
10   **A    They're in a file box.**
11   Q    So they're contained in a box.
12   **A    Correct.**
13   Q    Are those the only items in that
14   box, or are there other items in that box?
15   **A    I don't really know.  I'd have to**
16   **look.**
17   Q    And is that box maintained inside a
18   file cabinet, did you say, or is it somewhere
19   else in that room?
20   **A    It's in the room.**
21   Q    But it's not in a file cabinet.
22   **A    No, not in a cabinet.**

Page 115

1    Q    Okay.  Are the files that you refer
2   to as Ed Bolick's file on Cottrell Webster and
3   Ed Mahaney's travel files, are those contained
4   in their own file folders within that box?
5    **A    I don't know.  I don't recall.**
6    Q    Have you looked at them at any time
7   in the last year?
8    **A    I have about ten file boxes.  I have**
9   **a lot of files.  I don't really know.**
10   Q    About how many of those boxes are
11   files that you maintain for your EEO
12   litigation?  Just that one box, isn't it, or
13   are there others?
14   **A    No, I have about 10 boxes associated**
15   **with my litigation.**
16   Q    Okay.  The file that Ed Mahaney's
17   files, and Bolick's, and the Groome Law
18   report, and the Cottrell Webster memorandum,
19   is that all in one box?
20   **A    I don't know that it's currently in**
21   **one box, but it would probably fit within one**
22   **box.**

Page 116

1    Q    Who put them in the box?
2    **A    I did.**
3    Q    And when did you do that?
4    **A    At various points in time.**
5    Q    Did you pack those while you were at
6   your office at Theater One Building?
7    **A    Yes.**
8    Q    Did you do it prior to the
9   depositions that you took of FDIC witnesses in
10   this case last fall?
11   **A    I'm not sure I had all the files**
12   **then.**
13   Q    Okay.  But the ones referring to the
14   Cottrell Webster, Ed Mahaney's travel files,
15   and the Ed Bolick file, and the Groome Law
16   report, you had assembled those prior to the
17   depositions last fall, had you not?
18   **A    I don't know that I had all of those**
19   **files at that time.**
20   Q    Where would they have been, if you
21   didn't have them?
22   **A    They may have still been in Ed**

Page 117

1   **Mahaney's old office.  We didn't move to**
2   **Virginia Square until January, 2006.  And the**
3   **depositions occurred --**
4    Q    Between September and December.
5    **A    Right.  So I don't know that all of**
6   **these files would have been at my home at that**
7   **time.**
8    Q    But at some point during that period
9   of time in the fall, you took them home.
10       MR. SHAPIRO:  Objection.  She said
11   the move was the essential feature of the --
12       MS. BIBLIN:  That's not what she
13   said.
14       MR. SHAPIRO:  Yes.
15       MS. BIBLIN:  Mr. Shapiro, I ask you
16   not to testify for your client or coach her.
17       MR. SHAPIRO:  I'm not testifying.
18   She said -- I'm not coaching anybody.  She
19   said January was when the move was, 2006.
20   That's after the fall of 2005.  No?
21       MS. BIBLIN:  That has nothing to do
22   with this issue.

Page 118

1     MR. SHAPIRO: Ahh. Okay.
2     MS. BIBLIN: At least not according
3 to her testimony.
4     MR. SHAPIRO: That's debatable. Ask
5 away. You have a question? Ask it.
6     BY MS. BIBLIN:
7     Q   I asked you previously why you took
8 these documents home, and you said it was to
9 help you with your EEO complaint. Is that
10 correct?
11     A   That's not what I said. You're
12 putting words in my mouth that I didn't say.
13     Q   Okay. Why did you take these
14 documents home?
15     A   Why did I take which documents home?
16     A   The Groome Law report, the Cottrell
17 Webster file, Ed Bolick's file on Cottrell
18 Webster's relocation and travel, the legal
19 opinions, why did you take those home?
20     A   I was cleaning out his office, and I
21 had to put things somewhere, and some of them
22 I just decided to take home with me.

Page 119

1     Q   So it wasn't because of the move to
2 Virginia Square, was it?
3     A   We had to clean out. I think I've
4 said this several times now. We had to clean
5 out our files to the extent possible so that
6 we would not be bringing much paper with us
7 when we moved. Ed Mahaney turned over all of
8 his files to me. I didn't ask him for the
9 files, he gave me the files.
10     Q   He didn't direct you to take the
11 files home, did he?
12     A   I don't believe I said that.
13     Q   I'm just asking you if he asked you
14 to take the files home.
15     A   I'm sorry. What's your question?
16     Q   Did Ed Mahaney tell you to take the
17 files home?
18     A   No, he did not.
19     Q   You made that decision.
20     A   That's correct.
21     Q   And you made that decision only with
22 respect to certain files that you thought

Page 120

1 would help you with your EEO litigation.
2 Isn't that correct?
3     A   I made the decision to take some
4 files home, that's correct.
5     Q   You could have packed those files
6 along with the rest of Ed Mahaney's files and
7 given them to the appropriate people in DOF
8 who have responsibility for those areas.
9     A   And I did give a number of those
10 files to people.
11     Q   But not all of them.
12     A   Well, in some cases there were
13 multiple copies of files.
14     Q   But you didn't give all of them to
15 the other people, did you?
16     A   When you say --
17     Q   You selected certain ones, and you
18 took those home.
19     A   Well, in some cases there was more
20 than one copy.
21     Q   That's not what I'm asking. I'm
22 just saying, you didn't take all of them and

Page 121

1 give them to the people who had responsibility
2 for that area, did you?
3     A   I don't -- maybe I'm not making
4 myself clear in answering your question. Ed
5 Mahaney had been filing papers for many years,
6 and there were multiple copies of many
7 documents. And in some cases, documents were
8 given to other people, but there were multiple
9 copies, and I kept a copy for myself.
10     Q   Why didn't you just shred these
11 multiple copies instead of taking them home?
12     A   I did discard some of the multiple
13 copies.
14     Q   Which ones did you discard?
15     A   They're just too numerous to
16 mention.
17     Q   Did you discard any copies of the
18 Groome Law report?
19     A   To my knowledge, there was only one
20 copy. I don't recall there being any other
21 copies.
22     Q   Was there more than one copy of the

Page 122

1  Bolick file that Wanda Thompson gave you?
2     **A   I don't know.**
3     Q   The only file that you know of is
4  the one that she gave you.  Right?
5        MR. SHAPIRO:  You want to stop
6  cutting her off?  You want to stop cutting her
7  off.
8        MS. BIBLIN:  She said she didn't
9  know.
10       MR. SHAPIRO:  No, no, no, excuse me.
11  She was still talking, and you cut her off.
12  Now,  Dina, you made a great big deal at every
13  one of my depositions about that when it
14  happened, and when you imagined it happened.
15  I'd expect you to show a little courtesy.
16  That's all I'm asking.  You've been repeatedly
17  cutting her off.
18       MS. BIBLIN:  The record will reflect
19  what's going on.
20       MR. SHAPIRO:  Just let her finish
21  her answer.  Okay?
22       MS. BIBLIN:  She's been finishing

Page 123

1  her answer.
2        MR. SHAPIRO:  No, she has not been
3  finishing her answer.  You've been cutting her
4  off, and the record doesn't reflect that at
5  all.  How can it?  You cut her off, and start
6  talking.  The court reporter's record will
7  just show that you're talking.
8        MS. BIBLIN:  Are you done?
9        MR. SHAPIRO:  Let her - no.  Let her
10  finish.  Okay?  Just let her finish.  That's
11  all I'm saying.
12       MS. BIBLIN:  I heard it.
13       MR. SHAPIRO:  Ahh, now do it.
14       MS. BIBLIN:  I'll ignore your
15  comments, Mr. Shapiro.  The record will speak
16  --
17       MR. SHAPIRO:  If you keep ignoring
18  that comment, that you're not going to let her
19  finish, and you're going to repeatedly cut her
20  off, we're not going to have this deposition
21  continue, so I trust that you'll let her
22  finish her answers.  See, it's a simple thing,

Page 124

1  Dina.  You ask the questions, she answers the
2  questions.  Thank you.
3        MS. BIBLIN:  Thank you for your
4  lesson on deposition taking, Mr. Shapiro.
5        MR. SHAPIRO:  Oh, I didn't intend
6  that.
7        MS. BIBLIN:  I'm sure you didn't.
8        BY MS. BIBLIN:
9     Q   Ms. Roberson, was there more than
10  one copy of Ed Bolick's file that Wanda
11  Thompson gave you?
12       MR. SHAPIRO:  Asked and answered.
13       MS. BIBLIN:  You told me she hadn't
14  finished answering it, so go ahead.
15       THE WITNESS:  To my knowledge, this
16  was a file that was Ed Bolick's particular
17  file, and I don't know if anything else exists
18  like it.  I have no idea.
19       BY MS. BIBLIN:
20    Q   So you just took it home.
21    **A   That's correct.**
22    Q   You didn't ask anybody else to see

Page 125

1  if they had a copy of it.
2     **A   There are many, many copies of**
3  **reports dealing with Cottrell Webster's**
4  **relocation, and his regular duty travel.**
5  **There are probably more copies than anyone**
6  **will ever need.**
7     Q   That's not the question I asked, Ms.
8  Roberson.
9     **A   There are --**
10    Q   The question I asked was--
11       MS. BIBLIN:  Let's read back the
12  question I asked.
13       COURT REPORTER:  Certainly.
14       (Playback.)
15       BY MS. BIBLIN:
16    Q   Did you ask anybody else if they had
17  a duplicate of Ed Bolick's file on Cottrell
18  Webster's relocation and travel?
19    **A   Did I ask anyone if they had a copy**
20  **of Ed Bolick's file?  No.**
21    Q   So you just took it home.
22    **A   That's correct.**

Page 126

1    Q    And you thought it was helpful to
2  your EEO complaint.  Would that be correct?
3    **A    What is your question?**
4    Q    Did you think that file is helpful
5  to your EEO complaint?
6    **A    I believe that it shows a similarly**
7  **situated male executive has been treated far**
8  **more favorably than I, yes.**
9    Q    Would you agree that Mr. Bolick's
10  file on Cottrell Webster's relocation and
11  travel was something Mr. Bolick did in the
12  course of his employment at the FDIC working
13  for the Division of Finance?
14    **A    I don't know.**
15    Q    Did it look to you like its contents
16  contained work that he was doing at the
17  Division of Finance?
18    **A    I would need to review that folder.**
19  **I don't really remember the contents at this**
20  **point.**
21    Q    I guess when we get a hold of it,
22  we'll have to resume this line of questioning.

Page 127

1    MR. SHAPIRO:  That's maybe your
2  opinion.  Depends how much time you have left
3  on your seven hours.
4    MS. BIBLIN:  We'll discuss that
5  later.
6    MR. SHAPIRO:  I'm not going to
7  discuss it at all.
8    BY MS. BIBLIN:
9    Q    Did you confirm with Vanessa Hester
10  that the other legal opinions that were
11  contained in Ed Mahaney's travel files were
12  also part of her files, that she had a copy of
13  them?
14    **A    No.**
15    Q    What was the purpose of your
16  memorandum to Fred Selby dated April 30th,
17  2004 on regular duty travel, Cottrell Webster,
18  2002 to present?  What was the purpose of that
19  memo?
20    **A    As I recall, Tom Peddicord, who is**
21  **one of my colleagues in the Division of**
22  **Finance, is responsible for budget, and he**

Page 128

1  **raised some concerns about travel expenditures**
2  **in Cottrell Webster's office, which is the**
3  **Office of the Ombudsman.  And Tom thought,**
4  **looking at the budget expenditure reports,**
5  **that that particular office spending was out**
6  **of pattern, and so he raised the issue to**
7  **either Ed Mahaney, or Fred Selby, or both of**
8  **them, and Ed Mahaney told me - this is when Ed**
9  **Mahaney reported to me - Ed Mahaney told me**
10  **that Tom Peddicord had this concern, and**
11  **wanted to look at how the money was being**
12  **spent.  To that end, Ed Mahaney went through**
13  **the electronic travel files and I believe he**
14  **had several reports done for him, himself, and**
15  **then he used this information to develop**
16  **spreadsheets showing all of the dates when**
17  **Cottrell Webster was traveling from and to**
18  **headquarters, which is where his permanent**
19  **duty station is.**
20    **When Ed Mahaney completed this**
21  **analysis, he briefed me on it.  And after he**
22  **did that, I prepared this memo for Fred Selby.**

Page 129

1  **Fred Selby then asked me to conduct a briefing**
2  **for Jim Collins, who is a special advisor to**
3  **John Bovenzi.**
4    **I briefed Jim Collins.  I did not**
5  **give him a copy of this memorandum, but I**
6  **briefed him on the contents, because it**
7  **appeared that Mr. Webster was not working at**
8  **his duty station, and was, instead, spending**
9  **a preponderant amount of time in Memphis,**
10  **where he and his wife own a home.  And it**
11  **appeared that he, perhaps, had not relocated**
12  **to the extent we would expect of an employee**
13  **when we reimburse them for relocation.**
14    Q    So at the time that you were doing
15  this work, this was an area that was reporting
16  to you, travel policy.
17    **A    That's correct.**
18    Q    And Mr. Cywinski was the head of
19  that group, at some point?
20    **A    At some point, yes, he was.**
21    Q    At the time that you were doing this
22  particular analysis, was Mr. Cywinski the head

Page 130

1  of that group, or was somebody else the head
2  of that group?
3      A    I can't remember whether it was
4  Connie Brindle or Rick Cywinski.  I'm not
5  sure.
6      Q    And where did Mr. Mahaney fit in?
7      A    Mr. Mahaney was a direct report to
8  me, and he was responsible for two areas.  He
9  was responsible for travel, which was headed
10 up at one point by Connie Brindle, and then
11 later by Richard Cywinski.  And he was
12 responsible for a second area, which was
13 accounting and tax policy, managed by Vanessa
14 Hester.
15     Q    Okay.  And Ed Bolick, where did he
16 fit in at that point, or was he gone?
17     A    He never worked in my chain of
18 command.
19     Q    When he was working for the FDIC,
20 was he in what would have become your chain of
21 command?
22     A    If he had not retired, he would have

Page 131

1  been in my chain of command.
2      Q    Okay.  And would have reported up to
3  Ed Mahaney.
4      A    That's correct.
5      Q    Okay.  Why did you take home that
6  document, the regular duty travel of Cottrell
7  Webster?
8      A    I wrote that document.
9      Q    But why did you take it home?
10     A    Cottrell Webster is a similarly
11 situated male executive at the FDIC.
12     Q    And?
13     A    Who committed fraudulent acts, and
14 was rewarded through bonuses and pay
15 increases.  Nothing negative happened to him
16 for defrauding the corporation.  He was not
17 removed from his job.
18     Q    Now the OIG report for paid
19 vouchers, FDIC electronic travel voucher
20 system, that's a run date.
21     MR. SHAPIRO:  Which one is this?
22     MS. BIBLIN:  The document right

Page 132

1  above the regular duty travel document.
2      MR. SHAPIRO:  Ahh, oh, good.
3      BY MS. BIBLIN:
4      Q    Run date, October 21st, 2004.  What
5  is that document?
6      A    I'm not sure.
7      Q    So you don't know what the
8  significance is, or where you got it?
9      A    I'd have to refer to the document.
10 I'm not sure which document it is.
11     Q    Okay.  Further down, plaintiff's
12 correspondence to and from Rick Cywinski,
13 emails.
14     A    Yes.
15     Q    Where do you maintain that?
16     A    A lot of those emails are on the
17 FDIC system.
18     Q    So you could -- do you have them
19 segregated in an Outlook file?
20     A    Yes.
21     Q    Would you be able to copy the PST
22 file on it and give it to your counsel?

Page 133

1      A    I probably could.
2      Q    Do you also maintain a hard copy of
3  those documents at home?
4      A    I have a hard copy of some
5  documents, but I don't know which ones.
6      Q    The some that you have a hard copy
7  of, is that a subset of the group that you
8  maintain in your digital file on Outlook, or
9  is that identical, roughly, to the file you
10 maintain on Outlook?
11     A    I don't know.
12     Q    The next item, "Why Government Is
13 Not Perfect", which your counsel produced a
14 hard copy of today, how did you get that
15 document?
16     A    I got several copies of that
17 document from multiple sources.  It was a very
18 widely distributed and very popular document
19 when it was distributed.
20     Q    And you got it in electronic form or
21 paper copy?
22     A    Paper copy.

Page 134

1    Q   Did you ever receive it in
2  electronic format?
3    A   No.
4    Q   Why do you identify it on your list
5  of documents as being of significance, or
6  relevance to your EEO claims in this case?
7    A   There's one chapter - there are
8  several chapters that are helpful, but one
9  chapter is particular interesting, and I think
10  it might be Chapter 13, but I'm not sure about
11  that.  And it's titled "Sex."  And it talks
12  about two people who are named the Vamp and
13  the Scamp, who are pretty well known in the
14  corporation as Erica Cooper, now Bovenzi, and
15  John Bovenzi, and the very public affair they
16  conducted in the office while they were
17  married to other people, and the impact that
18  that had on the people around them.
19    Q   Who is Frip Chissom?
20    A   It's not someone who I personally
21  know, but I understand that it's someone
22  named, I think David Holland.

Page 135

1    Q   Do you know who David Holland is?
2    A   I believe he has since left the
3  corporation, and I think I remember hearing
4  that he worked in a policy group that existed
5  maybe during Ricki Helfer's tenure.  I'm not
6  sure, but it's not someone I know.  I don't
7  know Mr. Holland.
8    Q   Do you know what division he worked
9  for?
10    A   I do not.
11    Q   How would you characterize this
12  document, "Why Government Is Not Perfect"?
13  What is it?
14    A   It's what we would refer to as a
15  roman a clef.
16    Q   Yes?  And how would you characterize
17  that for the general Populus?  It's fiction,
18  isn't it?
19    A   No, that's not what a roman a clef
20  is.
21    Q   Then you tell me what it means to
22  you.

Page 136

1    A   It's taking circumstances, it's
2  taking something that's happening in real
3  life, and changing the names to protect the
4  innocent, or not so innocent.
5    Q   But it includes fiction, does it
6  not?
7    A   I would not really characterize this
8  as fiction, fictional.  It's more, perhaps,
9  satyrical.
10    MR. SHAPIRO:  I'll offer it again to
11  you, if you want it.
12    MS. BIBLIN:  You've offered it.
13  It's sitting right there.
14    MR. SHAPIRO:  Yes, I know.
15    MS. BIBLIN:  Why, are you taking it
16  back?
17    MR. SHAPIRO:  Well, I need a copy of
18  it, because I don't have a copy of it.
19    MS. BIBLIN:  That's okay.
20    MR. SHAPIRO:  I haven't read it, but
21  if -- and I would like a copy, since we're
22  turning it over to you.

Page 137

1    MS. BIBLIN:  You've already made
2  that clear, Mr. Shapiro.
3    MR. SHAPIRO:  Okay.  So you'll let
4  me know.  I'm going to read it now, after this
5  conversation.
6    MS. BIBLIN:  Oh, you should.  And
7  you should definitely have it with a sip of
8  scotch.
9    BY MS. BIBLIN:
10    Q   Do you believe that everything
11  that's referred to in the Frip Chissom
12  document is true, Ms. Roberson?
13    A   Do I believe that everything in it
14  is true?
15    Q   Yes.
16    A   I don't know some of the people in
17  this novel.
18    Q   That's not the question I asked.  Do
19  you believe everything in it is true?
20    A   I don't know, but I believe that
21  Chapter 13 is pretty much on the mark.
22    Q   Is there anything other than Chapter

Page 138

1   13 on which you rely in that novel, or the
2   roman a clef?
3       A   I'd have to go back and really
4   refresh my memory.  It's that one particular
5   chapter that's most of interest to me.
6       Q   Why is it interesting to you?
7       A   Because I believe that there are
8   certain standards of conduct that should be
9   followed in the workplace.  And I also believe
10  that it's not good to have a conflict of
11  interest that results in an absence of checks
12  and balances.
13      Q   And what's the absence of checks and
14  balances that you're referring to here with
15  relation to you?
16      A   I think it's a little -- it somewhat
17  strains credibility to think that there can be
18  any fairness in the discrimination complaint
19  process, when the Office of Diversity and
20  Economic Opportunity reports to a man who is
21  having an affair, and subsequently weds a
22  Deputy General Counsel, who's involved in

Page 139

1   employment issues at the FDIC.  I think
2   there's an absence of a firewall.
3       Q   Is this based on your opinion?
4       MR. SHAPIRO:  You asked for her
5   opinion, did you not?
6       BY MS. BIBLIN:
7       Q   Is there anything other than this is
8   just your opinion, is there anything other
9   than your opinion and Chapter 13, on which
10  this conclusions is based?
11      A   I don't really understand your
12  question.
13      Q   Other than your opinion and this
14  Chapter 13 of the Frissom document, is there
15  any other factual basis you have for making
16  this allegation about checks and balances, vis
17  a vis ODEO and the legal division, and Mrs.
18  Bovenzi?
19      A   In terms of standards of conduct, I
20  think it presents a problem for employees and
21  managers when two people at the very highest
22  levels of the organization conduct themselves

Page 140

1   in such a way to cause fear and to behave in
2   a totally unethical and unprofessional manner,
3   and to think that that's okay.  And it
4   certainly had quite an impact on this
5   corporation.
6       Q   Now you said "fear", is that the
7   impact you're talking about?
8       A   That's one of the impacts.
9       Q   Who's fearful of the fact that Mr.
10  and Mrs. Bovenzi are married?
11      A   I think what caused general
12  discomfort was their very visible affair while
13  they were married to other people, and their
14  conduct in the office.
15      Q   What makes you think that they were
16  having an affair when they were married to
17  other people?  What's your basis for that?
18      A   Jim Collins made comments to
19  Charlotte Craig about the discomfort he
20  experienced working for Mr. Bovenzi, and
21  witnessing this behavior in the office.
22      Q   Did you talk to Mr. Collins about

Page 141

1   that?
2       A   Mrs. Craig shared this with me.
3       Q   Other than that, is there any other
4   basis for your --
5       A   There are other comments from other
6   people in the main building.
7       Q   Who?
8       A   It's widely discussed.
9       Q   Who?  Name one.
10      A   It was so widely discussed, I mean,
11  there are just tons of people.
12      Q   Well, tell me.  You tell me someone
13  who you believe is fearful.
14      A   I think if you want to look at the
15  fear factor, you can look at the questionnaire
16  that was completed and discussed at the
17  Executive Leadership Conference, I think it
18  might have been March, February-March 2006,
19  where it showed that a majority of executives
20  were afraid to take risks because of the
21  repercussions they might experience here.
22      Q   And where does that have anything to

Page 142

1  do with John and Erica Bovenzi?
2      **A   It all starts at the top.**
3      Q   What does that have to do with John
4  and Erica Bovenzi?
5      **A   It's very rare to have that much**
6  **power in two people at the top, one of whom**
7  **gets to give bonuses and pay increases to the**
8  **other one.**
9      Q   What's your basis for saying that
10  Mr. -- I assume you're referring to Mr.
11  Bovenzi.
12      **A   Mr. Bovenzi.**
13      Q   What's your basis for saying Mr.
14  Bovenzi is giving bonuses and pay increases to
15  Mrs. Bovenzi?  She doesn't report to him, does
16  she?
17      **A   No, but Mr. Bovenzi and Mr. App make**
18  **the decisions about which executives get pay**
19  **increases, what the amount of that pay**
20  **increase is, which executives get bonuses, and**
21  **what the amount of those bonuses are.  So Mr.**
22  **Bovenzi, in effect, is compensating himself**

Page 143

1  **when he's compensating his spouse.**
2      Q   You're making the assumption then
3  that he's compensating his spouse.  Were you
4  not here during Mr. Bovenzi's deposition, when
5  he testified that he does not involve himself
6  in that decision?
7      **A   I don't believe that to be true.**
8      Q   Oh, so you don't believe him.
9      **A   That's correct.**
10      Q   Do you have any other basis, other
11  than that, for stating that he's responsible
12  for compensating Erica Bovenzi?
13      **A   I don't understand your question.**
14      Q   Other than the fact that you don't
15  believe Mr. Bovenzi, do you have any other
16  factual basis to state that he's responsible
17  for her compensation?
18      **A   I might.**
19      Q   What?
20      **A   Memos that have been issued stating**
21  **who's making the decisions about who gets what**
22  **pay.**

Page 144

1      Q   Oh, so you're saying because it's
2  the ERB making those decisions, and Mr.
3  Bovenzi sits on the ERB, that, therefore, he's
4  responsible for Mrs. Bovenzi's raise.
5      **A   Mr. Bovenzi is on the ERB, yes.**
6      Q   Right.  So just because he's on the
7  ERB, and you just don't believe the fact that
8  he doesn't participate in that decision.  Am
9  I correct?
10      **A   I believe there are only two people**
11  **on the ERB one year, Mr. Bovenzi and Mr. App.**
12  **And last year, I believe it was Mr. Bovenzi,**
13  **Mr. App, and Mrs. Thompson, who reports to Mr.**
14  **Bovenzi, so I would imagine she would be**
15  **somewhat influenced.**
16      Q   Okay.  And who makes the final
17  decisions on executive pay?  It's not the ERB,
18  is it?
19      **A   Technically, it's the Chairman,**
20  **technically.**
21      Q   And Mr. Bovenzi is not the Chairman,
22  is he?

Page 145

1      **A   He's the Chief Operating Officer.**
2      MS. BIBLIN:  Why don't we take a
3  break for lunch at this point.
4      MR. SHAPIRO:  If you wish.  What
5  time would you like us back?
6      MS. BIBLIN:  What works for you?
7      MR. SHAPIRO:  I'm not leaving the
8  building, as far as I know.
9      MS. BIBLIN:  Okay.
10      MR. SHAPIRO:  I assume that the
11  cafeteria is well-run, and will expedite us as
12  fast as we need to expedite, so I'm just
13  asking you whatever you --
14      MS. BIBLIN:  Are we off the record,
15  by the way?
16      (Whereupon, the proceedings went off
17  the record at 12:14:52 p.m. and went back on
18  the record at 1:12:33 p.m.)
19      BY MS. BIBLIN:
20      Q   Referring again to Exhibit 1, on
21  page 35, bottom of the page, you indicate the
22  FDIC Outlook calendar for Fred Kearns.  Is

Page 146

1    that an electronic document, or a paper
2    document?
3       **A    It's now a paper document.**
4    Q    Okay.  And how did you obtain that?
5       **A    By accessing his calendar.**
6    Q    And how did you do that?
7       **A    His calendar was open to anyone who**
8    **looked at it.**
9    Q    Where?
10      **A    In Outlook.**
11   Q    When you say "his calendar was
12   open", meaning that you can see the individual
13   appointments, or just the times?
14      **A    The individual appointments.**
15   Q    Oh, okay.  And which particular
16   appointments did you look for?
17      **A    I was not looking for particular**
18   **appointments.  I was looking to see what his**
19   **responsibilities were, and how he was being**
20   **treated after the circumstances that he had**
21   **been in.**
22   Q    Okay.  And what did you conclude

Page 147

1    from that?
2       **A    I concluded that although he did**
3    **some things that I think were inappropriate,**
4    **but I don't know all the details because I'm**
5    **not privy to that, but apparently, he promoted**
6    **a female employee within his chain of command**
7    **with whom he was having a personal**
8    **relationship, even though she, apparently, was**
9    **not regarded as the best qualified on the**
10   **roster of eligible candidates.  And he was**
11   **removed from his position, and became, I**
12   **believe a dean, at Corporate University, and**
13   **continued.  Although it appeared he had been**
14   **removed from his job, he continued to have**
15   **quite a bit of international travel, and to be**
16   **involved in meetings with other high level**
17   **officials, so it appears that he was treated -**
18   **as a similarly situated male executive, it**
19   **appears that he was treated much more**
20   **favorably than I was.**
21   Q    Oh, you think he's similarly
22   situated to you?

Page 148

1       **A    Yes.**
2    Q    Why would he be similarly situated
3    to you?  Did you have an affair with somebody
4    that I don't know about?
5       **A    No, I did not.**
6    Q    Okay.  Then what's the similar
7    situation?
8       **A    He's a male executive who was found**
9    **to have done something inappropriate.  His**
10   **management moved him out of his job for a**
11   **period of time, but while it may have appeared**
12   **that he was moved out of his job, in reality,**
13   **he continued to enjoy the same benefits he had**
14   **while he was in the job.**
15   Q    Okay.  First of all, what's your
16   basis for saying he did something
17   inappropriate?
18      **A    It's considered inappropriate, and**
19   **usually disciplinary action will result, if**
20   **it's found that a manager promotes an employee**
21   **for personal reasons.**
22   Q    And how do you know that that was

Page 149

1    done? What's your basis for knowing that
2    factually?
3       **A    It's just something I heard from**
4    **some very good sources.**
5    Q    Who did you hear it from?
6       **A    And I think that if we depose Mr.**
7    **Kearns and depose Mrs. Maureen Sweeney, that**
8    **we will find out that that is the reason he**
9    **was removed.**
10   Q    Who did you hear this from?
11      **A    It's commonly understood.**
12   Q    Who did you hear this from?  Am I
13   not being clear?
14      **A    I hear your question, and I can't**
15   **recall.**
16   Q    Can you think of anybody you talked
17   to about this, to come to this conclusion?
18      **A    It was such a commonly discussed**
19   **issue, I really can't recall a specific**
20   **person.**
21   Q    So your basis for this information
22   is gossip.  Is that correct?  It was commonly

Page 150

1  discussed.  Is that correct?
2      A   It's by some people at fairly high
3  levels.
4      Q   Who?  Who at high levels?
5      A   I cannot recall.
6      Q   So it's people at high levels, and
7  you can't recall who they are, and you're
8  relying on that.  Is that correct?
9      A   That is correct.
10     Q   Okay.  What's your basis for saying
11 he was removed from his job?
12     A   He was detailed to Corporate
13 University.
14     Q   That's not the same thing as
15 removal, is it?
16     MR. SHAPIRO:  Objection.  She
17 answered the question, and it's not a debate.
18     MS. BIBLIN:  I said that's not the
19 same thing as removal, is it?
20     THE WITNESS:  From a personnel rule
21 perspective, no, it is not the same thing.
22 But in terms of common language, removal means

Page 151

1  to be in another place.
2      BY MS. BIBLIN:
3      Q   So you're basing this on the
4  dictionary.
5      A   I'm just saying that the word
6  "removal" can be interpreted different ways.
7      Q   Oh, okay.  How are you interpreting
8  it?
9      A   He was physically moved from one
10 location to another.
11     Q   Okay.  Did anybody ever tell you
12 that at Corporate University you still have
13 obligations or duties at your job, your
14 original job, people who are detailed over
15 there?  Has anybody ever discussed that with
16 you?
17     A   I don't know what they're doing in
18 Corporate University.
19     Q   Okay.  So you don't know first-hand.
20 Is that what you're saying?
21     A   I'm not sure what your question is.
22     Q   You don't know first-hand what

Page 152

1  people do at Corporate University when they're
2  on detail, vis a vis their home job.
3      A   He was a long-term detail.
4      Q   Regardless, you don't know first-
5  hand what people do at Corporate University,
6  what the common practice is when they're there
7  on a detail from another organization.  Is
8  that correct?
9      A   The people I know on detail there
10 seem to pretty much be working full-time for
11 Corporate University.
12     Q   And who are those people?
13     A   One example would be Vijay
14 Deshpande.
15     Q   Anybody else?
16     A   He's on detail.
17     Q   Anybody else?
18     A   That's one that comes to mind.
19     Q   Is there anybody else, besides
20 Vijay?
21     A   I don't know.
22     Q   And you believe he's on detail right

Page 153

1  now?
2      A   I am aware that he's on detail from
3  the Division of Information Technology.
4      Q   And that's what you think he is
5  right now.
6      A   Yes.
7      Q   Okay.  Now when you looked at the
8  calendar for Fred Kearns, what were the things
9  on the calendar that you believe were
10 indicative of attending high level meetings?
11     A   I can't remember specifics without
12 referring to the document, but I recall that
13 he was in meetings with other executive
14 managers, and I believe that he was in
15 meetings with division directors, as well.
16     Q   And is there something inappropriate
17 about that?
18     A   And I think what makes it
19 interesting is to see what the subject of some
20 of the meetings is.
21     Q   Okay.  Well, first of all, is there
22 anything inappropriate about him attending

Page 154

1   meetings while he's working at Corporate
2   University with high level people?
3       **A    That, in and of itself, would not be**
4   **inappropriate.**
5       Q    And what was the subject of the
6   meetings?
7       **A    That's where I'd need to refer back**
8   **to the calendars.**
9       Q    What was inappropriate then?
10      **A    I'm not saying that it's**
11  **inappropriate.  I'm not sure I used that word**
12  **in describing this.  What's interesting is**
13  **that it appears that he was continuing to**
14  **perform many of the same duties while at**
15  **Corporate University that he performed while**
16  **he was a Deputy Director in the Division of**
17  **Insurance and Research.**
18      Q    And is there something wrong with
19  that?
20      **A    Well, when someone has - what's the**
21  **word I want - when there's an improper**
22  **personnel action, one wouldn't typically**

Page 155

1   **continue to send someone out to represent the**
2   **FDIC on international travel at international**
3   **meetings.  One would expect to see some form**
4   **of disciplinary action.**
5       Q    That's you would expect to see
6   disciplinary action.
7       **A    Typically, that's what I've seen in**
8   **my career.**
9       Q    And that's your opinion.
10      **A    Typically, that's what I've seen in**
11  **my career.  One cannot use one's office to**
12  **benefit one's self.**
13      Q    And what's the basis, other than
14  office gossip, for these conclusions?
15      MR. SHAPIRO:  Which conclusions?
16      MS. BIBLIN:  Any of these
17  conclusions about Fred Kearns.
18      THE WITNESS:  I think that when Mr.
19  Kearns is a witness, that it will be very
20  clear.  I think when other people are
21  witnesses, it will be very clear.
22      BY MS. BIBLIN:

Page 156

1       Q    Did you talk to Mr. Kearns about
2   this?
3       **A    No, I did not.**
4       Q    Did you talk to Maureen Sweeney
5   about this?
6       **A    No.**
7       Q    Did you talk to anybody with
8   personal knowledge about this?
9       **A    I'm not sure.  I'd have to go back**
10  **and look at notes.**
11      Q    You kept notes of this?  You kept
12  notes of what you're thinking about Fred
13  Kearns?
14      **A    I don't understand the question.**
15      Q    You just said to me, you'd "have to
16  go back and look at notes."
17      **A    Well, look at materials I have in my**
18  **files.  I'm just not sure what I have right**
19  **now.**
20      Q    Did you keep notes of people you
21  talked to about Fred Kearns?
22      **A    No.**

Page 157

1       Q    Then what were the notes you were
2   referring to a moment ago when you answered
3   that question?
4       **A    Referring to his calendar.**
5       Q    His calendar.  Did you make notes on
6   his calendar?
7       **A    I made notes that I have in regard**
8   **to his calendar.**
9       Q    Where are those notes?
10      **A    At my home.**
11      Q    When you go into Outlook, and you
12  look at Fred Kearns' calendar, how is it
13  you're able to access the contents of the
14  actual meetings?  How are they visible to you?
15      **A    Well, I don't know if you're aware**
16  **of this, but when you go into Outlook, you can**
17  **set up a profile, and you can set up**
18  **permissions.**
19      Q    Yes.
20      **A    And, apparently, when Mr. Kearns set**
21  **up his calendar in Outlook, when he set the**
22  **permission, he set it for open view, so anyone**

Page 158

1  who goes into his calendar can see every
2  appointment, every attachment to an
3  appointment, all the attendees to every
4  meeting he went to, the times, the places,
5  it's all there.  And that's up to an
6  individual employee to decide how to set up
7  his or her calendar in Outlook.
8      Q   Do you know what the default is for
9  that setting?
10     A   I don't know.  I would imagine - I
11 can't state this with absolute accuracy - but
12 I believe the default is that the calendar is
13 not open.  The employee has to go in and make
14 a decision about who will have access.
15     Q   Why did you select the particular
16 dates that you did between September 5th and
17 December 31st, 2005?
18     A   Because that's at a point where he
19 had gone to Corporate University on his
20 detail, and then at some point after January,
21 December - I can't remember exactly when - he
22 must have realized that his calendar was open,

Page 159

1  or I don't know - I can't speculate - but at
2  any rate, he changed the permissions on his
3  calendar, and it was no longer open.
4      Q   And you think that was after
5  December 31st?
6      A   Yes, January, December, somewhere in
7  there.
8      Q   Okay.  And you're saying you can't
9  answer any further questions about this
10 concerning the specifics of what you
11 downloaded without looking at it.
12     A   I just haven't looked at it for a
13 long time.
14     Q   Okay.  You'd have to look at it to
15 answer those questions.  Okay.  Do you -- the
16 Outlook calendar for Mike Zamorski for
17 September 5th, 2005 through January 27th, 2006
18 - did you obtain that through the same method
19 on Outlook?
20     A   That's correct.
21     Q   And was Mr. Zamorski's calendar
22 open?

Page 160

1      A   Yes.
2      Q   Open permissions?
3      A   Yes.
4      Q   Was there a time in which it became
5  closed?
6      A   I believe it became closed, perhaps,
7  in February.
8      Q   And how do you know that?
9      A   Because I couldn't access it.
10     Q   So you were continuing to access it
11 --
12     A   That's correct.
13     Q   -- up until that point.
14     A   That's correct.
15     Q   Okay.  And when you did that, you're
16 saying you printed some of these out, and took
17 them home.
18     A   That's correct.
19     Q   Do you remember what dates you were
20 looking at, in particular, between September
21 5th and January 27th?
22     A   Every day.

Page 161

1      Q   Every day.
2      A   Yes.
3         (Whereupon, the proceedings went
4  immediately into a Confidential Session.)

Page 169

1    Q   Okay.  Now going back to this, would
2  you agree that you and Mr. Zamorski have
3  completely different skill sets?
4    A   I'm not aware of what Mr. Zamorski's
5  skill set is.
6    Q   Okay.  But you were not doing the
7  same type of work as Mr. Zamorski at any time,
8  were you?
9    A   At what point?
10   Q   At any time, ever.
11   A   I don't know very much about his
12 job.
13   Q   Okay.  You've never had a job in
14 bank supervision at the FDIC, have you?
15   A   That is correct.
16   Q   Okay.  So you were never in charge
17 of bank supervision for the Premier Bank
18 Insurance Regulator for the United States of
19 America, were you?
20   A   Well, I guess I would have to ask
21 who the Premier Insurance --
22       MS. BIBLIN:  I'm going to ask Mr.

Page 170

1  Shapiro to stop that.
2        MR. SHAPIRO:  I just never thought
3  of it that way.  I thought it was more like a
4  criminal conspiracy, myself, at the FDIC, but
5  if you say so, I was just astounded by the
6  description.
7        THE WITNESS:  I guess since there
8  are several regulatory agencies that examine
9  banks, I would have to ask who the Premier
10 Regulator is, to which you refer.
11       BY MS. BIBLIN:
12   Q   You don't have that responsibility
13 as a regulator, you've never had that
14 responsibility as a regulator of FDIC insured
15 banks, have you?
16   A   No, I have not.
17   Q   And you have no experience in bank
18 supervision, which is the chief function of
19 the FDIC, do you?
20   A   I do not have bank examination
21 experience.
22   Q   Or bank supervision experience.

Page 171

1    A   That is correct.
2    Q   Did you ever visit Mr. Zamorski's
3  office on the sixth floor when he was moved up
4  there?
5    A   Did I visit him?
6    Q   His office.
7    A   I did not visit it.
8    Q   Do you have any idea what it looked
9  like physically?
10   A   I just heard.
11   Q   Heard from whom?
12   A   From people in the building where he
13 moved to.
14   Q   Who?
15   A   I don't remember the specific
16 people.  I think the fact that he was on the
17 sixth floor of the main building speaks for
18 itself.
19   Q   To you.
20   A   To me, it does.  That's where the
21 Chairman, the Vice Chairman, the outside board
22 member, the COO, the CFO, the Chief of Staff,

Page 172

1  that's where they all sit, on the sixth floor.
2    Q   Status is important to you, isn't
3  it, Ms. Roberson?  Status, how it's perceived
4  by others.  That's important to you, would you
5  agree?
6    A   I don't see a connection to your
7  previous question.
8    Q   Doesn't matter.  I just want to know
9  if status is important to you, how people are
10 perceived by where they physically sit, and
11 what their titles are.  That's important to
12 you, isn't it?
13   A   No.
14   Q   Okay.
15   A   What's important is to do the right
16 thing.  That's what's important.
17   Q   Now you say he convened meetings
18 with Division Directors.  On what subject did
19 he convene meetings, according to these
20 documents you took home?
21   A   I would have to look at the
22 calendars.  I have not looked at them for a

Page 173

1 period of time.
2   Q   And off-hand, you can't remember
3 anything that speaks out to you as being
4 significant and relevant to your case?
5   A   Yes, he was try -- he was in a new
6 role, and he was convening meetings to
7 establish an international program at the
8 FDIC.
9   Q   But you don't remember a specific
10 meeting, or specific information off that
11 document right now that --
12   A   I just gave you an example.
13   Q   Be specific, what's the specific
14 example?  You talked about a generality.
15   A   The example I'm giving you is that
16 he was setting up a new office, a new program,
17 and he convened meetings to talk about his
18 programs with the other Division Directors to
19 get them - I would assume - on board with what
20 he was doing.
21   Q   And what specific meeting was it
22 that you're talking about?

Page 174

1   A   There were a series of these
2 meetings.
3   Q   When were they?
4   A   And I would have to look at the
5 calendars.
6   Q   With whom were these meetings?
7   A   I already answered that question;
8 with Division Directors.
9   Q   Which Division Directors?
10   A   I believe Supervision, DIR, DRR.
11   Q   Was it one meeting with several
12 directors, or were there several different
13 meetings that you're referring to?
14   A   The answer I gave you previously is
15 that there were --
16   Q   I'm asking you a question now.
17   MR. SHAPIRO:  She's --
18   MS. BIBLIN:  I'm not asking for a
19 previous answer.
20   MR. SHAPIRO:  Hold on.  I object to
21 your tone.  You're being abusive, and I don't
22 get why, but listen - she said - she answered

Page 175

1 that question already, and she was still
2 talking.  You cut her off, and you're being
3 nasty.  Come on now, let's just keep this on
4 a civil --
5   MS. BIBLIN:  The record --
6   MR. SHAPIRO:  The record doesn't
7 reflect tone of voice at all.  It just
8 reflects what is said.  Now look it, Dina,
9 calm down and ask the questions, and let's be
10 civil.  She's not trying to avoid your
11 questions, she's trying to answer your
12 questions, so let's just not lose control of
13 ourselves, and let's be civil, because that's
14 what we're supposed to do.  Civil.
15   MS. BIBLIN:  (Laughing.)  I love
16 getting this lecture from you, of all people,
17 but I --
18   MR. SHAPIRO:  I will allow these
19 aspersions to be cast, because I can't stop
20 them, and I won't bother to try.  But, Dina,
21 you're not going to abusive by being nasty,
22 and loud, and using bad language, and getting

Page 176

1 very upset with the client.  Just ask your
2 question --
3   MS. BIBLIN:  The audio record will
4 reflect --
5   MR. SHAPIRO:  Yes.
6   MS. BIBLIN:  -- what transpired here
7 today.
8   MR. SHAPIRO:  Yes, just ask --
9   MS. BIBLIN:  As it has for the other
10 15 depositions you've taken, Mr. Shapiro.
11   MR. SHAPIRO:  Just ask your
12 questions, ma'am.  Don't be abusive, just ask
13 your questions.
14   MS. BIBLIN:  Mr. Shapiro, I will ask
15 my questions when you stop interrupting both
16 your witness and me.
17   MR. SHAPIRO:  Ahh, please.  Just
18 ask.
19   MS. BIBLIN:  Would you please read
20 back my last question before Mr. Shapiro
21 interrupted me.
22   COURT REPORTER:  Certainly.

Page 177

1    MR. SHAPIRO: If you can find it.
2    MS. BIBLIN: And I want the record
3 to reflect that Mr. Shapiro is quietly
4 mouthing and making fun of me while we're
5 doing this; not that I care, I just want the
6 record to reflect it, because we're talking
7 about civility here.
8    MR. SHAPIRO: Listen, listen, Dina.
9 Ask your questions. You were getting very hot
10 tempered with the witness for no reason.
11    MS. BIBLIN: The record will reflect
12 --
13    MR. SHAPIRO: All I did was try to
14 get you to calm down.
15    MS. BIBLIN: Oh, yes.
16    MR. SHAPIRO: Now just ask your
17 questions.
18    MS. BIBLIN: (Laughing.) This is
19 pretty funny. Go ahead.
20    MR. SHAPIRO: The cackling doesn't
21 help, and the audio did pick that up.
22    MS. BIBLIN: It's pretty funny.

Page 178

1    (Playback.)
2    BY MS. BIBLIN:
3    Q   Okay. I want to know now, not for
4 what you answered before, but my question is,
5 on this calendar, was there one meeting that
6 would have several different directors in it,
7 or were there several meetings with one
8 director?
9    A   Several meetings with several
10 directors.
11    Q   Okay. And do you recall which
12 directors were in which particular meeting?
13    A   I believe these meetings generally
14 consisted of directors from the Division of
15 Supervision and Compliance, the Division of
16 Insurance and Research, the Division of
17 Resolutions and Receiverships.
18    Q   Now just now you said these
19 meetings, did you mean one meeting?
20    A   No, there were a series of meetings,
21 which appeared to be on the same topic, and
22 were attended by the same group of people.

Page 179

1    Q   Okay. Thank you. Do you know who
2 else was present at those meetings besides
3 those Division Directors?
4    A   I'd have to refer to the calendars.
5    Q   And you're saying that information
6 was contained in those calendars?
7    A   That's correct.
8    Q   Now referring to the FDIC Outlook
9 calendar for Robert Russell, what dates did
10 you -- I assume you picked that up from
11 Outlook?
12    A   That's correct.
13    Q   Was his calendar open permission?
14    A   Yes. That's correct.
15    Q   And what dates did you pick up?
16    A   They weren't consecutive days as I
17 had picked up with Mr. Zamorski and Mr.
18 Kearns. They were kind of a random number of
19 days. I don't remember the specific dates.
20    Q   Now you stopped it - it doesn't
21 indicate what dates they were - was there a
22 time at which you stopped looking at his

Page 180

1 calendar prior to his leaving the Corporation?
2    A   He, apparently, changed the
3 permissions on his calendar at some point, and
4 it could no longer be accessed.
5    Q   Now you've mentioned that both he
6 and Mr. Zamorski, and Mr. Kearns, apparently,
7 changed their permissions. Was it all around
8 the same time?
9    A   No. Mr. Russell changed his
10 permissions earlier than Mr. Kearns and Mr.
11 Zamorski.
12    Q   Okay. You said you don't recall
13 what the exact dates were, but can you recall
14 what the subject was of the meetings that you
15 were looking for on that calendar?
16    A   I recall one meeting that was of
17 particular interest to me, and it was held -
18 let's see - I think it might have been either
19 January 21st or January 22nd, 2003. And that
20 was a meeting that was attended by John Rich,
21 John Bovenzi, Steve App, Bob Russell, Mary
22 Boyd, and Vijay Deshpande, to discuss the

Page 181

1   results of their clandestine report on --
2   pertained particularly to me, and to Carol
3   Heindel.
4       Q   Were you or Ms. Heindel mentioned in
5   the calendar?
6       A   The subject was mentioned in the
7   calendar.
8       Q   And what was the subject?
9       A   And I can't --
10      Q   Did the subject contain the word
11  "clandestine"?
12      A   No, that's my word.
13      Q   Oh, okay. Just checking. So what
14  was the subject?
15      A   I can't remember specifically.
16      Q   Was it IT Security?
17      A   It was something a little broader
18  than that, but it was easy to see that -- and
19  I knew from my subsequent meeting with John
20  Bovenzi, that that was the purpose of the
21  meeting on the 21st or 22nd.
22      Q   Okay. And when did you download

Page 182

1   this Outlook calendar?
2       A   A long time ago, about two years
3   ago, a year ago, two years ago. I don't
4   remember.
5       Q   Was it while you were still -- while
6   you were on the detail working for Mr.
7   Peddicord, or was it subsequent to that?
8       A   It may have been while I was on
9   detail, because I had so much free time. And
10  another particular appointment that I found
11  interesting was - well, there were a couple -
12  one was a dinner appointment with Mary Boyd
13  and John Rich, and then there was the boating
14  outing with John Rich and his wife. I'm not
15  sure I remember any of the other meetings.
16      Q   Is there anything wrong with Mr.
17  Russell going boating with Mr. Rich, when they
18  are friends and work together?
19      A   Well, the question you asked me was
20  whether I recalled any of the events on the
21  calendar.
22      Q   Well, you said it was interesting.

Page 183

1   What was interesting about it, then?
2       A   To me? I said what was interesting?
3       Q   You said the meeting that involved a
4   boating outing with John Rich was interesting.
5       A   Oh, that wasn't - if that's what you
6   thought, that's not what I meant.
7       Q   Okay.
8       A   What I thought was of interest was
9   the dinner with John Rich and Mary Boyd.
10      Q   And why was that of interest?
11      A   Because they seem to have a very --
12  all have a very close relationship.
13      Q   And the close relationship is based
14  on the fact that you saw that calendar entry?
15      A   I just thought it was interesting.
16      Q   When you say they have a "close
17  relationship", what's the basis for you saying
18  that, other than the calendar entry?
19      A   Well, they seem to have had lunches
20  and to have had a fairly close - it was
21  interesting to me because it appeared that
22  Mary Boyd had much more access to the Vice

Page 184

1   Chairman than I did, which is kind of
2   interesting for a Grade 13-14 examiner.
3       Q   Well, you didn't work for the Vice
4   Chairman, did you?
5       A   No, I did not.
6       Q   And you're familiar with the fact
7   that Ms. Boyd was detailed to the Vice
8   Chairman's office for a period of time?
9       A   For 60 days.
10      Q   And after that, she was subsequently
11  extended to do this IT assessment, working for
12  the Vice Chairman?
13      A   Well, that's not exactly what I
14  heard in one of the depositions.
15      Q   Okay. Well, she was working for
16  John Bovenzi. Right?
17      A   Yes, she was detailed to John
18  Bovenzi.
19      Q   Right. And the Vice Chairman was in
20  charge of the Audit Committee at that time --
21      A   That's correct.
22      Q   -- to which her work reported.

Page 185

1      A    I don't know that her work reported
2  to the Audit Committee.
3      Q    Okay.
4      A    I believe we did ask in our
5  disclosure request for copies of those Audit
6  Committee meetings, so perhaps that would
7  refresh my memory, when you provide that.
8          MR. SHAPIRO:  When we get them.
9          MS. BIBLIN:  Well, speaking of Audit
10  Committee minutes, I think you quote one of
11  them, or cite one of them in here on page 36,
12  "Minutes of the meeting of the Audit Committee
13  of the FDIC, February 23rd, 2004."
14         MR. SHAPIRO:  Where is that?
15         MS. BIBLIN:  That's on page 36.
16         MR. SHAPIRO:  Oh, yes.  I've got it.
17  Thank you.
18         BY MS. BIBLIN:
19     Q    If you're waiting to get them, how
20  did you get that one?
21     A    I don't remember, and I don't
22  remember what those minutes say.  I just would

Page 186

1  have to go back and look at that.
2      Q    And you don't remember how you got
3  the minutes of the Audit Committee?
4      A    If I read them and I knew what the
5  subject was, I'd probably remember how I got
6  the minutes.
7      Q    Well, you weren't present at the
8  Audit Committee on February 23rd, 2004, were
9  you?
10     A    I don't remember.
11     Q    And to this day, you don't remember
12  why you had that particular Audit Committee
13  minute record in your possession.
14     A    I would need to look at it to
15  refresh my memory.
16     Q    And that's at your home.
17     A    That's correct.
18     Q    Okay.  Now you said you have the
19  FDIC Outlook calendar for Michael Bartell for
20  various dates.
21     A    That's correct.
22     Q    Do you recall what dates you

Page 187

1  downloaded that?
2      A    I think it was primarily in 2003.
3      Q    Okay.  And, again, I don't mean to
4  jump ahead, but I assume you obtained it by
5  downloading it from Outlook.
6      A    That's correct.
7      Q    Okay.  When did you download it?
8      A    I think primarily during the year
9  2003.
10     Q    Okay.  Why did you download it?
11     A    Because Mr. Bartell was in a number
12  of meetings with Mr. Deshpande.
13     Q    In 2003?
14     A    That's correct.
15     Q    And what has that got to do with --
16     A    Well, what is so interesting about
17  those meetings is that there are meetings with
18  the Senior Team.  Mr. Deshpande was meeting
19  with the Deputies in DIRM, but he did not
20  invite Mrs. Heindel to those meetings;
21  although, she was his General Deputy at the
22  time.

Page 188

1      Q    How do you know he didn't invite
2  her?
3      A    Because her name is not on the
4  invitation list.
5      Q    Oh, okay.
6      A    And she did confirm that for me when
7  I asked her about it.
8      Q    And what do you derive from that?
9      A    I derive from that that women are
10  treated differently than men at the FDIC.
11     Q    And you assume that the reason she
12  wasn't invited to those meetings, assuming
13  that's correct, is because she was a woman,
14  and not because her job was not operational?
15     A    It was always the custom in DIRM for
16  the Division Director to hold regular meetings
17  with the senior staff, which consisted of the
18  General Deputy, Mrs. Heindel, and the -
19  depending on the organization at the time -
20  the three or four deputies who reported to
21  him, so it seemed very odd that the Division
22  Director would have meetings without the

Page 189

1  **presence of his General Deputy.**
2      Q   Now when you talk about it had been
3  the pattern, for at least a year or so of that
4  pattern, Ms. Heindel was the Acting Director
5  of DIRM.  Right?
6      **A   That's correct.**
7      Q   So she was calling those meetings?
8      **A   She and her predecessor had those**
9  **types of meetings.**
10     Q   Let's start with Ms. Heindel.  Okay?
11     **A   Yes.**
12     Q   Ms. Heindel called meetings, and
13  there was no General Deputy when she called
14  those meetings?
15     **A   That's correct.**
16     Q   So it was just the -- how many
17  deputies were there at the time?
18     **A   I think there were three.**
19     Q   Including you.
20     **A   Yes.**
21     Q   Okay.  And how often would Ms.
22  Heindel conduct those meetings?

Page 190

1      **A   It depended on what was going on.**
2      Q   She wasn't having a daily meeting,
3  was she?
4      **A   No.**
5      Q   Was she having a weekly meeting?
6      **A   She had a weekly meeting with all of**
7  **the senior - all of the executives.  Every**
8  **Monday afternoon, all of the executives --**
9      Q   So it wasn't just the deputies, it
10  was deputies --
11     **A   That's correct.**
12     Q   -- and assistant directors.
13     **A   That's correct.**
14     Q   Okay.  So there was no daily meeting
15  on operations under Ms. Heindel's tour of duty
16  as Acting Director of DIRM, was there?
17     **A   Not that I recall.**
18     Q   Now prior to Ms. Heindel, Mr.
19  Demitros was the Director of DIRM.  Is that
20  correct?
21     **A   That's correct.**
22     Q   And during the time that Mr.

Page 191

1  Demitros was Director of DIRM, and you were
2  one of his executives, were there daily
3  operational meetings of Mr. Demitros and his
4  deputies?
5      **A   He may have had during some**
6  **emergency periods where there was a specific**
7  **problem, he may have had regular meetings, but**
8  **typically, Mr. Demitros had weekly meetings**
9  **with all of his executives, and he sometimes**
10  **had meetings just with his deputies.**
11     Q   So with respect to deputies only,
12  his meetings were not daily, but occasional.
13     **A   That's correct.**
14     Q   And that would include Ms. Heindel
15  as General Deputy.
16     **A   That's correct.**
17     Q   And you're saying he had meetings
18  with all of the executives, including all
19  directors and assistant directors weekly.
20     **A   That's correct.**
21     Q   But that was not a general
22  operational meeting, that was just his regular

Page 192

1  meeting with all of his executives.
2      **A   Yes, it was a standing meeting.**
3      Q   Okay.  And Ms. Heindel was invited.
4      **A   Yes.**
5      Q   So would it be fair to say that
6  during your experience as an executive at
7  DIRM, and prior to Mr. Deshpande taking over
8  as Acting Director of DIRM, there had never
9  been daily operational meetings of the
10  deputies?
11     **A   I can't state that one way or**
12  **another with certainty, because my job, for**
13  **the most part, was not in operations, so I**
14  **don't know if Mr. Demitros or Mrs. Heindel had**
15  **meetings with the other deputies.  For**
16  **example, really, operations tends to be pretty**
17  **much infrastructure, and I don't know whether**
18  **there was a standing meeting in that area.  I**
19  **probably wouldn't have been there.**
20     Q   And Ms. Heindel may not have been
21  there, either, if it was about infrastructure.
22     **A   She, typically, would be, because**

Page 193

1 she was kind of -- she was involved in a lot
2 of the big issues.
3     Q   Well, you say she typically would
4 be, but you just said prior to that that you
5 weren't at those meetings, so how would you
6 know whether she was there or not?
7     A   Well, just from talking with her.  I
8 know that she was very involved in some of the
9 issues we had with infrastructure.  I can't
10 remember if it was main frame or servers, but
11 I know that she was very involved in some of
12 those issues.
13     Q   But you don't know whether there was
14 -- she was part - under Demitros, whether she
15 was part of a daily operational meeting,
16 because you don't know that one took place.
17 Is that correct?
18     A   I'm not sure.
19     Q   You don't know?
20     A   I'm not sure.
21     Q   When you were Deputy to Mr.
22 Demitros, were there daily operational

Page 194

1 meetings?
2     A   I don't know.
3     Q   With Mr. Demitros.
4     A   I did not attend daily operational
5 meetings.
6     Q   When you were an Assistant Director
7 under Mr. Demitros, who was your deputy?
8     A   I reported to different deputies
9 when I was an assistant.  I reported to Carol
10 Heindel at one point, and I reported to Robert
11 Shepherd at one point, as well.
12     Q   Did you ever have occasions to talk
13 to Ms. Heindel at the time, when you were
14 working for her, when you were an Assistant
15 Director, about whether or not she attended
16 any daily operational meetings with Mr.
17 Demitros?
18     A   I don't think I would have even
19 asked her that question, because I wasn't
20 involved in operations.
21     Q   And the same question for Mr.
22 Shepherd - did you ever talk to him about

Page 195

1 whether, or find out that there was any daily
2 operational meeting to which he was invited?
3     A   I don't recall Mr. Shepherd talking
4 about that.
5     Q   Now other than looking at the
6 calendar for Mr. Bartell for 2003 --
7         MR. SHAPIRO:  The calendar that she
8 has.
9         MS. BIBLIN:  The calendar that you
10 have, that you looked at.
11         BY MS. BIBLIN:
12     Q   You don't know what those meetings
13 were about, do you?
14     A   Well, in some cases I would say that
15 I do, because it's fairly -- the title may be
16 fairly specific to an issue, or there may have
17 been an attachment, like a Word document, or
18 an Excel spreadsheet, or something.
19     Q   And did you keep those?
20     A   Yes.
21     Q   And those were also stored at your
22 home?

Page 196

1     A   Yes.
2     Q   Do you remember what any of those
3 attachments were?
4     A   I don't -- well, first of all, I
5 need to clarify that I'm not sure that I have
6 any calendar with attachments for Mr. Bartell.
7 I would have to go back and look at the
8 calendars themselves.
9     Q   Okay.  Well, you said a moment ago
10 that there were calendars with attachments and
11 Word documents.
12     A   Well, I've seen calendars with
13 attachments and Word documents.  Whether I
14 have any of those for Mr. Bartell is another
15 question.  I'm not sure that I do.
16     Q   Okay.
17     A   I can't --
18     Q   I'm sorry.
19     A   I can't validate that at this time.
20     Q   Okay.  The ones that you were just
21 mentioning, where you said you saw calendars
22 with Word documents and Excel spreadsheets

Page 197

1  attached was in the context of talking about
2  what you knew of Mr. Bartell's meetings.  So
3  does that mean that you looked at those in Mr.
4  Bartell's calendar?
5      A   Well, you were asking me how I knew
6  -- if I knew what the topic of the meetings
7  was, and I was speculating that I may have
8  been more clear on what the purpose of the
9  meeting was, depending on the title of the
10 meeting, and whether or not there was some
11 kind of an attached document or spreadsheet.
12     Q   Okay.  So you were talking
13 hypothetically.
14     A   Yes.
15     Q   Okay.  Now did you ever talk to Ms.
16 Heindel about whether she was invited to any
17 of these meetings?
18     A   She told me that Mr. Deshpande told
19 her that she could come to any meeting she
20 wanted to; however, she wasn't specifically
21 invited to there was either weekly or bi-
22 weekly luncheons that Mr. Deshpande had with

Page 198

1  Mr. Bartell, and I can't remember the other -
2  oh, Mr. Collins, who was serving in my
3  position.  And I can't remember who the other
4  deputy was.
5      Q   Russomano?
6      A   Yes, Russomano.
7      Q   So she wasn't invited to regular
8  luncheon meetings.
9      A   That's correct.
10     Q   And were those meetings that you
11 found out about on the calendar?
12     A   Yes.
13     Q   And then you asked her about those
14 meetings?
15     A   I don't ask her about those specific
16 meetings.
17     Q   So how do you know she wasn't
18 invited, or what the purpose of them was?
19     A   She's not on the invitation list.
20 She's the General Deputy to the Division
21 Director.  General Deputy, typically, is
22 involved in most meetings.

Page 199

1      Q   Is there a requirement that the
2  General Deputy be invited every time Mr.
3  Bartell goes to lunch?
4      A   Well, I think when there's a
5  standing, whether it's weekly or bi-weekly
6  luncheon, and you only invite the boys, and
7  you don't invite the most senior key person in
8  your office, it looks a little strange.
9      Q   But you don't know what that was
10 about.
11     A   I think it's about discrimination.
12     Q   Okay.  And that's your conclusion.
13     A   Yes, it is.
14     Q   Without knowing what took place at
15 those luncheons, or if they existed.
16     A   That's my conclusion.
17     Q   Now you say you were looking at Mr.
18 Bartell's calendar; he doesn't issue the
19 invitation for the meetings, does he?
20     A   Some of the meetings to which he
21 sent invitations, and some of the meetings
22 were meetings to which he had been invited.

Page 200

1      Q   Okay.  Do you know whether there was
2  a business purpose for any of those meetings,
3  the lunch meetings?
4      A   I would assume so.
5      Q   But you don't know.
6      A   I wasn't there, but I would -- I
7  don't know.
8      Q   You're just assuming that it was a
9  business purpose.
10     A   Well, since it was all of the
11 deputies, except one - yes, that's what I
12 would think.  I mean, this is work.
13     Q   And how regular were those meetings?
14     A   They were either weekly or bi-
15 weekly.  I'd have to go back and look at the
16 calendars.
17     Q   And that was during 2003?
18     A   That's correct.
19     Q   Now to your knowledge, Ms. Heindel
20 hasn't raised any complaints through the
21 channels at FDIC about any discrimination
22 against her, has she?

Page 201

1    A    I don't know.

2    Q    And you weren't working in DIRM at

3    that time, other than that was your assigned

4    position, but you weren't doing DIRM work

5    during 2003, after Mr. Deshpande became Acting

6    Director.

7    A    That's correct.

8    Q    You were, at that point, assigned to

9    a detail in DOF.

10   A    That's correct.

11   Q    Are you claiming any discrimination

12   against yourself arising out of what you

13   perceive to be these lunch meetings of the

14   boys in 2003?

15   A    I don't understand your question.

16   Q    Are you claiming that the existence

17   of these 2003 lunch meetings of the boys that

18   you're deducing happened from a calendar

19   constituted discrimination against you,

20   personally?

21   A    It could be construed that way.

22   Q    How?  Would you explain that?

Page 202

1    A    Because my position of record was in

2    DIRM, and when a person is detailed elsewhere,

3    a detail, there's a presumption that the

4    person will return to the position of record,

5    and so I would have considered it advisable

6    for them to keep me in the loop, because

7    theoretically, I would have been returning.

8        In point of fact, my first detail

9    there was out of DIRM to the Division of

10   Finance, was for 60 days.  And I had every --

11   I felt that there was every intention that I

12   would be returned to DIRM within 60 days,

13   because I had every expectation that the

14   investigation, for which there are no

15   policies, would be concluded in a timely

16   manner, and it would be found that there was

17   no wrongdoing on my part, and I should be

18   restored to my position of record.  So yes, I

19   would construe that as discrimination.

20   Q    When you say you should have been

21   "kept in the loop", are you saying that you

22   should have been invited to meetings that Mr.

Page 203

1    Deshpande, or Mr. Bartell had while you were

2    on detail, that involved the senior executives

3    in DIRM?

4    A    I think that would be reasonable.

5    Q    And you think that should have

6    happened.

7    A    Yes.

8    Q    Okay.  The next item on page 36 of

9    Exhibit 1, Top 150 CMs and EMs.  This was a

10   FOIA request, it wasn't your request, was it?

11   A    You know, when I got the FOIA

12   response, I'm not sure how -- I believe the

13   FOIA response I got was listed, I think that's

14   what the title of it was.  I think yes,

15   because previously when I had done a FOIA

16   request, I believe what I got was an

17   Alphabetical listing of people.  And for this

18   particular FOIA request, I believe everyone

19   was ranked in order of pay.  And I believe

20   that it was the Top 150.

21   Q    Well, that's what you've indicated

22   the title is.  I think my question is, is this

Page 204

1    a FOIA request you made, or just one you

2    happen to have possession of?

3    A    I believe this is the FOIA request I

4    made.

5    Q    Number 06-0150.

6    A    I don't know.  I'd have to look at -

7    -

8    Q    If it was not the one that you

9    requested, do you recall how you may have

10   gotten this document, or who gave it to you?

11   A    Well, I would have to look at see if

12   this is my document.

13   Q    Okay.  Assuming it's not --

14   A    Well, I'm assuming that it is.

15   Q    Okay.  The opinion on sanctions in

16   the Hurwitz case, who gave you that?

17   A    I got that through internet search.

18   Q    Okay.  And why did you get it?

19   A    Actually, I think it was - is that

20   American Banker?

21   Q    No, actually, what you've cited is

22   the actual opinion.

Page 205

1    A    But I think I got a link from there.
2 You know, this was pretty widely reported, the
3 Hurwitz case was pretty widely reported, and
4 I thought it was just a very interesting case.
5 And I was very curious about reading it. And
6 when I read it, it just seemed to fit within
7 my case.
8    Q    Really, why?
9    A    Because the judge wrote a very
10 eloquent opinion, and noted that some of the
11 FDIC attorneys had lied under oath. And it
12 didn't appear that any of them had been
13 sanctioned in any way. I thought that was
14 pretty egregious, if true.
15    Q    Okay. And, therefore, how does this
16 relate to your case?
17    A    Because there are similarly situated
18 male executives at the FDIC who, apparently,
19 did something quite egregious, for which there
20 was no punishment. And, in fact, they
21 continue to receive pay increases and bonuses.
22    Q    Give me an example of one that has

Page 206

1 something to do with the Hurwitz case.
2    A    Jack Smith.
3    Q    And what's your basis for believing
4 that he lied?
5    A    It's not a basis, it's what the
6 judge stated in his opinion.
7    Q    So your basis for it is what the
8 judge stated.
9    A    I have no reason not to believe the
10 judge.
11    Q    Oh, okay. And you don't know
12 whether the judge had an evidentiary hearing
13 involving Mr. Smith.
14    A    I just know that the judge ruled on
15 this particular case. I know that the FDIC
16 lost the case, and I know it's going to cost
17 many, many millions of dollars, unless the
18 agency wins on appeal. And I know that in the
19 opinion, the judge stated that some FDIC
20 attorneys lied under oath.
21    Q    And do you know what Judge Hughes
22 accused Mr. Smith of lying about?

Page 207

1    A    I just recall that there were
2 several attorneys mentioned. Jack Smith just
3 stood out in my mind, because he was a Deputy
4 General Counsel here, which is a very high
5 position. As a matter of fact, I believe you
6 were within his chain of command at that time,
7 at the time this decision was rendered.
8    Q    That's right. And what do you
9 deduce from that connection, that I worked for
10 Jack Smith?
11    A    I was just stating a fact.
12    Q    Okay. Are you --
13    A    I wasn't --
14    Q    -- any deduction that I lie under
15 oath, or anything like that?
16        MR. SHAPIRO: Are you under oath?
17        THE WITNESS: No, I'm not making
18 such a deduction.
19        MS. BIBLIN: Just checking. Okay.
20        BY MS. BIBLIN:
21    Q    Have you ever tried to look at my
22 personal calendar on Outlook?

Page 208

1    A    Yes.
2    Q    And what did you find out?
3    A    You have not given permission for me
4 to access your calendar.
5    Q    That's pretty good. Did you ever
6 try to look at Mr. Smith's calendar?
7    A    No.
8    Q    I guess by realizing that I worked
9 for Mr. Smith, you also recognize that I don't
10 work for Ms. Bovenzi.
11    A    Well, you do, and you don't.
12    Q    Oh, really. Based on what are you
13 saying that?
14    A    I believe that you do meet with her.
15    Q    And what's your basis for that?
16    A    It's just something I've heard.
17    Q    And who have you heard that from?
18    A    Various people.
19    Q    Really?
20    A    I've heard that you do converse with
21 her, you converse with Jimmy Lawrence.
22    Q    And based on that, what do you

Page 209

1  conclude about me and Ms. Bovenzi?
2      A   I guess I'd say that jury is still
3  out.
4      Q   You haven't done any investigation
5  to find out how I know Mrs. Bovenzi, do you?
6  Have you done any investigation to find out
7  how I know her?
8      A   How you know her?
9      Q   Yes.
10     A   I'm not sure what you mean.
11     Q   Well, do you think I know her
12 because I work with her, or do you think I
13 have some other relationship with her?
14     A   I have no idea.
15     Q   Just wondering what you've found
16 out.  Okay.  The next document on your item
17 here is IT Program Assessment, Chapter 1,
18 Strategy Report, September 8th, 2003.
19 Prepared for the FDIC by Deloitte Consulting,
20 September 22nd, 2003.  How did you get that
21 document?
22     A   That was sent to everyone in the

Page 210

1  Division of Information Resource Management,
2  I believe.
3      Q   Well, you stated that you weren't in
4  the Division of Information Resource
5  Management at the time, you were on detail.
6  And you were being kept out of the loop, so
7  how did you get this document?
8      A   I'd have to go back and look.  I
9  just remember getting it.  I'm not quite sure
10 how I got it, but I remember getting an email,
11 and either this was an attachment, or another
12 - I'm not sure.  I'd have to look.
13     Q   By looking at the document itself
14 that you maintain at your house, would you be
15 able to determine from where it came?
16     A   I seem to recall that I got it
17 because an email was sent out, and this was an
18 attachment to the email.  But I don't remember
19 who all the people were on the email that - I
20 don't remember what the email distribution
21 was.
22     Q   You said earlier you thought it was

Page 211

1  sent to everybody in DIRM, and just now you
2  said that you weren't sure what the
3  distribution was.
4      A   I think this went to everyone in
5  DIRM, and I think it went to parties outside
6  of DIRM, but I just don't remember.
7      Q   Okay.  And the one after that, the
8  IT Program Assessment, Chapter 3, December
9  5th, 2003 - how did you get that?
10     A   I think that was by email, as well,
11 but I'm not positive.
12     Q   Do you think it was from the same
13 source from which you got the Chapter 1
14 strategy report?
15     A   I don't remember.
16     Q   Do you know whether these are public
17 documents?
18     A   I believe they are.
19     Q   What makes you believe that?
20     A   Because it was all about the
21 transition, and how DIRM was going to be
22 restructured, and I think all of these

Page 212

1  materials were shared at employee meetings,
2  with all the employees.  I don't think there
3  was anything --
4      Q   How do you know that?  You say you
5  think that, how do you know that?
6      A   I just think I remember that there
7  were briefings, hearing about briefings that
8  were being done for all employees.
9      Q   When you say you heard about this,
10 how did you hear about it?
11     A   From employees in DIRM.
12     Q   Which employees in DIRM?
13     A   It was just pretty much a general -
14 it was a big project there.
15     Q   Well, you claim that you were,
16 again, left out of the loop during 2003, so
17 how were you getting this information?
18     A   I was left out of the loop by senior
19 management.  I wasn't left out of the loop by
20 my friends.
21     Q   So who were your friends in DIRM
22 that were giving you information in 2003?

Page 213

1    A    I have a lot of friends in DIRM.
2    Q    Let's name them one-by-one.  Who are
3 the people giving you information in 2003 in
4 DIRM?
5    A    About what?
6    Q    We're just discussing it.  You tell
7 me who the people were that were giving you
8 this information in 2003.
9    A    I don't really under -- first of
10 all, I told you that I'm not really sure how
11 I got this information.
12    Q    Well, then you just tell me who the
13 people are that you believe are your friends
14 in DIRM in 2003.
15    MS. BIBLIN:  Let the record reflect
16 that Mr. Shapiro is whispering to his client.
17    MR. SHAPIRO:  How inappropriate for
18 a lawyer to talk to his client.
19    MS. BIBLIN:  While a question is
20 being asked.
21    MR. SHAPIRO:  Let the record reflect
22 - my goodness, do you want an answer to your

Page 214

1 question?  Do you want an answer to your
2 question?
3    MS. BIBLIN:  I'm asking questions.
4    MR. SHAPIRO:  Yes, do you want an
5 answer, or do you just want to ask?
6    MS. BIBLIN:  All right.  Do you have
7 an objection to make here?
8    MR. SHAPIRO:  I want to know if you
9 want to ask a question, instead of talking to
10 me.  Talk to her.  Ask a question.
11    MS. BIBLIN:  I have been talking to
12 her, and you interrupted.
13    MR. SHAPIRO:  I didn't interrupt
14 anything.  Ask a question.  You made the
15 comment.  Just ask the question.
16    BY MS. BIBLIN:
17    Q    I want you to name the people who
18 were your friends in 2003 at DIRM, who were
19 giving you information about what was going on
20 in DIRM.
21    A    Okay.  Well, I can give some
22 examples; Gloria Turner, Doreen Fulton.

Page 215

1    Q    Who else?
2    A    Linda Wainwright.
3    Q    Who else?
4    A    Joan Grigg.
5    Q    What was the first name?
6    A    Joan.
7    Q    Oh.  Grigg?
8    A    Grigg, G-R-I-G-G.
9    Q    Oh.
10    A    Sharon Roberts.  Those are probably
11 the people I've been closest to.
12    Q    Okay.  What's Gloria Turner's
13 position in DIRM?
14    MR. SHAPIRO:  Then or now?
15    MS. BIBLIN:  Then.
16    THE WITNESS:  I think she was a
17 Management Analyst.
18    BY MS. BIBLIN:
19    Q    And who did she work for?
20    A    At what time?
21    Q    When she was in DIRM.
22    A    She worked for a lot of different

Page 216

1 people.  We reorganized a lot.
2    Q    Who did she work for in January of
3 2003, did she work under you?
4    A    No, she worked for Deborah Sweeney.
5    Q    And did she continue to work for
6 Deborah Sweeney throughout 2003?
7    A    Yes.
8    Q    Okay.  And does she still work in
9 DIRM?
10    A    No.
11    Q    What happened to her?
12    A    She accepted a position with the
13 FBI.
14    Q    When was that?
15    A    I think it was sometime in 2005.
16    Q    Do you know what she does for FBI?
17    A    She's working in the IT area.
18    Q    Do you still talk to her?
19    A    Yes.
20    Q    When was the last time you talked to
21 Gloria Turner?
22    A    Probably a couple of weeks ago.

Page 217

1   Q   Where is she living now?
2   **A   In Maryland.**
3   Q   Where in Maryland?
4   **A   I think she's in PG County.**
5   Q   What about Dorian Fulton, who was
6   she working for in 2003?
7   **A   Charlotte Craig.**
8   Q   And what was Charlotte Craig's
9   position in 2003?
10  **A   She was in charge of the**
11  **Administration section.**
12  Q   And who did she report to?
13  **A   She reported to - in January, she**
14  **reported to me.  For the balance of the year,**
15  **she reported to James Collins.**
16  Q   And what was Doreen Fulton's job?
17  **A   Management Analyst.**
18  Q   And is she still with the FDIC?
19  **A   No.**
20  Q   When did she leave the FDIC?
21  **A   She left during 2005.**
22  Q   And do you know why she left?

Page 218

1   **A   She accepted a position with the**
2   **FBI.**
3   Q   Is she working in the same area
4   where Gloria Turner is working, do you know?
5   **A   No, she is not working in the same**
6   **area.**
7   Q   Okay.  Do you know what she's doing
8   at the FBI?
9   **A   She's working in Personnel.**
10  Q   And do you still communicate with
11  her?
12  **A   Yes.**
13  Q   And what's the most recent time you
14  talked to Doreen Fulton?
15  **A   Maybe a month or two ago.**
16  Q   Okay.  What about Linda Wainwright,
17  she was working at DIRM, and still works at
18  DIRM?
19  **A   That's correct.**
20  Q   What does she do there?
21  **A   She is, I believe, a Management**
22  **Analyst, and she reports to Rack Campbell and**

Page 219

1   **his area is responsible for Internal Controls**
2   **and Audit Coordination.**
3   Q   Okay.  And you still talk to her?
4   **A   Yes.**
5   Q   And is it possible that either she,
6   or Ms. Fulton, or Ms. Turner may have
7   forwarded the IT Program Assessments to you?
8   **A   It's possible.**
9   Q   How about Joan Grigg, what was her
10  job in 2003?
11  **A   She was a Management Analyst.**
12  Q   And who did she report to?
13  **A   To Rack Campbell.**
14  Q   Did she work with Linda Wainwright?
15  **A   That's correct.**
16  Q   Okay.  And did Rack Campbell report
17  to you?
18  **A   Yes.**
19  Q   Okay.  So does he now report to
20  Steve Anderson?
21  **A   Yes.**
22  Q   And is Joan Grigg still with the

Page 220

1   FDIC?
2   **A   No.**
3   Q   When did she leave?
4   **A   I think it was September, 2005.**
5   Q   And where is she now, do you know?
6   **A   No, actually it was earlier than**
7   **that.  She left in May, 2005.**
8   Q   Do you know why?
9   **A   She took the buy-out and her**
10  **retirement date was in September.**
11  Q   So she retired?
12  **A   Yes.**
13  Q   Do you still talk to her?
14  **A   Yes.**
15  Q   And when is the most recent time
16  you've talked to her?
17  **A   A month or so ago.**
18  Q   Do you know whether Gloria Turner,
19  or Doreen Fulton took the buy-out?
20  **A   They both took the buy-out.**
21  Q   And what about Sharon Roberts?
22  **A   Yes.**

Page 221

1    Q    She took the buy-out?

2    A    I believe so.

3    Q    And what was her position in DIRM?

4    A    I think she may have been a

5    Management Analyst.

6    Q    Did she work for Rack Campbell?

7    A    Yes.

8    Q    Did she - were you her second level

9    supervisor for a while?

10    A    Yes.

11    Q    And in 2003, was she still working

12    for Rack Campbell?

13    A    Yes.

14    Q    And is it possible that she may have

15    given you any of these documents from

16    Deloitte?

17    A    It's possible.

18    Q    When did Ms. Roberts leave the FDIC?

19    A    I'm not sure.  I think it was either

20    2004, or 2005.  I'm not sure.

21    Q    And do you know what she does now?

22    A    She retired, and I don't believe

Page 222

1    she's currently employed.

2    Q    Is there anybody else that we

3    haven't named that you say are your friends

4    that were giving you information about what

5    was going on in DIRM in 2003?

6    A    Those are the people that most

7    readily come to mind.

8    Q    Regarding the minutes - we talked

9    about the Audit Committee.  New Financial

10    Environment - request for amended investment

11    budget authorization - report to the Board of

12    Directors, April 23rd, 2004.  What is that

13    document?

14    A    That's a document that is fairly

15    lengthy, and it talks about the need to

16    baseline the project because it was exceeding

17    both schedule and budget.  And in this

18    particular document, it's a request to the

19    board to significantly increase the budget and

20    the time line so they could complete the

21    project.

22    Q    And would you agree that this is a

Page 223

1    confidential document of the FDIC?

2    A    No.

3    Q    Do you think it's a public document?

4    A    I don't know if it would be

5    considered public, but I don't believe it's

6    considered confidential.  It's certainly

7    readily available within the Division of

8    Finance.  It's not kept under lock and key.  I

9    mean, to me, pretty much - I mean, maybe

10    coming from the Navy, where we did have

11    confidentiality, and we had locked document,

12    locked cabinets, but at least in the Division

13    of Finance, this is a document that could be

14    picked up off of just about anyone's

15    bookshelf.  So that's one reason why I

16    wouldn't consider it confidential.

17    Q    And who wrote this document, to your

18    knowledge?

19    A    It's probably a group of people.

20    Q    Do you know who made the

21    presentation to the board about this?

22    A    I wasn't present at the board

Page 224

1    meeting, but I understand that it was, I

2    believe that Mike Bartell was a presenter, and

3    I don't know whether it was Steve App or Fred

4    Selby who was the other presenter.

5    Q    Okay.  And how do you know who

6    presented it?

7    A    Because it was commonly discussed in

8    the Division of Finance.

9    Q    And you say you took a copy of this

10    document home.

11    A    That's correct.

12    Q    Why did you take it home?

13    A    Because I believe that it shows that

14    senior executives and similarly situated

15    executives very badly mismanaged a project

16    resulting in increased costs of millions and

17    millions of dollars to the point where the

18    Chairman was asking, apparently during the

19    meeting, who got fired because of this, and

20    yet not only did nothing adverse happen to the

21    executives involved in this project, but some

22    of them received the Chairman's award, pay

Page 225

1   increases, bonuses.
2      Q   And who are the "some of them" that
3   you're referring to?
4      A   Michael Bartell, Mark Brennaman,
5   Fred Selby, James Anderson. He's not an
6   executive, he's a Corporate Manager. Karen
7   Hughes, I think those are probably the key
8   people. Oh, sorry, I left out John Bovenzi
9   and Steve App.
10     Q   John Bovenzi and Steve App, are you
11  saying they got bonuses because of NFE?
12     A   I believe that it was generally felt
13  that this has been - this was touted as a
14  highly successful project, when those of us
15  who were involved in it know that it's far
16  from that.
17     Q   Who's "those of us", besides you,
18  that think it was not successful?
19     A   You can interview just about anyone
20  in DOF who works with this system --
21     Q   I'm interviewing you, Ms. Roberson.
22     MR. SHAPIRO: Is this an interview?

Page 226

1      MS. BIBLIN: She's the one that used
2   the term "interview", so I want to know what
3   you think.
4      MR. SHAPIRO: She's told you what
5   she thinks.
6      BY MS. BIBLIN:
7      Q   Who, besides you?
8      A   It's generally seen as a failure.
9      Q   Name people who think it's a
10  failure.
11     A   It's generally seen as a failure.
12     Q   So are you saying you're refusing to
13  name anybody who thinks it's a failure?
14     A   What I'm telling you is that it's
15  commonly discussed within the Division of
16  Finance that there are significant problems
17  with this system. That's what I'm telling
18  you. There's no point in naming all of the
19  employees, or most of the employees in the
20  Division of Finance.
21     Q   Well, let me decide what point there
22  is. You tell me who it is, besides you, that

Page 227

1   believes that this was a failure, and that
2   nobody should have been rewarded for their
3   work on it.
4      A   Thomas Peddicord.
5      Q   Who else?
6      A   That would be the key person I would
7   mention.
8      Q   Anybody else besides Mr. Peddicord?
9      A   That would be the key person.
10     Q   Is there anybody else besides Mr.
11  Peddicord? Do you have an answer to my
12  question? Is there anybody else besides Mr.
13  Peddicord?
14     A   I think that would be the key person
15  I would mention.
16     Q   Is there anybody else besides Mr.
17  Peddicord?
18     A   I think the people who work in the
19  systems area in DOF would uniformly say that
20  it's a system with many problems.
21     Q   Who are the people that you're
22  referring to?

Page 228

1      A   There are about 40 of them.
2      Q   Who is the supervisor?
3      A   Ralph Elosser.
4      Q   And are you saying that Mr. Elosser
5   would say that it's a failure?
6      A   Mr. Elosser would probably state
7   that it's a system with significant problems,
8   that makes his job very difficult.
9      Q   And is there anybody else besides
10  Mr. Elosser, or are you just saying everybody
11  who works for Mr. Elosser would say that?
12     A   Well, let me say something that
13  might be helpful to you. The Assurant
14  Statements that we referenced earlier were
15  prepared by my subordinate managers and rolled
16  up to me, so I have an Assurant Statement from
17  Jim Anderson, I have an Assurant Statement
18  from Tom Jones, I have an Assurant Statement
19  from Ralph Elosser. In those Assurant
20  Statements, they cannot assure me that I don't
21  have serious risks with the system, as
22  delivered.

Page 229

1      Q   And when you say "serious risks",
2   you mean potential risks.
3      **A   No, not potential. We don't have**
4   **security documentation, we don't have**
5   **operations and production documentation. We**
6   **can't assure the GAO, which is why we got**
7   **another reportable condition in 2005, that**
8   **access is appropriate, and that we don't have**
9   **segregation of duties issues.**
10     Q   Okay. Who are you saying got
11  rewarded for NFE?
12     **A   Rewarded? I guess I can repeat**
13  **that. I would say, again, that those who were**
14  **rewarded would include Michael Bartell, the**
15  **Director --**
16     Q   Okay. You're referring now to the
17  same group from before. What's your basis for
18  saying these people were rewarded for NFE, per
19  se?
20     MR. SHAPIRO: I don't think she
21  actually said that. I think if you go back,
22  you'll see that she didn't actually say that.

Page 230

1   You ask her again, but --
2      BY MS. BIBLIN:
3      Q   You're saying people were rewarded
4   for NFE.
5      MR. SHAPIRO: No.
6      THE WITNESS: There were some people
7   who were specifically rewarded for NFE. There
8   was a Chairman's award this year for people
9   associated with NFE. And you may recall the
10  photo in the FDIC News -- in the FDIC News,
11  there was an article on the Chairman's award
12  to these people. And in the picture on the
13  front row we have John Bovenzi, we have Steve
14  App, we have Fred Selby, we have Karen Hughes,
15  we have Jim Anderson, we have a lot of people
16  that were closely associated with that
17  "successful" project.
18     BY MS. BIBLIN:
19     Q   And you believe Mr. Selby was
20  rewarded for NFE?
21     **A   Yes, I do.**
22     Q   On the OIG assessment of the FDIC's

Page 231

1   Information Security Program for 2001 and
2   2002, Executive Summary at the bottom on page
3   36 - what's the significance of that document?
4      **A   The IG does a report every year. It**
5   **usually precedes the GAO audit, and this is a**
6   **report that they have to do in compliance with**
7   **federal regulation to look at several areas in**
8   **the IT arena, and then rate them on a**
9   **scorecard as yellow, green, or red.**
10        **This particular report showed that**
11  **during the time that I was overseeing the**
12  **Information Security area, that I was making**
13  **significant progress in fixing longstanding**
14  **problems.**
15     Q   Okay. Now you refer to the
16  Executive Summary here. How long is the
17  Executive Summary?
18     **A   I believe it's a few pages.**
19     Q   Is that a public document?
20     **A   I don't know.**
21     Q   How did you obtain it?
22     **A   I worked in that area. I got a copy**

Page 232

1   of it.
2      Q   I'm sorry. So you obtained it
3   during the time you were at DIRM?
4      **A   Yes.**
5      Q   Okay. And you took it home.
6      **A   Yes. I took it home because when I**
7   **was detailed out of DIRM, when I was informed**
8   **of this detail on a Friday, I was asked to**
9   **immediately pack up my office and get all of**
10  **my belongings out before the following Monday,**
11  **so I had to just put all my files in boxes and**
12  **carry all of them home.**
13     Q   Do you consider your belongings to
14  include documents belonging to the
15  Corporation?
16     **A   They were not official files. There**
17  **were multiple copies of this.**
18     Q   So the OIG assessment of the FDIC's
19  Information Security program copy that you
20  took home you think is not an official file
21  because it was a copy?
22     **A   The official file is maintained by**

Page 233

1  the IG. It's their document.
2      Q   But is this a public document?
3      A   There are many copies. There were a
4  number of us in DIRM who had copies of this
5  document.
6      Q   When you say there were multiple
7  copies of the same document, are you referring
8  to the very last item on page 36, the OIG
9  Assessment of the FDIC's Information Security
10 Program?
11     A   Yes.
12     Q   Okay. Going to the document above
13 that, the independent evaluation of FDIC's
14 Information Security Program 2003 - evaluation
15 report 03-340. Do you recall what that
16 document is?
17     A   I believe that's also what they call
18 a FISMA report, F-I-S-M-A. And it's, again,
19 the annual review that's done by the IG's
20 office preceding the GAO audit.
21     Q   Okay. Do you have the entire
22 report?

Page 234

1      A   I think I might.
2      Q   How did you get it?
3      A   I believe I got a copy of that from
4  Ned Goldberg.
5      Q   How did it come about that you got
6  it from Ned Goldberg?
7      A   I believe that he just gave me a
8  copy.
9      Q   This is when you were on the detail
10 to Mr. Peddicord?
11     A   That's correct.
12     Q   Okay. Did he tell you that it was
13 confidential?
14     A   I don't ever recall hearing the word
15 "confidential" associated with this document.
16     Q   Did you read the document?
17     A   I don't really remember it that
18 well.
19     Q   You don't recall reading in the
20 summary of the document, in the management
21 comments, that this document was not intended
22 to be made for public release?

Page 235

1      A   Well, I haven't released it
2  publicly.
3      Q   That's not the question I asked.
4  I'm just asking if you remember reading that?
5      A   No, I do not.
6      Q   Okay. So you have the entire
7  document, and you took it --
8          MR. SHAPIRO: She said she thinks
9  so.
10         BY MS. BIBLIN:
11     Q   You think you have the entire
12 document, and you took it home.
13     A   That's correct.
14     Q   Okay. And why did you take it home?
15     A   I think it's a good report for me to
16 have. I think that it supports my case, that
17 I made progress with security, and there are
18 still issues with security. And I believe in
19 this particular report that they actually got
20 worse in one area after I left, but I'm not
21 positive about that. And I guess I should
22 state for the record that at the time Mr.

Page 236

1  Goldberg gave me this document, I was still -
2  my position of record was still as Deputy for
3  Information Technology Management.
4      Q   Okay. If you were to look for that
5  document today, how would you go about finding
6  it, other than at your house?
7      A   Finding the -- which one?
8      Q   The OIG --
9          MR. SHAPIRO: The independent
10 evaluation?
11         MS. BIBLIN: The independent
12 evaluation, yes.
13         THE WITNESS: If I wanted a copy of
14 it, I could talk to Ned Goldberg, I could talk
15 to Rack Campbell, I could talk to Steve Beard
16 or Russ Rowe in the IG's office.
17         BY MS. BIBLIN:
18     Q   Okay. The last item that you've
19 listed at the top of page 37, is the Chief
20 Information Officer Program Review of FDIC's
21 Information Security Program Required by the
22 Government Information Security Reform Act,

Page 237

1  September 2002. What is that document?
2      A  I think that's the -- when the IG
3  does their annual assessment, the Program
4  Office also has to do an assessment. And I
5  believe that this is part of the final report
6  that goes forward for the Chairman's signature
7  before the document goes to the Office of
8  Management and Budget.
9      Q  Is it a public document?
10     A  It's submitted to the Office of
11  Management and Budget, but I don't know if
12  it's considered public or not.
13     Q  Okay. And how did you get it?
14     A  In 2002, I was responsible for that
15  area.
16     Q  So that would have been part of your
17  --
18     A  Part of my job.
19     Q  Okay. Why did you choose to take
20  that home?
21     A  It was in the boxes that I took home
22  when I packed up my office.

Page 238

1      Q  Well, did you specifically select
2  that?
3      A  When I packed up my office, I only
4  had a few hours, so I just threw things into
5  boxes and put boxes in my car, and took my
6  belongings with me. I had the expectation at
7  that time that I would be returning at some
8  point, and I just stored the boxes in my
9  basement for a long time, until I waited to
10  see where I was going to go next.
11     Q  Since that time, however, have you
12  segregated from the boxes certain things that
13  you believe to be relevant to your complaint,
14  and certain things that are not?
15     A  I've thrown a lot of things out, and
16  I have kept some things that I believe are
17  relevant to my complaint.
18     Q  So would it be fair to say from what
19  you're saying, that what you threw out is
20  stuff that was not relevant to your complaint,
21  and everything else that you kept was relevant
22  to your complaint?

Page 239

1      A  That's probably true.
2      Q  Are there any documents that fall
3  into a category of took them home, realized
4  somebody else could use them, and you brought
5  them back and gave them to somebody at DIRM?
6      A  I don't remember.
7      Q  Okay. When you say you don't
8  remember, do you mean you don't remember doing
9  that, or you're not sure if you did it, or you
10  just do not recall?
11     A  The documents that I had in my
12  possession when I was in DIRM were not the
13  official files, they were copies of things,
14  and there were even things like T&As that I
15  just picked up when I left. I just picked up
16  everything. I just emptied all the drawers
17  and put the belongings into boxes.
18     Q  Well, was there anything in
19  particular that you can recall saying gee, I
20  should have left this behind, or I should give
21  this to somebody else, it's an official file?
22     A  No, I didn't have anything official

Page 240

1  to give anyone.
2          MS. BIBLIN:  Is this a good time to
3  take a short break?
4          MR. SHAPIRO:  We break when you
5  want. If you think it's a good time, then
6  it's a good time for us. Whatever you think.
7          MS. BIBLIN:  We've gone for a while.
8  Why don't we take a quick bathroom break, or
9  whatever, and come back in a couple of
10  minutes.
11         (Whereupon, the proceedings went off
12  the record at 2:40:10 p.m. and went back on
13  the record at 3:01:56 p.m.)
14         MS. BIBLIN:  Back on the record. I
15  want the record to reflect that Mr. Selby, who
16  was here for a little while, has left again,
17  while I pursue this particular line of
18  questioning.
19         BY MS. BIBLIN:
20     Q  Ms. Roberson, you've indicated in
21  your complaint that you have suffered personal
22  and physical damages as a result of the

Page 241

1 allegations that are at issue in this
2 litigation. Could you explain what these -
3 and I'm not talking about your financial stuff
4 right now. I'm talking about simply any
5 physical or personal anguish that you claim
6 that you have suffered as a result of the
7 claims in your complaint.
8   **A   The most glaring, or the most**
9 **prominent is depression, and I talked to my**
10 **primary care physician, who is Maria Bella**
11 **Natividad, and I've been under her care for a**
12 **while, both when she was practicing with**
13 **George Washington University, and now she has**
14 **her own private practice. And I was telling**
15 **her how painful it was to be, without warning,**
16 **without discussion, removed from - physically**
17 **from my office and detailed, and how traumatic**
18 **all of that was for me. And it was her**
19 **recommendation, it was not my request, it was**
20 **her recommendation that I take a anti-**
21 **depressant, and she prescribed Zoloft for me.**
22   Q   When was that?

Page 242

1   **A   And that was in, I believe, March of**
2 **2003.**
3   Q   Okay.
4   **A   And I have continued on that**
5 **medication since that time.**
6   Q   Is that the only medication she has,
7 or anybody else has prescribed for you that
8 involve either anxiety or depression?
9   **A   Yes.**
10   Q   Since that time?
11   **A   That's correct.**
12   Q   How much Zoloft are you taking on a
13 daily basis?
14   **A   It depends on what's happening to me**
15 **in this environment. Initially, I think it**
16 **was taking 25 milligrams, and then the**
17 **retaliation became so severe and so aggressive**
18 **that 25 milligrams did not work, and so we**
19 **boosted it to 50 milligrams.**
20   Q   When did you boost it to 50
21 milligrams?
22   **A   You know, I don't recall the exact**

Page 243

1 **dates, because we've gone back and forth.**
2 **I've done 50, and then I've dropped back to**
3 **25, and then I've gone back up to 50, so it's**
4 **just kind of depended on what was going on**
5 **here in the office.**
6   Q   You can't remember any specific
7 dates on which you changed the medication?
8   **A   No, because sometimes -- now I'm**
9 **just getting 50 milligrams, and if I want to**
10 **cut it in half, I cut it in half.**
11   Q   Is it a capsule or a hard pill?
12   **A   It's a hard pill.**
13   Q   So it's up to you, depending on how
14 you're feeling.
15   **A   Yes.**
16   Q   Okay. Is there any other drug that
17 you've taken since March of 2003 for anxiety?
18 I think I asked you that, but I just wanted to
19 make sure.
20   **A   No, I have not.**
21   Q   Okay. And have you undergone any
22 therapy, mental health therapy, concerning any

Page 244

1 of your depression?
2   **A   From 2003?**
3   Q   Since 2003.
4   **A   No.**
5   Q   Have you been diagnosed as depressed
6 since 2003?
7   **A   I'm not sure how Dr. Natividad would**
8 **state it from a clinical perspective. I**
9 **believe that she would probably say that I'm**
10 **clinically depressed, but otherwise, I don't**
11 **think she would have prescribed Zoloft.**
12   MS. BIBLIN: I just want the record
13 to reflect that right before the break, Mr.
14 Shapiro handed me a document, which is marked
15 as "highly confidential", and I'm not going to
16 read it into the record. I'm just going to
17 say it exists, and that you produced it to me
18 today right before the break, dated September
19 25th, 2006, and it's from Dr. Natividad.
20   MR. SHAPIRO: You could read it into
21 the record, as far as I'm concerned.
22   MS. BIBLIN: I don't want to,

Page 245

1 because you've mentioned it's highly
2 confidential, and this is part of the open
3 record.
4         MR. SHAPIRO:  Well, you've told --
5         MS. BIBLIN:  Right.
6         MR. SHAPIRO:  This is what I got
7 from the doctor when I asked her for a report,
8 and I turned it over to you, because we're
9 supposed to turn over the report to you, so I
10 have.
11         MS. BIBLIN:  Okay.  And let the
12 record reflect that I indicated to you I don't
13 believe that this meets the criteria --
14         MR. SHAPIRO:  And we'll discuss it
15 later, as you've said.
16         MS. BIBLIN:  Right.
17         MR. SHAPIRO:  But the point is that
18 I marked it "highly confidential" because of
19 the words used in the proposed draft
20 protective order, which we've just started
21 working on.  And if the report is not
22 confidential, then I don't care if this --

Page 246

1  this is not confidential to me.  I just
2 marked it that way, because I didn't want to
3 miss an opportunity.
4         MS. BIBLIN:  And just for the
5 record, actually, we started working on this
6 document over a year ago.
7         MR. SHAPIRO:  This document.
8         MS. BIBLIN:  The document that I
9 gave you, the confidentiality document.
10         MR. SHAPIRO:  The one that you just
11 emailed to me on Friday night.
12         MS. BIBLIN:  The one I emailed to
13 you on Friday night was actually -- it's just
14 a continuation of the same document we were
15 exchanging last August.
16         MR. SHAPIRO:  Okay.
17         MS. BIBLIN:  I just changed words
18 from Administrative Judge to Magistrate.
19         MR. SHAPIRO:  Not all the words.
20         MS. BIBLIN:  Not all the words.
21 Okay.  I will say that in this letter, Ms.
22 Natividad, or Dr. Natividad, says she's been

Page 247

1 treating you for the first time for
2 depression/anxiety with medications.
3         BY MS. BIBLIN:
4      Q    How long have you been seeing Dr.
5 Natividad?
6      A    **Probably since the late 1990s.**
7      Q    And she's an internist.  Correct?
8      A    **Family practice, internist.**
9      Q    Family practice.
10     A    **I guess, I'm not sure how they**
11 **characterize.**
12     Q    She's not a psychiatrist, is she?
13     A    **No, she's a family medicine - I**
14 **guess internist would be the right term.**
15     Q    And she's not a psychologist?
16     A    **No.**
17     Q    And she's not a social worker.
18     A    **Correct.**
19     Q    So she is an M.D.
20     A    **Yes.**
21     Q    Who treats you for general --
22     A    **Yes.**

Page 248

1      Q    -- medical health issues.
2      A    **Yes.**
3      Q    Are you having any type of therapy
4 with her?
5      A    **No.**
6      Q    Okay.  And when I refer to
7 "therapy", I'm referring to psychiatric
8 therapy, i.e., talk therapy.
9      A    **Yes.**
10     Q    Have you ever had that kind of
11 therapy before?
12     A    **Yes.**
13     Q    When did you have that type of
14 therapy?
15     A    **In the I'd say early 90s, probably**
16 **1992/93.**
17     Q    And how long did you continue?
18     A    **I can't remember the exact dates.  I**
19 **had two different -- therapy two different**
20 **times.  I think it might have been like late**
21 **`92 into `93.**
22     Q    And you say there was another time?

Page 249

1    **A   During this time frame, during this**
2    **`92/93 time frame, I went through therapy**
3    **twice.**
4    Q   Was it with the same --
5    **A   With the same therapist.**
6    Q   Okay.  And who was that therapist?
7    **A   Her name is Claire Foudraine.**
8    Q   How do you spell that?
9    **A   I'm not positive, but I think it's**
10   **F-O-U-D-R-A-I-N-E.**
11   Q   Okay.  And is she -- what kind of a
12   doctor is she?
13   **A   She's a licensed social worker.**
14   Q   And where is she located?
15   **A   I don't know where she's located**
16   **now.  She was in the District.**
17   Q   Do you have any reason to believe
18   she's no longer practicing in this area?
19   **A   I've tried to find her, and I tried**
20   **a lot of different kinds of internet searches,**
21   **and I have not been successful.**
22   Q   Had she diagnosed you back in 1992

Page 250

1    to 1993?
2    **A   I don't know that she actually**
3    **diagnosed me, but I did have - during the**
4    **first time that I was in therapy with her, I**
5    **went four, five, six times, and then there was**
6    **a break.  And then there was a different**
7    **situation, where I called her and went through**
8    **therapy with my husband at that time for maybe**
9    **four, five, six times, sessions.**
10   Q   And then after that, there was no
11   more?
12   **A   And then I never -- I only talked to**
13   **her one other time when she called me for a**
14   **referral to a divorce attorney.**
15   Q   She called you.
16   **A   She called me, because she had**
17   **someone who needed a referral, and she was**
18   **calling me for advice.  And I haven't talked**
19   **with her since.**
20   Q   So who did you recommend?
21   **A   (Laughing).  Betty Thompson.**
22   Q   She's the David Shapiro of divorces.

Page 251

1    **A   She is, she's tough.**
2    Q   Now you said there were two
3    different instances in which you went.  Could
4    you explain what caused you to go get therapy
5    in 1992?
6    **A   The first or the second?**
7    Q   Let's start with the first.  Let's
8    go chronologically.
9    **A   Okay.  The first incident involved**
10   **my supervisor at the time, John Lynn.  That's**
11   **L-Y-N-N.  And Mr. Lynn - I worked for him at**
12   **the Department of Housing and Urban**
13   **Development.  I had worked for him at the**
14   **Department of Commerce, and he was really - I**
15   **consider him kind of a mentor, and he hired**
16   **me, he promoted me.  I was rewarded, I did**
17   **very well.  It was really his recommendation**
18   **that got me to the Resolution Trust**
19   **Corporation, that weighed very heavily in me**
20   **getting a job there.  And I reported directly**
21   **to him for a year or more, year, year and a**
22   **half.  And during that time, Mr. Lynn felt the**

Page 252

1    **need, apparently, to have me in his office**
2    **frequently, and it wasn't necessarily to talk**
3    **about business.  It was to talk about his**
4    **travel, about his spending, about his choice**
5    **of wines, and it was just almost a daily**
6    **occurrence that he would expect me to be in**
7    **his office to just sit there.  And it became**
8    **more and more frustrating to have kind of this**
9    **person who seemed to be very fixated on me,**
10   **making it very difficult for me to try to**
11   **manage my area because he would stretch these**
12   **meetings out for long periods of time.  And so**
13   **finally -- and then when I wouldn't show up in**
14   **his office, he would be abusive toward me,**
15   **because I wasn't there.  And finally, I talked**
16   **with his supervisor.**
17   Q   Who was?
18   **A   Dennis F. Gear, and Dennis and I**
19   **went to lunch, and I knew that he and Mr. Lynn**
20   **had been friends and colleagues for many**
21   **years, and I explained to Dennis that this was**
22   **becoming a bigger and bigger problem for me,**

Page 253

1  and that I wasn't sure how to handle the
2  situation. And I sought his advice. And
3  Dennis' response to me was that it's very hard
4  when you have one person - me - whose career
5  is on an upward trajectory, and the other
6  person's career is going in the opposite
7  direction, and that can cause a lot of
8  conflict, particularly when there's been this
9  mentoring relationship. And so I thought that
10  it was helpful, and I was really hoping that
11  Dennis would help work this through, so that
12  we could all just go on.
13         I don't know what he said to John
14  Lynn, but John Lynn called me into his office
15  the next day, and was extremely abusive, to
16  the point where I went back to my office and
17  I cried for about an hour. I was just shocked
18  at his behavior, and it was just amazing. And
19  I was very hurt by all this, because I thought
20  he -- he had been my mentor. He had helped me
21  move ahead in my career. I couldn't
22  understand his behavior, so one of my

Page 254

1  employees, who is an ex-nun.
2     Q    Who is that?
3     A    Mary Kreuzberger, talked with me
4  about it, because people could see this was
5  very troubling to me. And she recommended
6  that I seek counseling, and I'd never gone to
7  counseling in my life, and I really felt there
8  was somewhat of a stigma attached to it. And
9  I was resistant to doing it, but she said you
10  really need to do this. You need to have this
11  documented somewhere, which is one reason why
12  I would be very happy to find Ms. Foudraine,
13  and I hope I can find her. So I went into
14  therapy, and actually, I was very glad I did
15  that, because it was helpful to me. And
16  within a couple of sessions of talking with
17  her, I realized I just needed a clean break
18  here. I need to move on with my life. And,
19  fortunately, Dennis Gear moved - reassigned me
20  and my entire staff to work for JoAnn Henry.
21  And I'm not sure exactly what date that
22  occurred, but I do know that I worked for

Page 255

1  JoAnn in 1994 and 1995. And that worked out
2  quite well, when she gave me very good
3  performance appraisals, and I received
4  rewards, cash awards both years that I worked
5  for JoAnn.
6     Q    Okay. Well, let's focus on just the
7  medical issues for a moment, if we could.
8         MR. SHAPIRO: I'm not sure these
9  things are medical issues, social worker is
10  not a doctor. Therapy you mean?
11         MS. BIBLIN: Yes.
12         MR. SHAPIRO: Okay. So the
13  therapeutic issues.
14         MS. BIBLIN: Yes.
15         MR. SHAPIRO: Yes. Okay.
16         BY MS. BIBLIN:
17     Q    You're saying when you initially
18  went to this Dr. Foudraine --
19     A    She was not a doctor.
20     Q    Excuse me, social worker, Ms.
21  Foudraine, was she covered by insurance?
22     A    Yes.

Page 256

1     Q    Did you submit it to insurance?
2     A    Yes.
3     Q    Who did you submit it to? What was
4  your insurance company at the time?
5     A    Well, George Washington University
6  Health Maintenance Organization, but it wasn't
7  - her services weren't provided through them.
8  My insurance with them covered it, but she was
9  with some other group. I don't know whether
10  they were under contract to GW, I don't know
11  what the arrangement was, but they had certain
12  psychological/social worker services that they
13  would refer people to, and that's where the
14  Health Maintenance Organization referred me.
15     Q    Okay. And you're saying what you
16  were feeling was ill from this, or you just
17  needed assistance in --
18     A    No, I did not feel ill from it. I
19  felt very troubled, and very hurt by it.
20  Frankly, I probably would not have sought
21  counseling if someone I trusted hadn't highly
22  recommended that I do it. But I wouldn't say

Page 257

1  that I was depressed.  I needed to talk to
2  someone who would say this man is just - has
3  a problem.  He's obsessed with you, and you
4  need to get as far away from his as you can,
5  and try to have a professional work experience
6  in the office, and not have to deal with these
7  other things that are very troubling to you.
8  But I would not consider myself depressed, and
9  I was not on any kind of medication.  And she
10  did not prescribe any medication for me.
11     Q    You said there was a break after
12  that, and you went back to her again.
13     A    Yes.
14     Q    And what occurred that made you want
15  to go back to her for counseling again?
16     A    I found out that my husband was
17  running around on me, and was having an affair
18  with a woman, not his wife.  And when I
19  discovered that, I found some information
20  after he had gone to work, and I had gotten my
21  daughter off to school.  And I found this poem
22  he had written to his girlfriend, and that was

Page 258

1  the first indication I had that he had
2  something else going on.  And I had only seen
3  Claire a number of months before, and she was
4  just such a great person, that I called her
5  with this issue, because I was just shocked.
6  So I called her, and she immediately - she
7  remembered me, and she made an appointment for
8  me, and I met with her, and she was very
9  helpful, and helped me decide what I was going
10  to do in terms of talking to my husband.  And
11  what I did was confront him with the
12  situation, and I gave him two options.  I gave
13  him the option of going off with this other
14  person, and we would settle up and he could
15  go, or his other option was to go through
16  family counseling, and he decided he would go
17  through family counseling.  So we went through
18  family counseling for some period of time,
19  maybe a month or so, and then it became very
20  clear to me and to Ms. Foudraine that it
21  really wasn't going to work out.
22     Q    And then what happened?

Page 259

1     A    Then I started going through all my
2  financial records, figuring out what I needed
3  to do from a strategic perspective, and then
4  I conferred with Ms. Thompson.
5     Q    So then you got a divorce.
6     A    Yes.
7     Q    Okay.  In the course of the therapy
8  that you had, the second series, approximately
9  how many times did you go?
10     A    I'd say somewhere between four to
11  six times.
12     Q    Was it about the same as when you
13  went the first series of times?
14     A    Yes.  Maybe it might have been a
15  little bit more, because I really didn't - I
16  don't think I had very many sessions with her
17  on the first situation, because she helped me
18  understand the situation and resolve it within
19  myself, and decide how I wanted to proceed.
20  The family counseling was something that I
21  think was a little bit longer, maybe four to
22  six sessions.

Page 260

1     Q    Now during the family counseling
2  part of this, and your second issue that was
3  personal, when you say you were shocked, what
4  other things did you experience?  You
5  obviously felt hurt, did you cry?  Did you
6  feel like you had trouble sleeping, or
7  working, or concentrating during these times?
8     A    It was very upsetting to me, but I
9  had a really good work situation.  I had a
10  very good  support group in the office, and so
11  once I got to the office, I was fine.  I would
12  just put it totally out of my mind.  And then
13  I also had the care of my daughter, who was in
14  grade school at that time, and I really just
15  needed to keep everything going and remain as
16  healthy as I could, physically and mentally,
17  so that I could ensure stability in her life.
18  So I was upset, but I wouldn't say I was at
19  all depressed by it.  And, frankly, I reached
20  a point where I felt very liberated by it,
21  because I realized that I could just go on to
22  other things.  So, again, I was not medicated

Page 261

1  **during that time.**
2     Q   Now going back to the -- are you
3  saying that when you went through the divorce
4  and after this therapy, that it didn't really
5  have any impact on your work life?  Is that
6  your testimony?
7     **A   I don't believe that it did.**
8     Q   Okay.  Did you ever have any trouble
9  sleeping during the time that you were upset
10  about the divorce and the discovery of your
11  husband's infidelity?
12     **A   Well, I did, but part of that was**
13  **because we were still living in the same**
14  **house, and he was a little volatile, and**
15  **concerned about having to move, so it was a**
16  **little nerve racking trying to sleep in a**
17  **house with someone who owned a lot of guns.**
18     MS. BIBLIN:  Guns.  Sorry, I wasn't
19  saying that to be facetious.  I mean, I wasn't
20  laughing to be facetious, just scary.  I can
21  understand.
22     BY MS. BIBLIN:

Page 262

1     Q   How soon did he leave the house
2  after the therapy stopped as a family?
3     **A   I think the therapy - we went**
4  **through therapy, I think it might have been in**
5  **the spring.  And then I just told him that I**
6  **talked with a therapist, and we just didn't**
7  **think that this counseling was working, and**
8  **let's just give this a rest.  And then we just**
9  **really didn't talk about it for months.  And**
10  **then after I figured out what I wanted, then**
11  **I went to Betty Thompson.  I believe it might**
12  **have been in September.**
13     Q   Of what year?  Would that be `93?
14     **A   I think it was `93.  I think it was**
15  **`93.  And I went to her in September, and I**
16  **told her what was going on, and what I wanted,**
17  **and I got her advice.  And then talked to my**
18  **husband about it, and told him that I had**
19  **consulted with an attorney, and that I wanted**
20  **a divorce.  And then he retained counsel, and**
21  **then we went from there, but he would not move**
22  **out, because he did not want to be charged**

Page 263

1  **with desertion.  So he did not move out until**
2  **several days before Christmas, when we**
3  **executed a signed settlement agreement.**
4     Q   Who was your husband's divorce
5  attorney, if you remember.
6     **A   Ilona, and I remember - Betty told**
7  **me she had been married so many times, that it**
8  **was hard to remember her name.  It was**
9  **Grenadier at one point.**
10     MS. BIBLIN:  I forget who she
11  married.  I know who you're talking about.  I
12  think it's Kaufman or something, I forget.
13     BY MS. BIBLIN:
14     Q   Between that time that you were in
15  therapy and the time you consulted Dr.
16  Natividad about your depression, was there any
17  other instance where you were seeking medical
18  care for any mental health issue?
19     **A   No.**
20     Q   And prior to 1992, had you ever -
21  you mentioned you never had therapy before,
22  and you had conceptions about it, but had you

Page 264

1  ever seen anybody for any kind of mental
2  health issue prior to that time?
3     **A   No, I did not.**
4     Q   Had you ever, in retrospect, now
5  that you know what it feels like to be
6  depressed, had you ever prior to that 1992,
7  felt depressed for any reason?
8     **A   No.**
9     Q   In 1992, for the first instance,
10  when you said you went and talked to Dennis
11  Gear about it, and you referred to Mr. Lynn as
12  being "fixated on you", did you see him as --
13  did you think he was hitting on you, or what
14  do you mean by that?
15     **A   Hitting on me, obsessed with me,**
16  **just needed to have me in his presence.**
17     Q   Now earlier you had said that when
18  you talked to Mr. Gear about it, Mr. Gear was
19  referring to this as one person on an upward
20  trajectory professionally, which would be you,
21  and a person on a downward trajectory, being
22  Mr. Lynn.  Was it your sense that Mr. Gear

Page 265

1   thought this was just a matter of Mr. Lynn
2   hanging on because - for professional reasons?
3       A   I don't really know what Mr. Gear
4   thought.  I think he may have felt that it was
5   a little threatening to John Lynn that I was
6   progressing while he was, perhaps, going in
7   the other direction.  I didn't see it that
8   way.
9       Q   Did you ever tell Mr. Gear that you
10  thought Mr. Lynn was expecting you to have
11  some sort of a relationship with him that was
12  personal, as opposed to professional?
13      A   What I told Mr. Gear was that Mr.
14  Lynn seemed to have a need for me to spend a
15  lot of time in his office, and that it wasn't
16  business-related discussion.  And that it was
17  very difficult for me to try to manage a staff
18  of 10 people when I was expected to sit in Mr.
19  Lynn's office and hear him talk about wine,
20  and where his next vacation would be, and hear
21  him talk about his 401(k).
22      Q   So you felt he was wasting your

Page 266

1   time.
2       A   Yes, he was wasting - but it was
3   bigger than that.  He just seemed a need to
4   have me in his office.
5       Q   As a buddy, as somebody to talk to?
6       A   It felt like more than that to me.
7       Q   What do you mean by "felt like more
8   than that"?
9       A   I just felt kind of harassed, that I
10  had to spend - and he had the power to keep
11  calling me into his office, and I'd have to
12  sit there, and I liked him.  I thought he was
13  just a nice guy, a good boss, but it was just
14  making it very, very hard for me to get my
15  work done.  And it was hard for me - I was
16  concerned about the perception of the people
17  working for me and with me.
18      Q   Now you said subsequent to your
19  conversation with Mr. Gear, Mr. Lynn became
20  abusive to you.  In what way was he abusive?
21      A   Verbally.
22      Q   Give me an example.

Page 267

1       A   He told me that - he said that I may
2   have thought that when I went out to lunch
3   with Dennis, that Dennis would be helpful.
4   But, in fact, Dennis came straight back from
5   lunch and told him everything that was said,
6   and that he resented me going out to lunch
7   with Dennis and complaining about him.  And
8   that he couldn't stand the way I handled that,
9   and he didn't like me for doing that.  And he
10  just thought I was a big problem, I created a
11  big problem.  And he just - was just ugly.
12      Q   Did you go then back to Dennis Gear
13  and tell him that you wanted to be reassigned,
14  or how did it come about that you were
15  reassigned?
16      A   I think - I'm not sure I talked to
17  Dennis about it again.  I'm not positive that
18  I did.
19      Q   Did you talk to JoAnn Henry about
20  it?
21      A   No, I did not talk to JoAnn.
22      Q   Did you talk to anybody else in

Page 268

1   RTC's equivalent of EEO office about it, or a
2   Human Relations person about it?
3       A   Well, I worked with these guys
4   before.  I didn't want to make a big deal out
5   of any of this.  My goal in talking to Dennis
6   was to try to get everything on a better
7   track, and it never occurred to me to complain
8   about anyone.  But what I do remember is that
9   I went on vacation, and when I came back - and
10  I don't remember what the time frame is - when
11  I came back from vacation, I had been moved.
12  My whole staff and I had been moved to JoAnn
13  Henry, and I thought that was just a wonderful
14  solution to the whole thing.
15      Q   Do you know how that came about?
16      A   I don't know.
17      Q   You didn't ask?
18      A   I didn't.
19      Q   You didn't go checking anybody's
20  calendar to find out?
21      A   I wasn't as technically competent
22  then.

Page 269

1    Q    When, approximately -- you said it
2    was  somewhere between 1994 and 1995 that that
3    happened.  How soon --
4        A    No, it was before - it had to be
5    1994 or earlier, because when I was working
6    for JoAnn, she gave me a cash award in `94,
7    and she gave me a cash award in `95, so I was
8    reporting to her during those years.
9        Q    Okay.  Now your complaint to Dennis
10   was probably in 1993.
11       A    Either that, or early in 1994.
12       Q    Okay.  So you didn't complain to
13   Dennis until 1993 or early 1994, which would
14   have been around the time you and your husband
15   had parted ways, to put it in perspective
16   time-wise.
17       A    You know, I don't remember.
18       Q    Was it -- let's put it this way.
19   How soon was it after you had completed your
20   first series of counseling with Ms. Foudraine
21   that you went and talked to Dennis about the
22   problem you were experiencing?

Page 270

1        A    You know, I'm not sure.  I think I
2    may have talked to him while I was talking to
3    Ms. Foudraine.
4        Q    Do you have a recollection of how
5    much -- how soon in time after that your
6    office eventually got moved?
7        A    You know, I think it got moved in
8    `93. I'm pretty sure it got moved in `93.
9        Q    Do you remember what the vacation
10   was that you were taking?
11       A    I'm not sure.  The only vacation I
12   can remember that year was, I think, in May,
13   when I went to Williamsburg, just with my
14   daughter.  And I don't remember if I had other
15   vacations that year or not.
16       Q    You said it was after coming back
17   from a vacation that you found out that you
18   were reassigned, so is it possible it was May
19   of `93?
20       A    It's possible.  I just don't
21   remember.
22       Q    From the period 1991 through the

Page 271

1    time that you were at the RTC -  moved from
2    RTC to FDIC in what year?
3        A    I think it was in the fall sometime
4    in 1995.
5        Q    Okay.  During that period of time
6    while you were still at the RTC, besides Ms.
7    Foudraine, did you consult with any other
8    doctors for any other ailments?
9        A    For any other like physical
10   ailments?
11       Q    Physical, or mental.
12       A    That was about 10 years ago, or
13   more.  The only other thing I can think about,
14   I had a cystic ovary that burst, and I had to
15   go to the hospital.  That was very painful,
16   but that's the only thing I can think of.
17       Q    That would have been GW Hospital, or
18   did you go somewhere in Alexandria?
19       A    You know, I don't remember.
20       Q    And what year was that, do you
21   think?
22       A    It was in the early 90s, but I can't

Page 272

1    remember the exact year.
2        Q    Were you home when this happened, or
3    at the office?
4        A    I think I was at home.
5        Q    Was it possible you went to see a
6    doctor in Virginia?
7        A    Oh, well, my gynecologist was Dr.
8    Fern Grapin, and that's the doctor who's been
9    treating me.  I think she told me that --
10   she's been my doctor since 1992, because I
11   asked her.  I couldn't remember when I started
12   seeing her.
13       Q    And she's over by Alexandria
14   Hospital on Seminary.  Right?
15       A    Yes.
16       Q    Is that where you were treated for
17   the cystic ovary?
18       A    I don't remember.
19       Q    All right.  But Fern Grapin was your
20   doctor?
21       A    Yes.
22       Q    Are there any other medical

Page 273

1 professionals that you would have consulted
2 during the 1990s that you can recall? Let's
3 go beyond RTC, anybody in the 1990s besides
4 Dr. Grapin, Ms. Foudraine, and Dr. Natividad,
5 who you said you started seeing late 1990s.
6 For example, did you have another internist or
7 general practitioner prior to Dr. Natividad
8 that you can recall?
9 **A   Well, I met Dr. Natividad when she**
10 **was with the HMO.  And before her, I had**
11 **different doctors, because it was just kind of**
12 **who was available when I went in, so I didn't**
13 **really - I don't have anyone else I can**
14 **remember.**
15 Q   Okay.  Do you remember what types of
16 things you were treated for, besides normal
17 checkups?
18 **A   I know that I had a stress test at**
19 **one point to check my heart.**
20 Q   Do you remember when that was?
21 **A   And that was ordered by Dr.**
22 **Natividad.  That was a test that she ordered,**

Page 274

1 **and that was, I believe, in 2003.**
2 Q   Okay.  Do you know that was ordered?
3 **A   Because I was experiencing pain up**
4 **through my arm, into my chest, and she was**
5 **concerned, because she knew I was going**
6 **through this stress, and she knew that I was**
7 **on Zoloft, and I was depressed, and she was**
8 **concerned that maybe I might have a heart**
9 **condition. But as it turned out, I was fine.**
10 **But she didn't want to take any chances, so**
11 **she had me go through that testing.**
12 Q   Have you taken any medication for
13 any kind of hypertension?
14 **A   I have low blood pressure.**
15 Q   Oh.  So are you taking any
16 medication for that, or that's just normal?
17 **A   Oh, it's normal.**
18 Q   That's good.  Does Dr. Natividad
19 treat you for that type of thing at this
20 point?
21 **A   For?**
22 Q   Anything having to do with blood

Page 275

1 pressure, general health?
2 **A   Yes.**
3 Q   Okay.
4 **A   But I don't have any blood pressure**
5 **issues.**
6 Q   Okay.  You indicated in your
7 complaint that you get migraines.
8 **A   Yes.**
9 Q   How long have you gotten migraines?
10 **A   I haven't had any recently, but for**
11 a while I would just get these excruciating
12 headaches.
13 Q   When did you first start getting
14 migraines?
15 **A   Just the last couple of years.  But**
16 **I didn't realize that they were migraines, I**
17 **just thought they were really bad headaches.**
18 **But then my daughter was diagnosed with**
19 **migraine headaches, and that's when I realized**
20 **that I had some of the same symptoms.**
21 Q   When was your daughter diagnosed
22 with migraines?

Page 276

1 **A   I think she might have been in grade**
2 **school.**
3 Q   So it's a number of years ago.
4 **A   Yes.**
5 Q   So you're saying it's around then
6 that you realized what you had were migraines.
7 So when was your daughter in grade school, 10
8 years ago?
9 **A   Approximately.  It might have been**
10 **later than grade school.  I just don't really**
11 **remember, but I think she was still seeing the**
12 **pediatric team.**
13 Q   So that would have been prior to
14 2000?
15 **A   She just left the pediatric team I**
16 **think when she was 17 or 18, and she's now 20,**
17 **so somewhere, three years or further back.**
18 Q   Okay.  And for how long has your
19 daughter suffered migraines?  You said roughly
20 10 years?
21 **A   I think we first found out when she**
22 **was in grade school, but she might have been**

Page 277

1  in junior high. I'm not exactly sure.
2      Q   So is that approximately 10 years?
3      A   I guess.
4      Q   And you said that prior to your
5  daughter being diagnosed with migraines, you
6  had had bad headaches.
7      A   Yes, and it didn't occur to me at
8  the time that it could be something. I didn't
9  even know what a migraine headache was.
10     Q   Sure. So you were having them prior
11 to the year 2000.
12     A   I may have, or not. I was never
13 diagnosed with a migraine headache.
14     Q   When were you first diagnosed with
15 this headache being a migraine?
16     A   Well, I haven't been diagnosed by a
17 doctor. I'm just assuming that some of the
18 headaches I've had are migraines, because
19 they're similar to migraines that my daughter
20 had. But I have not been diagnosed by a
21 doctor.
22     Q   Have you seen any doctor for these

Page 278

1  headaches?
2      A   No.
3      Q   Never in the past have you seen a
4  doctor for the headaches?
5      A   No.
6      Q   And were you experiencing the
7  headaches prior to the year 2000?
8      A   Yes.
9      Q   Have you ever talked to Dr.
10 Natividad about the headaches?
11     A   I don't know. I don't remember
12 whether I did or not.
13     Q   Okay. Are there any other doctors
14 or medical ailments that you can recall that
15 you've had since the 1990s, for which you've
16 been treated?
17     A   I had a stress fracture in my right
18 ankle, and I was treated by an orthopedic
19 doctor. And I can't remember what his name
20 was, but he was in Alexandria, Virginia.
21     Q   So in the same place as Fern Grapin,
22 same building?

Page 279

1      A   I don't remember. I don't remember.
2  I don't remember his name.
3      Q   Was that covered by your health
4  plan?
5      A   Yes.
6      Q   What health plan were you on at the
7  time?
8      A   I think I was still under GW.
9      Q   When did you -- did you switch to
10 another health plan since the HMO?
11     A   Yes.
12     Q   When did you switch health plans?
13     A   The HMO ceased to exist, it was
14 either in 1999 or in 2000. I'm not sure which
15 year.
16     Q   And what did you switch to?
17     A   I switched to Blue Cross/Blue
18 Shield.
19     Q   Okay. Your attorney indicated to me
20 in an email last week that you've checked with
21 Blue Cross - maybe I'm extrapolating - but the
22 GWU HMO did not have records for your care,

Page 280

1  that there was nobody at GW that maintained
2  those records at the time.
3      A   Well, I tried to have my records and
4  my daughter's records sent to our new doctors,
5  and I don't know what happened, but her
6  records never got to her new doctor, and my
7  records never got to my doctor.
8      Q   And when you say doctors, you're
9  referring to Dr. Natividad?
10     A   For me.
11     Q   For you, and then the other doctor,
12 who was the other doctor?
13     A   I can't remember the name of my
14 doctors, my daughter's doctors group.
15     Q   Well, it wasn't somebody that you
16 were seeing.
17     A   No.
18     Q   The only doctor you're seeing now is
19 Dr. Natividad, except for the stress fracture,
20 and female issues, for which you're going to
21 Dr. Grapin?
22     A   correct.

Page 281

1 Q Okay. Is there any other medical
2 care that you can recall that you've received
3 in the last 10 or 15 years?
4 **A I had a colonoscopy within the last**
5 **five or six years.**
6 Q That was also --
7 **A And I can't remember the name of the**
8 **doctor, but Dr. Natividad referred me for it,**
9 **because colon cancer runs in my family.**
10 Q And nothing else that you can think
11 of. Okay. Other than GW, the HMO, and Blue
12 Cross/Blue Shield, have you had any other
13 medical insurance carrier since you came to
14 the RTC?
15 **A No.**
16 Q Those are the only two plans you've
17 been on.
18 **A That's correct.**
19 Q And was the GW HMO through the
20 FDIC's health plan, or through another health
21 plan?
22 **A It was a federal health plan.**

Page 282

1 Q It was just one of the general
2 federal health plans.
3 **A Right.**
4 Q The Blue Cross is also --
5 **A US OPM.**
6 Q US OPM health plan, administered by
7 the FDIC.
8 **A That's correct. I don't think it's**
9 **administered by the FDIC, at all. It's just**
10 **a health plan that's offered to all federal**
11 **employees.**
12 Q Okay.
13 **A We just have a different pay rate**
14 **for it than the average employee.**
15 Q Right. Are there any other symptoms
16 that you are claiming that you have, other
17 than depression, as a result of the claims
18 that you're alleging in this litigation?
19 **A No.**
20 Q Medical symptoms.
21 **A No.**
22 Q And to your knowledge, does Dr.

Page 283

1 Natividad have any other source of information
2 about the cause of your symptoms, other than
3 what you've told her?
4 **A Not to my knowledge.**
5 Q Do you maintain any of your medical
6 bills as part of your financial records?
7 **A I keep them for one year for**
8 **purposes of flex fund, but then after I get to**
9 **the end of the year and I've fulfilled the**
10 **flex fund dollar amount, then I throw them**
11 **out.**
12 Q Okay. So you don't have any records
13 of your bills from prior years.
14 **A No, I don't.**
15 Q Are you on any other medications
16 besides Zoloft?
17 **A Yes.**
18 Q What other medications do you take?
19 **A Menostar.**
20 Q What is that? How do you spell
21 that?
22 **A I think it's M-E-N-O-S-T-A-R.**

Page 284

1 Q What's that for?
2 **A Hormone replacement.**
3 Q Any others?
4 **A Fosamax. No, I'm sorry. I used to**
5 **be on Fosamax, Boniva - B-O-N-I-V-A.**
6 Q And you've taken Fosamax in the
7 past, and Boniva for how long?
8 **A Maybe five years or more.**
9 Q And how long have you been taking
10 Menostar?
11 **A A few years.**
12 Q More than five?
13 **A I'd say two years, maybe two years.**
14 Q And who prescribes the Menostar?
15 **A Dr. Fern Grapin.**
16 Q Who prescribes the Fosamax?
17 **A Dr. Fern Grapin.**
18 Q Any other medications that you're
19 taking now?
20 **A No.**
21 Q Are there any other medications you
22 can think of you've taken in the past 10

Page 285

1  years, besides these?
2       MR. SHAPIRO:  You include things
3  like 10 days on some antibiotic?
4       MS. BIBLIN:  No, not antibiotics,
5  other than things like that.  Anything you've
6  taken on a regular basis.
7       THE WITNESS:  FEMHRT.  I think it's
8  F-E-M-H-R-T, I'm not sure.
9       BY MS. BIBLIN:
10      Q   And who prescribed that?
11      A   Dr. Grapin.
12      Q   And why did she prescribe that, to
13  your knowledge?
14      A   Birth Control pills.
15      Q   Might I ask why - was she
16  prescribing it for birth control, or for
17  another symptom?
18      A   For birth control.
19      Q   Okay.  I apologize for asking
20  personal questions.
21      A   It's okay.  I think that's --
22      Q   I know it's uncomfortable.

Page 286

1       A   I think I need to go back and
2  clarify one thing, though.
3       Q   Sure.
4       A   Because I kind of group everything
5  together.  When you asked me if depression was
6  the only symptom that I have, I think probably
7  even more than depression, it's not so much
8  depression, it's more anxiety.  And I don't
9  know how different those terms are, but I
10  think in some ways the anxiety is really more
11  the issue than the depression.
12      Q   Well, in your mind, how do you
13  distinguish the anxiety from the depression?
14      A   To me, anxiety is being fearful, and
15  worrying that bad things will happen.  And
16  depression, to me, is when you just feel sad,
17  and you're not sure why you feel sad, but you
18  may not be afraid.
19      Q   Have you discussed the distinctions
20  between these with Dr. Natividad?
21      A   No, I don't think so.
22      Q   Have you discussed the distinctions

Page 287

1  between these with any other medical
2  professional?
3       A   Dr. Grapin.
4       Q   In what context did you discuss them
5  with Dr. Grapin?
6       A   Dr. Grapin has also prescribed
7  Zoloft for me.
8       Q   When did she prescribe Zoloft?
9       A   I don't remember. I think maybe a
10  year or two ago.
11      Q   Why did doctor - to the extent you
12  know  - why did Dr. Grapin prescribe Zoloft if
13  you were already taking it with Dr. Natividad?
14      A   Well, my prescription was running
15  out, and I just happened to have an
16  appointment with Dr. Grapin.  And I told her
17  about my prescription running out, so she
18  prescribed it for me.
19      Q   Okay.  Has Dr. Grapin ever
20  recommended to you that you seek some sort of
21  therapy, in addition to taking the anti-
22  depressant medication?

Page 288

1       A   No.  I had -- I saw her yesterday,
2  and she said that - she's known me for a long
3  time, and she said she thinks I'm doing fine
4  with what I have.  Taking the Zoloft seems to
5  be evening things out for me, and I'm okay.
6  So no, she has not recommended therapy.
7       Q   And what about Dr. Natividad - has
8  she, at any time, recommended any kind of
9  psycho therapy for you, in addition to the
10  anti-depressant medication?
11      A   She has not.
12      Q   Going back to your comment about
13  depression and anxiety, fearful - have you
14  ever felt any of those symptoms prior to 2003?
15      A   Ever?
16      Q   Yes.
17      A   It's hard to go back 56 years.  I
18  would say that I've never been a depressed
19  person.  I don't think of myself as a
20  depressed person.  Anxiety, certainly, anxiety
21  before taking a big test, anxiety about
22  whether or not a promotion is going to come

Page 289

1   through, anxiety about the birth of a child.
2   I can say that I've experienced anxiety
3   throughout my life, but not to a point where
4   it's ever been overwhelming, or it's kept me
5   from having a happy life.
6       Q   Do you feel that the anxiety you are
7   experiencing now is preventing you from having
8   a happy life?
9       A   It makes it very difficult to have a
10  happy life, when you're never sure when the
11  next shoe is going to fall.
12      Q   And when did you begin feeling that
13  level of anxiety?
14      A   In January, 2003.
15      Q   For the period from January of 2003
16  until today, have there been any periods where
17  you felt relieved of some of the anxiety that
18  you claim you're feeling?
19      A   On a very sporadic basis.
20      Q   Are there times, in particular, that
21  you remember?
22      A   When I felt relieved of anxiety?

Page 290

1       Q   Yes.
2       A   Maybe for a few days or a few weeks,
3   but not on a continuing basis.
4       Q   Is there anything in particular that
5   you associate with the days or weeks where you
6   say you were feeling less anxiety, that calls
7   to your attention when that was?
8       A   Certainly, when I'm on vacation
9   there's less anxiety.  When I'm not being
10  retaliated against by my boss, or other senior
11  officials at the FDIC, for a period of time,
12  I'm less anxious.
13      Q   So you're saying there are some
14  times when you feel you're not being
15  retaliated against?
16      A   Yes.
17      Q   When are those?
18      A   They're kind of milestones.  I mean,
19  they're kind of points in time where it has
20  been extremely stressful and anxiety-producing
21  to be here.  I mean, it's kind of likes peaks
22  and valleys.

Page 291

1       Q   You think that's any different from
2   any other FDIC employee who has
3   responsibilities of the nature of your's?
4       A   I think that when people do things
5   that aren't rational to you, and you can't
6   find any logic in what they're doing, that
7   it's very, very anxiety-producing.  There can
8   be anxiety in the course of being in a
9   professional work situation, because there can
10  be a lot of pressures, and a lot of difficult
11  assignments, but this is not the same thing.
12  This is a situation where people accuse you of
13  things that haven't happened, or they rely on
14  the witness of one person who's lying to try
15  to put you on a PIP.  That's very anxiety-
16  producing, and it's when people try to do
17  things to you that aren't real, and have no
18  factual basis, that produces anxiety, because
19  then you never know what kind of irrational
20  act will be taken against you that could
21  result in your termination of employment.
22  That's very anxiety-producing, and that has

Page 292

1   nothing to do with the nature of the job.  I
2   could be a clerk, I could be running this
3   agency, it wouldn't matter.  That kind of
4   stress, that kind of anxiety is just
5   debilitating.
6       Q   In the course of your therapy with
7   Dr. Natividad - excuse me - in the course of
8   your therapy with Dr. Foudraine --
9       MR. SHAPIRO:  Miss.
10      MS. BIBLIN:  Ms. Foudraine, sorry.
11  Did you ever discuss anything that you do as
12  a personality modus operandi that contributes
13  to the situations in which you participate,
14  that you've complained about?
15      A   I think in the case of John Lynn,
16  her observation was that I didn't get myself,
17  as she put it, out of the path of an elephant
18  running down the street.  And that imagine
19  stayed with me, and it's been very helpful to
20  me in terms of trying to recognize situations
21  where a big elephant is running down the
22  street, and I'm going to get trampled if I

Page 293

1  don't get out of the way. That's the piece of
2  advice, and the observation she gave me that
3  meant the most to me, and has been the most
4  helpful.
5      Q    What about in the context of your --
6  were there any other observations she made
7  about things you do to contribute to your
8  situation, besides seeing something coming,
9  and getting out of the way?
10     A    That's the key thing that I
11  remember.
12     Q    What about in context of your
13  situation with your husband, when you were in
14  therapy for that, was there any feedback you
15  received from your counselor about ways in
16  which you participated, and caused some of the
17  problems in your marriage?
18     A    The therapy tended to be more
19  focused on my husband, and whether or not he
20  was going to continue his other relationship,
21  and why, or whether he was going to decide to
22  discontinue it. There was more focus on that.

Page 294

1      Q    Was there any focus on any criticism
2  by him of you, in terms of why he wanted to
3  have a relationship outside of the marriage?
4      A    I believe that he thought that maybe
5  I spent more time with my daughter, that she
6  was getting more attention than he was.
7      Q    Was there any other discussion
8  besides that?
9      A    That's the key thing I remember.
10     Q    Did your therapist give you any
11  advice concerning how to treat your spouse?
12     A    In the end, her advice was to let it
13  go, that this was not going to work out, that
14  he was not going to give up his other
15  relationship.
16     Q    In the course of your therapy with
17  Ms. Foudraine, was there any discussion,
18  generally, about ways in which you interact
19  with people, in which you may provoke people
20  to behave in a way towards you that you find
21  unsatisfactory?
22     A    In both of the --

Page 295

1      Q    In either one.
2      A    I don't recall anything of that
3  nature.
4      Q    Have you had any discussions of that
5  sort with Dr. Natividad in the course of
6  discussing your depression and anxiety?
7      A    No.
8          MS. BIBLIN: Why don't we take a
9  short break.
10         (Whereupon, the proceedings went off
11  the record at 4:02:10 p.m. and went back on
12  the record at 4:24:51 p.m.)
13         MS. BIBLIN: Back on the record.
14  The record will reflect that Mr. Selby is back
15  in the room.
16         I've given to counsel and plaintiff
17  Exhibit 2, which is a copy of the application
18  of Ms. Roberson for the job of Assistant
19  Director in DIRM, E301-1, and it's signed
20  February 25th, 1998. And this came, just so
21  you know, from a copy of your personnel file.
22  And I chose this only because it was the most

Page 296

1  recent copy I had of your SF-171. And I'm
2  only bringing it here so you can refer to it
3  in questions I'm going to ask you about your
4  background.
5          (Whereupon, Exhibit No. 2 was
6          marked for identification.)
7          BY MS. BIBLIN:
8      Q    Is that okay?
9      A    Yes.
10     Q    So feel free to peruse it as you
11  answer my questions.
12     A    Yes.
13     Q    Okay. You indicated previously that
14  you worked for the Department of Interior, for
15  the National Park Service in 1971 and `72.
16  That was summer jobs as a park aide.
17     A    Yes, that's correct.
18     Q    Okay. And in 1978, you indicated
19  you worked for the Department of the Navy,
20  initially doing personnel work.
21     A    That's correct.
22     Q    Okay. And was that a job that you

Page 297

```
 1   applied for, or how did it come about that you
 2   --
 3       A   I took the Federal Service Exam. It
 4   may have been called the PACE Exam, or the
 5   FSE, I don't remember any more. But at any
 6   rate, I took the exam, and then I got a letter
 7   from the Navy offering me a job based on my
 8   exam. And they offered me an entry level
 9   position. I'm not sure I remember what the
10   grade level was any more.
11       Q   Okay. Referring to Exhibit 2, the
12   third from the last page discusses your job at
13   Navy. It's Item O. Does that refresh your
14   recollection at all?
15       MR. SHAPIRO: It's the fourth page
16   from the back. Yes?
17       MS. BIBLIN: The fourth one. Yes,
18   you're right. I've got two sticking together
19   here.
20       THE WITNESS: Okay. I was a 7.
21   Okay.
22       BY MS. BIBLIN:
```

Page 298

```
 1       Q   Okay. And at least I thought you
 2   said earlier there were two different jobs you
 3   had at Navy, or was it just the personnel job?
 4       A   I don't remember earlier talking
 5   about two different jobs, but I have worked
 6   for the Navy two different times, and for
 7   different parts of the Navy.
 8       Q   Okay. Maybe that's what I'm
 9   thinking in my head. It was both in the area
10   of personnel?
11       A   No.
12       Q   Okay. Could you explain what they
13   were?
14       A   The first position I had with the
15   Navy was actually with NAVSEA, which is the
16   Naval Sea Systems Command, and I worked in the
17   personnel management area.
18       Q   And that was `78 to `79?
19       A   That's correct.
20       Q   What was the second one?
21       A   A subsequent job I had was with the
22   Naval Materiel Command, which was also located
```

Page 299

```
 1   in Crystal City. And I went there --
 2       Q   In the mid-1980s.
 3       A   Yes.
 4       Q   Okay. All right. It makes sense.
 5   Let's get to that later. I'm going to try to
 6   go chronologically to make sense of this. In
 7   your personnel job, did you supervise any
 8   people?
 9       A   No.
10       Q   Okay. And who did you report to?
11       A   Robert Rumpler.
12       Q   Okay. And are you still in contact
13   with Robert Rumpler?
14       A   No.
15       Q   What was your next job after you
16   left the Department of the Navy in 1979?
17       A   I went to the Department of Labor,
18   and when I went there, it was a co-op student.
19       Q   Okay. And what does that mean?
20       A   A co-op student means that I was
21   going to school at night at American
22   University, and I was able to accept an
```

Page 300

```
 1   assignment at the Labor Department, and not
 2   only get paid, but also get college credit.
 3       Q   And during this time, were you also
 4   simultaneously working for Montgomery County
 5   Library System?
 6       A   No.
 7       Q   Was it before you started working
 8   for the library?
 9       A   No, I worked for the Library System
10   until 1978, and I never went back.
11       Q   Okay. So this was during your
12   second degree at American University.
13       A   My second graduate degree, and that
14   was at American University.
15       Q   Okay. And in the Department of
16   Labor, you were Grade 7?
17       A   Yes.
18       Q   And you ended as a Grade 7, when you
19   left there.
20       A   No. During the time that -- when
21   my co-op ended, I was able to get converted to
22   a permanent position at the Department of
```

Page 301

1  Labor, and I was hired by Robert Hastings to
2  work in Labor Management Relations.
3      Q    And when was that, that you worked
4  there?
5      A    Okay.  November of `79 until May of
6  1980.
7      Q    Okay.  And you're answering that by
8  looking at your SF-171?
9      A    Well, yes.  And what I remember, I
10  was not exact on the date.  I just remember
11  that I went to work for Bob Hastings, and I
12  went to another part of Labor after that
13  assignment because I found out that I had
14  gotten accepted into the Presidential
15  Management Intern program, which offered me
16  some different opportunities.  And Mr.
17  Hastings was not - I liked working for him,
18  and I liked working in Labor Relations, but
19  one component of the program, Presidential
20  Intern program, allows rotational assignments
21  to other areas, and Bob Hastings wasn't
22  willing to entertain that as an option.

Page 302

1      Q    And was that your reason for
2  leaving, primarily?
3      A    Yes.  Plus, I had met Judith
4  Hofmann, and I thought she'd be an interesting
5  person to work for.
6      Q    How did it come about that you met
7  Judith Hofmann?
8      A    I knew the librarian at the
9  Department of Labor, and he worked for her.
10  I think he reported directly to her.  And when
11  I got the Presidential Internship, I talked to
12  him about possible places to go, and he said
13  "Oh, you really need to talk to Judy.  I think
14  she'd give you some good ideas."  And so I
15  didn't know her, but I made an appointment,
16  and I talked with her, and she offered me a
17  job.
18      Q    Now you indicate on your 171 under
19  the subsection L of your work experience, that
20  you worked for Judith Hofmann at Department of
21  Labor, Office of the Assistant Secretary.  Was
22  she the Assistant Secretary or what was her --

Page 303

1
2      A    No, she was not.  I don't know what
3  her grade was, but she managed an office that
4  had responsibility for procurement and
5  facilities management for Department of Labor
6  headquarters.
7      Q    And it indicates here that the title
8  of your job was Presidential Management
9  Intern.
10      A    That's correct.
11      Q    Well, is that a job, per se, or just
12  a program in which you were in?  I'm sort of
13  confused by the title.
14      A    Well, because we were able to move
15  to different places, we went with that title
16  wherever we were assigned.
17      Q    Okay.  So your functional title, I
18  mean, the title of your job is PMI,
19  Presidential Management Intern, but you were
20  doing something else.  You were doing
21  something called -- how would you characterize
22  what you were doing, Management Analyst?

Page 304

1      A    The nature of my assignments for her
2  was really more in the management analyst
3  discipline.
4      Q    And you were there from May of 1980
5  until when?  And feel free to look at this, if
6  it helps you.
7      A    Yes, I was just trying to remember
8  how that worked, because during this time
9  frame, Judith got an opportunity to be a
10  Schedule C, political appointee at the
11  Department of Housing and Urban Development.
12  And I believe before I actually moved over
13  there permanently, I might have been on a
14  detail.  I just don't remember when I actually
15  became a HUD employee.
16      Q    Well, do you want to take a moment
17  and look at the previous pages that show where
18  you went next?
19          MS. BIBLIN:  If I could ask Mr.
20  Shapiro not to point things out on the
21  document, to let them find them herself.  That
22  would be great.

Page 305

1          THE WITNESS:  I remember.  This is
2     very helpful.
3          MS. BIBLIN:  Thanks.
4          THE WITNESS:  I worked directly for
5     Judy from May until February.  Then she was on
6     a transition team at the Export/Import Bank,
7     and then she went over to HUD at some point.
8     And while she was doing all of this, I took
9     advantage of the opportunity to go on detail,
10    rotational assignments to other agencies.  And
11    I went to work at U.S. Office of Personnel
12    Management for a brief - I think it looks like
13    it was about a 60-day detail - and I worked
14    for Andrew Boesel, who at that time was the
15    manager for the Presidential Management Intern
16    program at OPM.  After I finished that
17    assignment, I then got a detail assignment at
18    Federal Labor Relations Authority.
19    Q    Now on your leave records, it
20    indicates you were on leave without pay from
21    June 4th to 30th, 1979.  Do you know what that
22    is all about?  It wouldn't be in the document

Page 306

1     you're looking at.
2     **A    Oh, yes.  That was between my job
3     with the Navy and my job at HUD.  I'm sorry,
4     my job at the Department of Labor, and I
5     decided that I wanted to backpack through the
6     British Isles, so I just thought this is a
7     great opportunity.  I'm leaving one job, I'm
8     starting another job, so I took a break in
9     service, or leave - not break in service, I
10    took leave without pay.**
11    Q    Okay.  All right.  So then you
12    continued after that with your next Department
13    of Labor job, which was with Judy Hofmann.
14         MR. SHAPIRO:  No.
15         THE WITNESS:  No, then I --
16         MS. BIBLIN:  Well, July '79 - that
17    was the first one - Robert Hastings.
18         THE WITNESS:  Yes.
19         BY MS. BIBLIN:
20    Q    Then you went to Judy Hofmann.
21    **A    Yes.**
22    Q    And then you - so you took advantage

Page 307

1     of these other opportunities, two months at
2     the Office of Personnel Management with Andy
3     Boesel.
4     **A    Yes.**
5     Q    And did you supervise any employees
6     there?
7     **A    No.**
8     Q    And what was the nature of your work
9     for Mr. Boesel?
10    **A    It was pretty much public relations,
11    outreach, developing written materials.  I
12    think I may have even been involved in looking
13    at some changes to the program, because I
14    think the Director of OPM had changed. I think
15    that Scotty Campbell had left about that time,
16    and they were looking at maybe doing some
17    things differently, so it was mainly writing
18    and analysis, research.**
19    Q    Okay.  And in 1981, were you using -
20    even using a computer, let alone doing any
21    kind of IT work?
22    **A    I don't remember using a computer at**

Page 308

1     that time.
2     Q    What was your next job after the two
3     month stint at the Presidential Management
4     Intern office?
5     **A    I interviewed with Peter Robb, who
6     was a manager at the Federal Labor Relations
7     Authority, and he offered me an assignment to
8     work for him.  And at the time that I went to
9     work there, we really didn't have a clear idea
10    of how long I would be there.  It was kind of
11    open-ended.**
12    Q    How long did you work there?
13    **A    I worked there until the summer.
14    And at that point, Judy Tardy at that time, it
15    wasn't Hofmann yet - had become the Assistant
16    Secretary for Administration at the Department
17    of Housing and Urban Development, and she
18    really needed to bring me back.  She wanted me
19    to come back in as a Special Assistant to her.**
20    Q    Well, as part of the PMI program,
21    was it intended that you do brief stints at
22    various agencies to get experience?

Page 309

1    A   It kind of depended on the hiring
2  agency.  Some interns got to do a lot of
3  different assignments, and some interns didn't
4  really get very many opportunities to do that.
5  I mean, the goal of the program was for the
6  interns to get multiple assignments.  That
7  didn't always happen. I was very fortunate
8  that I did get to move around.
9    Q   Now when you were first admitted to
10  the program, you were a Grade 9?
11    A   That's correct.
12    Q   Is that part of the requirement,
13  that you start as a Grade 9, or can you start
14  at any particular grade?
15    A   Typically, the entry level would be
16  a 9, and it's a career ladder to a 12.
17    Q   So the way this program works, is it
18  expected that you're going to be in it for a
19  certain number of years?
20    A   At that point in time, it was a two-
21  year program.
22    Q   Okay.  And within two years, one

Page 310

1  would ordinarily move from a 9 to a 12?
2    A   That's correct.
3    Q   Does that seem faster than usual,
4  based on your knowledge of the federal system?
5    A   Again, it kind of depends on the
6  agency.  Some agencies really are pretty good
7  about having career ladder opportunities.  I
8  don't see very much of that here at the FDIC,
9  but there are probably some good reasons for
10  that, because we haven't had a lot of hiring
11  here.  But I don't really think it was a
12  terrific advantage to be in a career ladder 9,
13  11, 12.  I could have applied for any number
14  of other jobs at Labor or at HUD and been on
15  a career ladder.  I think the advantage was
16  the exposure to people at higher levels, and
17  the opportunity to witness their management
18  styles, and to work in different areas.
19    Q   Ordinarily, wouldn't someone working
20  at a Grade 9 have to fulfill at least a year
21  in that grade in order to be promoted to the
22  next level which --

Page 311

1    A   That's correct.
2    Q   -- might be either a 10 or an 11, or
3  a 12, depending on what the job series was?
4    A   That's correct.
5    Q   And in your case, the next level
6  would have been an 11.
7    A   That's correct.
8    Q   Now you say that you went to -- you
9  were promoted to an 11 during the 60 days you
10  were at the Presidential Management Intern
11  office.
12    A   Right.
13    Q   And that was less than a year after
14  you started in the Presidential Management
15  Intern program.  Is that correct?  You started
16  in May of 1980?
17    A   You know, I think - I'm a little
18  fuzzy on this - I think that some of my prior
19  federal experience accelerated my promotion
20  somewhat.
21    Q   Well, it would have accelerated your
22  promotion when you first began, but it

Page 312

1  wouldn't necessarily accelerate your promotion
2  from a Grade 9 to a Grade 11, would it?
3    A   You know, I just really don't
4  remember. I don't remember all the specifics.
5  I just think there was something else in there
6  that I was able to move a little faster, but
7  I'm very fuzzy on that now.
8    Q   Now you left the PMI office, went to
9  work for Mr. Robb for four months at the
10  Federal Labor Relations Authority.  What did
11  you do at the Federal Labor Relations
12  Authority?
13    A   I was involved in one of the
14  elections, union elections, in terms of
15  monitoring the election.  I investigated a
16  number of unfair labor practice cases at the
17  Social Security Administration in Baltimore.
18  I did some writing and analysis.  That's
19  basically it.
20    Q   Why did you leave that rotational
21  assignment?
22    A   I would have liked to have stayed

Page 313

1 longer because I enjoyed it, but Judy really
2 wanted me to come to HUD and work for her.
3    Q   Okay.  And is that what your next
4 job was?
5    A   Yes.
6    Q   When did you go to HUD?
7    A   In July of 1981.
8    Q   Okay.  And what grade did you start
9 at HUD?
10    A   When I got there, I was an 11.
11    Q   Okay.  And how long did you continue
12 to work - you were working for Judy Hofmann at
13 that time.  How long did you continue to work
14 for her at that job?
15    A   I guess for about a year.
16    Q   Okay.  And you're basing that from
17 memory, or from looking at the SF-171?
18    A   Well, I'm looking at the SF-171, and
19 I remember doing a number of studies while I
20 was there.  But, quite frankly, I'd probably
21 have to go back to my SF-50s or something to
22 try to figure out exactly when I moved to

Page 314

1 another spot, because as you can see, I had
2 quite a few different rotational assignments.
3    Q   For what it's worth, on your federal
4 return benefit statement, it states that you
5 were at HUD from February 14th, 1982 until
6 January 5th, 1985, which is not necessarily
7 coincident with the 171, so I'm just wondering
8 if that helps you to remember what you were
9 doing.
10    A   You know, I know I was at HUD in the
11 early 80s.  I know that I did leave in 1985.
12    Q   Is it possible that part of the time
13 that you were at HUD, you were still part of
14 the Presidential Management Intern program;
15 and, therefore, still assigned to your
16 original --
17    A   Well, one of the things I remember
18 is that when I came to the end of the
19 internship, the two-year internship, there was
20 going to be a RIF at HUD.  And I remember that
21 when I converted from the Presidential
22 Management Internship, which was a Schedule A

Page 315

1 position, when I converted to a permanent
2 position, I was then very vulnerable in the
3 RIF situation.  And as a matter of fact,
4 that's when I remember Tom Peddicord was just
5 one person above me on the RIF list.
6    Q   This is at HUD.
7    A   At HUD.  And so because the U.S. OPM
8 was concerned that recent graduates of the
9 Presidential Intern program might get RIF'ed
10 at various agencies around the government,
11 they offered agencies the opportunity to
12 extend interns for a third year, and so in
13 order to protect me from the RIF, my
14 internship was extended, and it became a
15 three-year internship, rather than a two-year
16 internship.
17    Q   Okay.  So your internship -- were
18 you considered to be an employee of Department
19 of Labor during the internship, or the
20 Department of Housing and Urban Development
21 during your internship?
22    A   The Department of Housing and Urban

Page 316

1 Development was paying my salary, and I
2 considered myself to be an employee there, so
3 that's my recollection, that I was a HUD
4 employee.
5    MR. SHAPIRO:  Let me just suggest to
6 you that if you look at the 171, you'll see
7 that she's a Presidential Intern.  That's what
8 she's listed as the first HUD, for that first
9 year.  And the next HUD job is listed as a
10 management analyst, no longer a Presidential
11 Intern.  That may have something to do with
12 how the reporting works for the purpose of the
13 federal, whatever you're reading from.
14    MS. BIBLIN:  I appreciate, Mr.
15 Shapiro, that you're trying to be helpful, but
16 unfortunately, this is not your deposition,
17 but that of Ms. Roberson.
18    MR. SHAPIRO:  Well, I understand
19 that.
20    MS. BIBLIN:  I'd rather she testify
21 from memory.
22    MR. SHAPIRO:  Well, okay.

Page 317

1    MS. BIBLIN:  Rather than you helping
2  her out.
3    MR. SHAPIRO:  I'm not trying to help
4  her out, I'm trying to help you out.
5    MS. BIBLIN:  I know you're trying to
6  be helpful somewhat, but you --
7    MR. SHAPIRO:  I'm trying to help you
8  out, but if you don't want --
9    MS. BIBLIN:  You've objected to my
10  doing something similar before, so let's keep
11  it Ms. Roberson's testimony.
12    MR. SHAPIRO:  If you don't want my
13  help, I'm happy not to give it.  In fact, any
14  help I would give you would be purely
15  accidental, and not intentional, I assure you.
16    MS. BIBLIN:  That's what I assumed.
17    MR. SHAPIRO:  Good.
18    MS. BIBLIN:  Okay.
19    BY MS. BIBLIN:
20  Q    All right.  So at some point, your
21  detail was extended, is what you're saying, in
22  order to prevent you from getting a RIF.

Page 318

1    MR. SHAPIRO:  Objection.  She didn't
2  say detail.
3    MS. BIBLIN:  Excuse me, your
4  internship.
5    THE WITNESS:  My internship was
6  extended.
7    BY MS. BIBLIN:
8  Q  Yes.  Now while you were doing the
9  internship and during this RIF, is that when
10  you were doing the job that's identified in
11  Block I of your 171, Exhibit 2?
12    MR. SHAPIRO:  Block I.
13    THE WITNESS:  Oh, Block I.  When my
14  internship was extended, I still worked for -
15  in the Office of the Assistant Secretary for
16  a while, and then I moved into - I can't
17  remember the name of the organization, but I
18  was working in Dennis Gear's organization.
19    BY MS. BIBLIN:
20  Q  At HUD.
21  A  At HUD.  **Management Analysis Branch**
22  **in HUD.**

Page 319

1  Q    Now is that when you were working
2  for Judith Hofmann in the job until June 20th,
3  1982, or was that when you were working for
4  the Management Analysis Branch?
5  **A  I worked for Judith I think until**
6  **June, and then --**
7  Q    Of `82.
8  **A  Of `82.  And then I had an**
9  **assignment in the Office of Administrative**
10  **Services.**
11  Q    Was it just an assignment in the
12  Office of Administrative Services, or were you
13  moved to a new job?
14  **A  I was reassigned.**
15  Q    Reassigned.  Okay.  Now starting
16  with the Judith job, did you supervise
17  employees in that job?
18  **A  No.**
19  Q    Okay.  And briefly, what did your
20  job entail while working for Judith Hofmann
21  from July `81 to June of `82?
22  **A  I would characterize it pretty much**

Page 320

1  **as a management analyst type of job.  I did**
2  **management studies, organizational reviews.**
3  **One of the more time consuming studies I did,**
4  **and actually I did this with Tom Peddicord,**
5  **was one of overtime usage, and our policies**
6  **and procedures, and recommendations for making**
7  **some changes at the department.**
8  Q    Now what -- did you first meet Tom
9  Peddicord while you were working for Judith
10  Hofmann?
11  **A  That's correct.**
12  Q    So that was prior to 1983.
13  **A  It might have been.  I don't really**
14  **remember exactly when I met him.**
15  Q    What was Mr. Peddicord's position at
16  that time?
17  **A  He was a management analyst.**
18  Q    What grade level was he, if you
19  recall?
20  **A  I know that -- I remember that he**
21  **was a grade higher than I was, whenever we**
22  **worked on the overtime study, because I was**

Page 321

1  working in Judy's office, and Tom came up to
2  my office on that floor to talk about doing
3  the review.  And he said, "I'll be in charge
4  because I have a higher grade."  And I said,
5  "Well, Tom, look where I'm sitting.  I'm in
6  the Assistant Secretary's office.  Why don't
7  we just work on this together."  I remember he
8  was a higher grade than I was at that time.
9      Q    Did you have any difficulty working
10  with him at the time?
11     A    Oh, we had a great time.  He was a
12  lot of fun to work with.
13     Q    So you got along with him pretty
14  well.
15     A    Yes, very much.
16     Q    And would you say that you learned
17  anything from Mr. Peddicord while you were
18  working with him at HUD?
19     A    Yes, I would.  He's very smart, and
20  he had been there for a while.  He's very
21  knowledgeable, and he was a very professional
22  colleague to work with.

Page 322

1      Q    Is the study that you worked on with
2  him identified in Block I of your 171?
3      A    Yes, it is.
4      Q    Is that the second one, where you
5  say one of a two-person team, or is it another
6  one?
7      A    Yes, it's the bullet that talks
8  about the two-person team.
9      Q    Were there any other people that you
10  recall working with besides Mr. Peddicord
11  during the year you worked with Judith
12  Hofmann?
13     A    I worked with Lea Hamilton.  That's
14  a woman, and her name is spelled L-E-A.
15     Q    Okay.  And anybody else you can
16  recall?
17     A    I don't recall working with anyone
18  else.
19     Q    Now was Mr. Gear working at HUD at
20  the time?
21     A    He came to HUD after I did, and I
22  don't remember exactly when he got there.  But

Page 323

1  at the time that I went to work in Office of
2  Administrative Services, at the time that I
3  went to work in that particular office, Dennis
4  Gear was there.
5      Q    Okay.
6      A    Because when I was finishing my
7  internship, I was looking for a home, a
8  permanent home, and he's one of the people I
9  talked to about a placement.
10     Q    So did he help you to find a
11  placement?
12     A    He offered me a placement working in
13  his organization.
14     Q    Okay.  So he offered you that
15  placement.
16     A    Yes.
17     Q    Okay.  Now let's refer to Block H of
18  your 171.  And who was -- you said your
19  immediate supervisor in this job was Charles
20  McClelland.  Who is he?
21     A    Actually, I had several different
22  supervisors while I was in that particular

Page 324

1  office, and I can't think of the name of the
2  first supervisor I had.  It was a man.  It was
3  an era when people were allowed to smoke in
4  their offices, and he smoked a cigar in his
5  office, and I can't think of his name.  But I
6  worked immediately for someone before I worked
7  for Charles McClelland.  After I worked for
8  that person whose name I can't remember, I
9  then worked for several months for John Lynn.
10     Q    Is that when you first met John
11  Lynn?
12     A    I may have met him before I started
13  working for him, while I was at HUD, because
14  I think that Tom Peddicord may have worked for
15  John Lynn, so I may have met him prior to
16  coming to work for him at HUD.  And then he
17  left the agency, and when he left the agency,
18  Charles McClelland took that job, and then I
19  reported to Charles McClelland.
20     Q    And when Mr. Lynn left the agency,
21  where did he go, to your knowledge?
22     A    He went to the Department of

Page 325

1    Commerce.
2        Q    To NOAA?
3        A    I don't know if he went directly to
4    NOAA, or if he was actually at the department
5    level. I don't know where he went. I just
6    know that he was somewhere at the Department
7    of Commerce.
8        Q    Okay. Again, focusing on the 1982
9    to 1985 job at HUD in the Management Analysis
10   Branch, was Mr. Peddicord in the same
11   organization as you at that time?
12       A    No.
13       Q    Was he working for Mr. Gear?
14       A    No. No, he was working in the
15   Information Technology office.
16       Q    Okay. Did Mr. Gear -- but Mr. Gear
17   was ultimately in charge of the office where
18   you were. Is that correct?
19       A    He was my second or third line
20   supervisor.
21       Q    Okay. During the course of your
22   years in Management Analysis branch, did you

Page 326

1    supervise any employees?
2        A    I'm not sure whether this was the
3    job or not, but I think I had a 30-day, or a
4    60-day detail. I think it may have been while
5    I was in this job. I'm not positive.
6        Q    This 30 or 60-day detail, what was
7    that?
8        A    I think one of the managers was
9    gone, was absent for a while, and so there
10   were opportunities for people to rotate
11   through the job and get some very limited
12   experience.
13       Q    Is it possible that that was at
14   NOAA?
15       A    No.
16       Q    You think it was at HUD.
17       A    I think it was at HUD.
18       Q    Okay. Other than that 60-day
19   detail, did you supervise any employees as
20   part of your regular duties?
21       A    No.
22       Q    And during that 60-day detail, how

Page 327

1    many employees did you supervise?
2        A    I'm not even sure that it was 60
3    days. It may have been 30 days.
4        Q    Okay.
5        A    And it would have been -- it was a
6    fairly small group. It wasn't more than 10
7    people.
8        Q    Okay. And what grade level were you
9    at the time?
10       A    Thirteen.
11       Q    And the movement of the grade from
12   12 to 13 in the Management Analyst series, was
13   that a competitive promotion, or with just a
14   normal - I don't know what the term --
15           MR. SHAPIRO: Career ladder.
16           MS. BIBLIN: Career ladder. Thank
17   you, Mr. Shapiro, for helping me out. Career
18   ladder promotion.
19           THE WITNESS: I'm not positive, but
20   I think that it was an accretion of duties
21   promotion.
22           BY MS. BIBLIN:

Page 328

1        Q    What do you mean by that?
2        A    I think that -- I don't believe it
3    was competed. I believe that instead, it was
4    shown that I was operating at a higher level;
5    and, therefore, the personnel office said that
6    I should be a 13, rather than a 12.
7        Q    Was a desk audit done?
8        A    I don't remember a desk audit.
9        Q    Did you make a request to have that
10   reviewed, or did your supervisor?
11       A    I made a request to my supervisor,
12   and he did not think that it would be possible
13   for that to occur, but he allowed me to go
14   forward, and we did a PD, and it came back
15   classified as a 13, and I was non-
16   competitively put into the 13.
17       Q    And who was your supervisor at the
18   time?
19       A    It's the man whose name I can't
20   remember.
21       Q    The one who smoked cigars.
22       A    Yes.

Page 329

1    Q   Okay.
2        MR. SHAPIRO:  It's because she was
3    under a cloud.
4        (Laughter.)
5    BY MS. BIBLIN:
6    Q   And at the time, do you know what
7    grade Mr. Peddicord was at HUD?
8    **A   I don't know.**
9    Q   You don't recall thinking that when
10   you became a 13 you were now on the same level
11   with him?
12   **A   No.  That was kind of a joke.  I**
13   **didn't really see him that often, because he**
14   **was in a very different area.**
15   Q   How did it come about that you ended
16   up leaving HUD?
17   **A   I did the first A-76 study that was**
18   **done at HUD.  A-76 is an OMB Circular, where**
19   **agencies are supposed to look at their**
20   **services that are commercial in nature, and**
21   **determine whether or not it would be less**
22   **expensive to contract those services out to**

Page 330

1    **the private sector.  And I did a study of the**
2    **library at HUD, which was contracted out,**
3    **because it was found to be cheaper to contract**
4    **it out, rather than keep the service in-house.**
5    **And so after I had this result, which was - I**
6    **got some kind of award for it, then I became**
7    **the go-to person for doing these commercial**
8    **review studies.  And after I had done several,**
9    **I really felt that it was time to move on and**
10   **do something different, because I couldn't**
11   **seem to escape that particular assignment.**
12   **And I had an acquaintance who was a contractor**
13   **who worked there, not for me or in my area,**
14   **but I just knew her, and she was working,**
15   **doing some work at HUD, and she had friends at**
16   **Navy, and she said, "I know someone over at**
17   **Navy.  I think he'd love to have you work**
18   **there.  Why don't you talk to him".  And I did**
19   **talk to him, and he said, "Why don't you come**
20   **over", so I got a lateral reassignment to the**
21   **Naval Materiel Command.**
22   Q   Do you remember the name of the

Page 331

1    friend that referred you over there?
2    **A   It was Joan Litke.**
3    Q   How do spell that?
4    **A   I'm not positive, but I think it was**
5    **L-I-T-K-E.**
6    Q   And who is the person that she
7    referred you to over at Naval Materiel
8    Command?
9    **A   If I heard his name, I would**
10   **remember it.**
11   Q   Was it Nelson Miller?
12   **A   No.  Nelson Miller reported to the**
13   **man who talked to me about the job at the**
14   **Navy.  I can't think of his name.**
15   Q   Okay.  Well, it indicates on your
16   resume that -- or your SF-171, that you left
17   in January of `85 as a management analyst GS-
18   13, and then it shows you started in January
19   of `85 at U.S. Naval Supply Systems Command as
20   a GM-13.  Can you explain the difference in
21   the classification?
22   **A   No.**

Page 332

1    Q   Is it a typo, or --
2    **A   I think it must be a typo.**
3    Q   You're probably thinking GM, because
4    that's what we were doing at the FDIC.
5    **A   It was definitely General Schedule.**
6    Q   Okay.  All right.  So at the time --
7    you stayed in that job for roughly nine
8    months?
9    **A   Actually, I got over there, and I**
10   **had an invitation from OMB to speak at one of**
11   **their conferences on contracting out**
12   **commercial activities, and so I went to their**
13   **headquarters.  They only had one location.  I**
14   **went to their location to give a speech, and**
15   **after the speech, David Muzio, who was in**
16   **charge of the program - I'm not sure he was in**
17   **charge of it, but he worked in the program -**
18   **asked me if I'd be interested in coming to OMB**
19   **on a detail to work in the commercial**
20   **activities area.  And so I didn't know if that**
21   **would be possible or not, because I hadn't**
22   **been with the Navy that long, but my career**

Page 333

1  goal with the federal government had always
2  been to work at OMB, and I was really excited
3  about going there. And a man named - I think
4  it was Dick Fiesel - either Feesel or Fiesel,
5  I'm not sure any more - but anyway, he was the
6  contact person at OMB to try to arrange
7  details, and he contacted Dot Cook, who was at
8  the Pentagon, and said we want Janet Roberson
9  here to work on this project. And Dot Cook
10  approved it, and I went to work at OMB on a
11  detail.
12    Q    So if it was on a detail, who were
13  you employed by at the time?
14    A    By the Navy. My position of record
15  was with the Navy.
16    Q    Okay.
17    A    And I was paid by the Navy.
18    Q    So this was during the period from
19  January of `85 to September of `86 that you
20  went on this 30-day detail to OMB?
21    A    No, it wasn't a 30-day detail. I
22  went to OMB in the fall. Right? Yes, because

Page 334

1  I remember I was going to go on vacation, and
2  I was trying to arrange the schedule, so I
3  went to OMB in September of `85.
4    Q    Okay. And how long a period was
5  that for?
6    A    I was on detail until the week
7  before the birth of my daughter on July 4th,
8  1986.
9    Q    Okay. Did you take any leave for
10  the birth of your daughter?
11    A    I started sick leave a week before
12  she was born, and then I was on maternity
13  leave for several months. And I decided, I
14  think it was in September, that I would have
15  a break in service, and I wasn't really sure
16  whether I was going to come back to work, or
17  what I was going to do.
18    Q    Okay. Now reviewing this period of
19  time before you went out on maternity leave,
20  how would you characterize the work you were
21  doing at U.S. Naval System Supply Command, was
22  that all management analyst, or something

Page 335

1  else?
2    A    It was Information Technology
3  Budget.
4    Q    Okay. Was that your first exposure
5  to the Information Technology program at an
6  agency?
7    A    No. Wait a minute. Let me think in
8  terms of time frames again. Yes, it was.
9    Q    And when you were doing Information
10  Technology Budget, what were your
11  responsibilities?
12    A    To put together budget exhibits, to
13  look at the cost of software, to interface
14  with - I can't remember the name of the group
15  now - but there was a higher level group that
16  had higher level budget authority, and we had
17  to - they were located at the Navy yard, and
18  we had to go out there sometimes and work with
19  them on some of the budget exhibits for
20  formulation, budget formulation.
21    Q    Did you need to understand the
22  software in order to work on this --

Page 336

1    A    No.
2    Q    So this was primarily just a
3  management job.
4    A    That's correct.
5    Q    Okay.
6    A    I wouldn't characterize it as a
7  management job. It was an administrative job.
8    Q    Administrative job, working -
9  analyzing a budget.
10    A    That's correct.
11    Q    Did you supervise any employees
12  while you were there?
13    A    No.
14    Q    Did you work on a team?
15    A    No.
16    Q    You worked by yourself.
17    A    There were just several budget
18  analysts, and we all had areas of
19  responsibility.
20    Q    Okay. Did you complete the analysis
21  on this Information Technology budget before
22  you left?

Page 337

1    A    The analysis?
2    Q    You said in Bullet 5 - you were a
3  member of a team which analyzed, made
4  recommendations regarding requests from Naval
5  field and headquarters and solutions for ADP
6  equipment, software, information systems, et
7  cetera.  I assume that was what you were
8  talking about a moment ago.  Am I incorrect?
9         MR. SHAPIRO:  The analyze budget is
10  too big --
11         MS. BIBLIN:  Mr. Shapiro, when I
12  want to depose you, I'll let you know.
13         MR. SHAPIRO:  I'm talking about the
14  document.
15         THE WITNESS:  I'm trying to
16  remember.  I know what -- you're referring to
17  this last bullet, and I'm trying to remember
18  what that project was, but I just don't
19  remember it.
20         BY MS. BIBLIN:
21    Q    Is the project you were just
22  describing a little while ago about

Page 338

1  Information Technology, is that described in
2  one of these bullets?
3    A    I'm sorry.  What's your question
4  again?
5    Q    You were talking a few minutes ago
6  about a project being an Information
7  Technology budget, and you looked at cost of
8  software, et cetera.  And I'm asking you
9  whether that project is identified in one of
10  these bullets as a major accomplishment.
11    A    It's really, I think, more a part --
12  that's really more part of coming up with the
13  budget exhibits.
14    Q    What do you mean by a budget
15  exhibit?
16    A    When you're trying to defend a
17  certain dollar level, then a lot of times
18  there are many, many budget exhibits that
19  provide backup to the final number that
20  appears on the cover sheet.  And in the Navy,
21  there's a lot of background documentation.
22  They just have a lot of backup exhibits that

Page 339

1  need to accompany the document that kind of
2  summarizes at a high level what the numbers
3  are going to be.  But I'm really --
4    Q    So your work on this Information
5  Technology budget was not to prepare the
6  budget, per se, but to prepare the budget
7  exhibits?
8    A    Right, because we were at a fairly
9  low level in the whole budget chain of command
10  for the overall Navy Materiel Command budget.
11    Q    So you were not preparing the budget
12  itself.  You were working on pieces of it.
13    A    Yes.
14    Q    For the Information Technology.
15    A    Yes.
16    Q    And your piece was to come up with
17  these exhibits that would be attached to the
18  budget.
19    A    For the formulation piece, and for
20  execution tracking numbers, what was actually
21  being spent.
22    Q    So you would research the amount

Page 340

1  that was being spent, and input that into the
2  calculations.
3    A    Yes, we maintained a lot of
4  spreadsheets.
5    Q    Okay.  Why did you leave Naval
6  Supply  Systems Command?  Oh, you said that
7  was during your hiatus when you had your
8  child.
9    A    Yes.
10    Q    Okay.
11    A    And after I had my daughter, I was
12  really not sure whether or not I was going to
13  stay at home, or work part-time, but I knew
14  that I was not going to go back to work full-
15  time.
16    Q    Okay.  So what did you do then?
17    A    So then I took a break, and one of
18  my friends at HUD recommended to me that I
19  consider part-time employment.  And she told
20  me that her boss really liked to hire people
21  who were willing to work part-time.
22    Q    And who was this friend?

Page 341

1    A  Candy Harrison.
2    Q  And what did she do?
3    A  She was a management analyst at HUD.
4    Q  Okay.  So did you pursue a job with
5  her office?
6    A  Well, then I did contact her boss,
7  whose name was Hal Henry, and I talked to him
8  about coming to work in that particular
9  office, and asked him what kind of a part-time
10  schedule I could work out with him.  And he
11  offered me a part-time job.
12    Q  Was there any posting for this job,
13  or did they just create a job for you?
14    A  I guess he had a vacancy.  I don't
15  know.  I don't remember asking or talking
16  about that, but he was able to bring me back
17  as a part-time employee.
18    Q  Now you had had a background doing
19  some employment services work in government
20  prior to that, didn't you?
21    A  When you say "employment services",
22  do you mean personnel?

Page 342

1    Q  Human Relations, Personnel?
2    A  Yes.
3    Q  So you were familiar with hiring
4  rolls and things like that.
5    A  Yes.
6    Q  Did that seem strange to you, they
7  could create a job for you without a posting?
8    A  Well, I don't know that they created
9  a job.  I would imagine he had a vacancy, and
10  you can rehire someone who has career status,
11  and I had career status, so he was able to
12  just pick me up at the same grade level.  I
13  didn't get a promotion.  I was hired at the
14  grade level at which I had left the
15  government.
16    Q  Okay.
17    A  And Mr. Henry had been the personnel
18  officer before I went to work for him, so he
19  was very adept at using the Civil Service
20  Rules to obtain desired results.
21    Q  Okay.  So they obtained desired
22  results for you by finding you a part-time

Page 343

1  position at OMB.  What did you do there?
2    A  No, I didn't have a part-time
3  position at OMB.  I went to --
4    Q  Didn't you say that was the 32-hour
5  per week job?
6    A  No, my 32-hour per week job was with
7  HUD.  I worked full-time at OMB on a detail.
8    Q  This full-time job, then, is the one
9  that you're describing on the detail, is the
10  job that's described in Block F on your
11  Standard Form 171?
12    A  That's correct.
13    Q  Do you have any explanation for why
14  this information, that you worked from
15  September `85 to September `86 at 40 hours a
16  week --
17    MR. SHAPIRO:  Excuse me, that's July
18  `86.
19    MS. BIBLIN:  Excuse me, to July `86.
20  Sorry.
21    BY MS. BIBLIN:
22    Q  Does not show up on your Federal

Page 344

1  Return Benefit Service History?
2    A  I know that I worked with Vicki
3  Garzioni about, I don't know, one or two years
4  ago.
5    Q  She's a Benefit Specialist for the
6  FDIC?
7    A  That's correct.  And I wanted her to
8  help me compute my retirement benefits.  And
9  when she first computed them, and she gave me
10  the listing of agencies and dates, I matched
11  it up against the file I maintained of SF-50s,
12  and they didn't match up, so I took - and she
13  had used my official personnel file to come up
14  with a computation, so I brought my package of
15  SF-50s into Vicki, and then she went through some
16  kind of an audit, and then she recomputed my
17  retirement based on the SF-50s.  For whatever
18  reason, what was in my OPF was not accurate.
19    Q  Okay.
20    A  For example, what she had when she
21  first computed my benefits didn't reflect that
22  I had ever worked part-time, and I knew I had

Page 345

1  **worked part-time. I don't believe what she**
2  **had reflected a break in service, but I had a**
3  **30 or 40-day break in service, so I was really**
4  **concerned that she have accurate information,**
5  **because I wanted to get the most accurate**
6  **computation I could get of my retirement**
7  **benefits.**
8     Q   Okay. So what you're saying is, in
9  answer to my question, that you believe there
10  was some error somewhere in the official
11  personnel files concerning your job history?
12    **A   That's correct.**
13    Q   Well, I'm reading from a July 15th,
14  2005 computation, which would have been done
15  after you were assisted on clearing up your
16  history, and it does show a break in service
17  from September 24th, 1986 until October 26th,
18  1986, which is consistent with what you're
19  saying.
20    **A   Yes.**
21    Q   But it also shows that you were
22  working for the Department of the Navy from

Page 346

1  January 6th, 1985 --
2     **A   That sounds right.**
3     Q   -- through September 24th, 1986. And
4  on your resume, it says you were working for
5  OMB. Is it possible that you were there
6  because you were part of a detail?
7     **A   I went to OMB on a detail.**
8     Q   Right. So you were actually working
9  for the Navy at the time.
10    **A   My position of record was with the**
11  **Navy, and the Navy paid my salary.**
12    Q   Okay. So in contrast to the other
13  entry on your 171, where you say I was working
14  for this one, and detailed to that one, here
15  you're saying I'm working for the person I'm
16  detailed to, and you say underneath in Block
17  F, I'm detailed at the request of OMB from
18  Department of Defense.
19    **A   Yes.**
20    Q   That's the confusion.
21    **A   Yes.**
22    Q   Okay. From September - excuse me -

Page 347

1  from July of `86, until October of `86, that
2  would have been the time that you were on
3  maternity leave, and then took a leave of
4  absence?
5     **A   I was on maternity leave from July -**
6  **actually, I think it was at the end of June -**
7  **until September sometime. And at some point**
8  **in September, I visited my boss, Nelson**
9  **Miller, and told him that I had decided to**
10  **resign from the government.**
11    Q   Okay. And then 30 days later you
12  ended up with a job at HUD.
13    **A   That's correct.**
14    Q   Okay. How did that happen?
15       MR. SHAPIRO:  She just told you that
16  a few moments ago. Didn't you listen? She
17  told you that a friend told her a part-time
18  job might be available. Her boss liked to
19  hire part-time, and she went in. You don't
20  remember this testimony at all? It was just
21  within the last five minutes.
22       MS. BIBLIN:  Are you testifying, Mr.

Page 348

1  Shapiro?
2       MR. SHAPIRO:  No, I'm telling you
3  she just told you. You asked this question
4  five minutes ago, and she gave you a detailed
5  answer. Did you not hear it?
6       MS. BIBLIN:  Do you have an
7  objection?
8       MR. SHAPIRO:  Yes, asked and
9  answered. Do you not remember that it
10  happened?
11       MS. BIBLIN:  Then you can state
12  asked and answered, instead of lecturing me,
13  and raising your voice.
14       MR. SHAPIRO:  I'm not lecturing you.
15  I'm just simply saying you just - within the
16  five minutes, you asked the same question, and
17  she gave you a detailed answer about it - how
18  it happened she came to a part-time job.
19       MS. BIBLIN:  Your objection was
20  asked and answered, and it's noted. I don't
21  need the lecture, or the raising of your
22  voice.

Page 349

1  THE WITNESS: Would you please
2  repeat the question?
3  MS. BIBLIN: Okay.
4  BY MS. BIBLIN:
5  Q  The question is, when you went to
6  HUD in October of `86, I asked how you got
7  there. I'm understanding that this is the job
8  that you were describing earlier, as where a
9  friend of your's had told you about this guy
10  who will let you work part-time, and this is
11  the job in Block E that we're now referring
12  to.
13  A  Block E. That's correct.
14  Q  Thank you.
15  MS. BIBLIN: See, we didn't need all
16  that, David.
17  MR. SHAPIRO: Oh, au contraire. My
18  saying so brought you back to reality.
19  MS. BIBLIN: I resent the continuing
20  nasty and condescending characterization of my
21  mental state, and I want it to stop right now.
22  MR. SHAPIRO: Excuse me. I'm not

Page 350

1  commenting --
2  MS. BIBLIN: Stop it.
3  MR. SHAPIRO: I never meant to
4  comment on your mental state. I just couldn't
5  understand how you could miss a detailed
6  explanation --
7  MS. BIBLIN: David, you better shut
8  up while you can.
9  MR. SHAPIRO: -- within five
10  minutes.
11  MR. SHAPIRO: Ahh, shut up.
12  MS. BIBLIN: Quiet.
13  MR. SHAPIRO: Mmm.
14  MS. BIBLIN: Quiet.
15  MR. SHAPIRO: Somebody's having a
16  problem with civility today.
17  BY MS. BIBLIN:
18  Q  In this job at HUD, did you
19  supervise anybody?
20  A  No.
21  Q  This is the job where you worked 32-
22  hours a week.

Page 351

1  A  Correct.
2  Q  Who was your immediate supervisor?
3  A  Hal Henry.
4  Q  And that was the entire time when
5  you were in this job?
6  A  Yes.
7  Q  And this was until what time did you
8  leave that job?
9  A  I'm not sure exactly how long I was
10  there, because I was approached at some point
11  - I feel as like maybe I was there about a
12  year or so. Is that right? Yes. Okay, I was
13  there a little over a year, and then I was
14  approached by Brooks Dickerson. And Mr.
15  Dickerson wanted to know if I had an interest
16  in a job on a team where they were planning to
17  contract out their infrastructure, their IT
18  infrastructure.
19  Q  Who is Brooks Dickerson?
20  A  Brooks Dickerson was a Deputy
21  Director to Donald Demitros at the Department
22  of Housing and Urban Development, and Donald

Page 352

1  Demitros was in charge of the IT office there.
2  Q  Okay. When you went on this detail,
3  you continued to work for HUD. Would that be
4  accurate?
5  A  I need to ask which detail?
6  Q  Well, the one that you just now
7  talked about. You said you were asked by
8  Brooks Dickerson to go work on a detail.
9  A  Okay, yes. I became a little
10  confused, because that detail subsequently
11  became a permanent assignment.
12  Q  Okay.
13  A  But initially, I was detailed to the
14  team.
15  Q  All right. Well, starting with the
16  job that you started working at part-time,
17  what did you do in that job, roughly, if you
18  could generally characterize it?
19  A  It was a management analysis-type of
20  job, and we had kind of shifting groups of
21  people working on various projects. And it
22  was mostly doing analysis. I remember one

Page 353

1 analysis we did was of public and Indian
2 housing, just a lot of different kinds of
3 studies, where we would make recommendations
4 about either organization or ways to do things
5 differently, or policies that, perhaps, should
6 be changed, or added - those kinds of
7 assignments.
8    Q   So management and administrative-
9 type of job.
10    A   I didn't manage, but it was a - I
11 would characterize it as a management analysis
12 position.
13    Q   Okay.  And you didn't supervise any
14 employees there.
15    A   I did not.
16    Q   Okay.  And you didn't work in IT
17 there.
18    A   I did not.
19    Q   Okay.  Then you say you went to this
20 detail that ultimately became a job.
21    A   That's correct.
22    Q   And is that the one that's reflected

Page 354

1 in Block D of your 171?
2    A   That's correct.
3    Q   And that was not a supervisory job?
4    A   It was not.
5    Q   Okay.  You went in there at, again,
6 it says GM-13, but did you mean a GS-13?
7    A   You know, I think that it might have
8 been GM, because they moved to Merit Pay while
9 I was at HUD, and because I was under the
10 Merit Pay program, I'd have to check my 50s,
11 but I may have been -- because it was under
12 Merit Pay, it might have been termed "GM".
13    Q   Okay.  And you -- during that period
14 of time that you worked at HUD in the Office
15 of Information Policies and Systems, what did
16 you do, roughly what type of work was it?
17    A   I was supposed to look, primarily,
18 at how we would manage the contract once we
19 contracted out the infrastructure.  And I was
20 responsible for coming up with part of the
21 Statement of Work that dealt with how we would
22 be managing the contractor.

Page 355

1    Q   Okay.  So it was analysis.  Would
2 that be correct?
3    A   It was analysis, and it involved
4 some coordination with the other members of
5 the team, who were really the technical people
6 who were trying to put together the technical
7 specifications.  And I needed to have some
8 understanding of what they were trying to
9 contract out for, so that I could understand
10 how we could manage that contract, once
11 awarded.
12    Q   Now when you were back at HUD,
13 starting in October of 1986, and until, I
14 guess, roughly you were there through April of
15 1988?
16    A   Yes.
17    Q   Did you have occasion to work with
18 either Mr. Gear or Mr. Peddicord during that
19 period of time?
20    A   When I returned to HUD?
21    Q   Yes.
22    A   I remember that Tom Peddicord, I

Page 356

1 think, was still there.  He was.  Tom
2 Peddicord was at HUD when I returned, and he
3 was working for Don Demitros, and for Brooks
4 Dickerson.
5    Q   In IT.
6    A   In IT.  And he was in charge of the
7 budget shop there.  And I think they may have
8 done more than budget.  And, as a matter of
9 fact, Brooks Dickerson wanted to put Tom
10 Peddicord on this team to out-source the
11 infrastructure, but Tom didn't want this
12 assignment, and so he recommended that I get
13 it.  I didn't even know Brooks Dickerson, so
14 Brooks Dickerson came to me and talked to me
15 about this detail on the advice of Tom
16 Peddicord.
17    Q   So Tom Peddicord helped you get this
18 job.
19    A   Yes, he did.
20    Q   Is that a good thing?
21    A   That was great.  It was a very good
22 thing.

Page 357

1    Q    Why was it a good thing?
2    A    It was just a really great
3    assignment. I had never worked in IT before.
4    I hadn't had much exposure, and it was kind of
5    crazy. It was just a lot of people in a very
6    small room. We didn't have private offices.
7    We just had to sit around tables and work, and
8    the guys on the team were just very
9    interesting. And they were very patient in
10   terms of explaining some of the technical
11   issues to me so that I had a better
12   understanding.
13   Q    When you say "technical issues", do
14   you mean technical issues in the IT field?
15   A    Yes.
16   Q    Now you weren't doing IT work, per
17   se, but you were helping with budget and
18   planning for IT. Would that be accurate, or
19   is there a better way to describe it?
20   A    No, I was really focused more on
21   contract administration.
22   Q    For IT.

Page 358

1    A    Yes.
2    Q    Okay. And in this particular area,
3    were you supervising any employees?
4    A    No.
5    Q    Did you get any specific training in
6    the area of Information Technology while you
7    were there, other than the work you were
8    doing?
9    A    No. I did get promoted while I was
10   on this assignment.
11   Q    To a 14?
12   A    That's correct.
13   Q    And was that a career ladder
14   promotion, or was that a competitive
15   promotion?
16   A    It was a competitive promotion.
17   Q    And it changed the title of your
18   job, or you're still management analyst?
19   A    I don't remember.
20   Q    Now under the major accomplishments,
21   you indicate in this job - you say you oversaw
22   the work of consultants who provided

Page 359

1    assistance in the preparation of the RFP and
2    evaluation plan. What does that mean?
3    A    We had a lot of contractors working
4    with us, and they provided advice about some
5    of the issues that came up. I didn't work
6    with the contractors as much as the technical
7    people on the team did, but they were very
8    helpful in terms of helping me to understand
9    the area that I was working on in the RFP.
10   Q    Okay. Would you say that at the
11   time you left this job, that you had -- how
12   would you characterize your knowledge of the
13   Information Technology area as a result of
14   doing this job?
15   A    I would say I had a good basic
16   understanding of the different platforms, and
17   a little bit about the network, and kind of
18   how all the pieces fit together, but I would
19   not characterize myself as a technical expert.
20   I just had a much better understanding of how
21   all the pieces worked.
22   Q    Would you characterize yourself as a

Page 360

1    technical expert in IT today?
2    A    No.
3    Q    Why did you leave that job in April
4    of 1988, if that was the date?
5    A    You asked me previously if Dennis
6    Gear and Tom Peddicord were at HUD when I
7    returned, and Tom was there, but Dennis Gear
8    was not. Dennis Gear had gone to the
9    Department of Commerce, specifically to work
10   in NOAA. And I never remember what that
11   acronym means. I can never remember if it's
12   Oceanographic, or Oceanic, or whatever it is,
13   but it's NOAA, at the Department of Commerce.
14   And Dennis Gear was working there, and he
15   arrived at Commerce after John Lynn did. And
16   at some point, and I don't know when because
17   I wasn't working there, but at some point,
18   John Lynn ended up working directly for Dennis
19   Gear at NOAA. And John Lynn contacted me at
20   HUD, and told me that he had become the head
21   of a small staff of people, who were doing
22   liaison work with the Administrative Service

Page 361

1  Centers that NOAA had, and he wanted to know
2  if I was interested in coming over to Commerce
3  and working for him.
4      Q   And were you?
5      A   And I was, and I applied for a job
6  there, and I was selected.
7      Q   Okay.  And when was that?
8      A   I went there in 1988.
9      Q   Okay.  And how long did you remain
10  at NOAA?
11      A   Until August - mid to late August,
12  1991.
13      Q   Who was your immediate supervisor
14  when you were at NOAA?
15      A   Initially, my immediate supervisor
16  was John Lynn, and at some point during my
17  time there, he was promoted to an SES
18  position.
19      Q   Who was?
20      A   John Lynn was promoted.  And when he
21  was promoted, at that point, I reported
22  directly to Dennis Gear, and I acted in John

Page 362

1  Lynn's position.
2      Q   For how long did you act in John
3  Lynn's position?
4      A   I'd say it was a year, around a
5  year, maybe a little bit less.
6      Q   And what was the grade level of that
7  position?
8      A   The position - John Lynn's position
9  was a Grade 15, but I acted in that position
10  at my permanent grade level, which at the time
11  was a Grade 14.
12      Q   And you were reporting directly to
13  Mr. Gear, who was SES?
14      A   That's correct.
15      Q   Okay.  What was Mr. Gear's position
16  at NOAA?
17      A   He was in charge of administration
18  for NOAA.
19      Q   Okay.  Now you indicated that the
20  time you left your job was Director
21  Administrative Support Center Coordination
22  Staff.  Is that the acting position you were

Page 363

1  referring to?
2      A   I was acting, I was never
3  permanently put into that job.
4      Q   But you didn't mention acting in
5  your SF-171, did you?
6      A   No, I did not.
7      Q   Okay.  Now who were the four people
8  that you supervised, what level were they?
9      A   There was one secretary, she may
10  have been either a secretary or a program
11  assistant, and I don't know - she was probably
12  a Grade 5, 6, 7, somewhere in there.  I don't
13  recall.  There was - and the other three were
14  management analysts.
15      Q   And what levels were they?
16      A   I think they were Grade 13.
17      Q   Were any of them 14s?
18      A   I don't remember.
19      Q   Do you remember the names of the
20  management analysts that you were working
21  with?
22      A   One of them was Paul Sherman, one of

Page 364

1  them was Vijay Deshpande.  I remember I had an
2  analyst in on detail from Seattle for a while,
3  and I can't remember his name.  I don't
4  remember.
5      Q   When you were working - initially,
6  when you came to the office, you were working
7  with Mr. Sherman and Mr. Deshpande as peers.
8  Would that be correct?
9      A   When I first got to the office,
10  neither of those gentlemen worked there.
11      Q   Okay.
12      A   When I first got to the office, I
13  worked with a colleague, whose name was Kathy,
14  and I can't think of her last name.  At some
15  point she retired, and did something else.  Is
16  there anyone else?
17      Q   So you were in an office of two with
18  a support staff?
19      A   John Lynn was our supervisor, and
20  Kathy and I worked for him.
21      Q   Was she doing the same type of work
22  you were doing?

Page 365

1   A   She was doing the same type of work,
2   but I think she might have been a higher grade
3   level. I'm not sure. I don't know whether she
4   was a 14 or a 15.
5   Q   Okay. And you indicated that you
6   were a senior analyst on the staff.
7   A   That's correct. I was a 14.
8   Q   Okay. And then when did Mr.
9   Deshpande and Mr. Sherman show up?
10  A   Mr. Sherman showed up before Mr.
11  Deshpande. And I think Mr. Deshpande was kind
12  of more towards the end of my time there. I
13  don't remember how long we worked together.
14  Q   And were they also analysts, or
15  senior analysts?
16  A   I don't remember whether they were
17  analysts, or senior analysts.
18  Q   Well, did they do similar type of
19  work to what you were doing when you were
20  there?
21  A   They did.
22  Q   Okay. And then at some point, you

Page 366

1   say they were already there prior to the time
2   that you were - that you started acting for
3   John Lynn?
4   A   I know that Paul Sherman was, but
5   I'm not sure about Vijay.
6   Q   Okay. And other than those
7   individuals, Paul Sherman, Vijay, and was
8   there another analyst there at the time that
9   you were acting? Had Kathy already left?
10  A   I just don't remember.
11  Q   You mentioned earlier there was a
12  person that came in from Seattle.
13  A   Yes.
14  Q   You don't remember the name.
15  A   I don't remember his name.
16  Q   Was that also an analyst?
17  A   No, I think he was actually a
18  training specialist.
19  Q   Okay. Is that also a Grade 13
20  level, or 12, or lower?
21  A   I don't remember.
22  Q   And the secretary.

Page 367

1   A   Yes.
2   Q   So those are the four people you
3   supervised when you left.
4   A   Yes.
5   Q   And I know I asked this before, but
6   permit me to ask again - how long was the
7   period of time during which you were acting
8   supervisor for that group?
9   A   I think it was around a year.
10  Q   A whole year?
11  A   I just don't remember how many
12  months, but it was for a period of time.
13  Q   Okay. During the time -- was this
14  your first supervisory job in the government?
15  A   Yes.
16  Q   During that time, had you been given
17  any management training by the government?
18  A   When you say "management training",
19  I'm not sure what you mean.
20  Q   Had you been given any type of
21  training at Commerce or any of your other
22  prior jobs to gear you up for supervising

Page 368

1   other people?
2   A   I took some classes that touched on
3   those areas, but I had not been through really
4   a course of study to be a supervisor. I'd
5   just taken some classes here and there. I had
6   some classes in graduate school. I had some
7   classes that I went to.
8   Q   When you say, "classes that you went
9   to" --
10  A   OPM, U.S. OPM classes that I went
11  to.
12  Q   Okay. Do you remember any of those
13  classes?
14  A   I took an AMA management class.
15  Q   What's AMA?
16  A   I think it's American Management
17  Association.
18  Q   That's a private enterprise.
19  A   Yes, it is. I took --
20  Q   Did somebody pay for you to go to
21  that class?
22  A   Yes.

Page 369

1    Q   Who did?
2    A   **Department of Labor did.**
3    Q   Okay.  In one of your earlier jobs.
4    A   **That's correct.**
5    Q   Okay.  Do you remember what that
6    class was about?
7    A   **I can't remember what it was called.**
8    Q   Do you remember what you learned
9    there?
10   A   **A lot of it actually turned out to**
11   **be more private sector oriented, and talked**
12   **about things like advertising, running a**
13   **factory, some of it really wasn't very**
14   **relevant to government experience, some of it**
15   **was more kind of how to work with teams and**
16   **things of that nature.**
17   Q   Okay.
18   A   **It was a long time ago.**
19   Q   But you hadn't -- immediately prior
20   to your taking the job in an acting capacity
21   for Mr. Lynn at NOAA, you had not had any
22   immediate training or mentoring regarding

Page 370

1    being a manager.  Is that correct?
2    A   **I don't recall having any mentoring**
3    **at all, and I don't remember any classes right**
4    **around that time frame.**
5    Q   Did you have any difficulties with
6    the staff that you were working with when you
7    were serving in the acting capacity at NOAA?
8    A   **I don't recall any problems with Mr.**
9    **Sherman, or with Linda, whose name I can't**
10   **remember now, the secretary.  I did have some**
11   **issues with Mr. Deshpande.**
12   Q   And what about with the guy in
13   Seattle?
14   A   **No.**
15   Q   From Seattle.
16   A   **No, we didn't have any issues.**
17   Q   That you're aware of.
18   A   **From my perspective, we didn't have**
19   **any.  We had a very positive relationship.**
20   Q   And you said you had difficulties
21   with Mr. Deshpande.
22   A   **Yes.**

Page 371

1    Q   Getting along with him?
2    A   **Mr. Deshpande was very reluctant to**
3    **share with me what he was doing, some of his**
4    **projects.  And it made it very hard for me to**
5    **understand what he was doing, and when he was**
6    **doing it.  And he complained to Mr. Gear that**
7    **I was micro managing him, and I did not share**
8    **that perception.  I shared the view that he**
9    **did not wish to be supervised, and that he**
10   **wanted to be able to do whatever he wanted to**
11   **do without informing me.**
12   Q   And what happened, how was that
13   dispute resolved?
14   A   **I remember that - let's see - I had**
15   **applied for a job with the Veterans**
16   **Administration, and Dennis talked to me about**
17   **the complaint that Vijay had made about me,**
18   **and he said well, maybe this will just all**
19   **resolve itself if you end up going to the**
20   **Veterans Administration.  AS it was, during**
21   **the process of applying to the Veterans**
22   **Administration, Dennis Gear left NOAA and went**

Page 372

1    to work with the Resolution Trust Corporation,
2    and I don't remember what happened to Mr.
3    Deshpande.
4    Q   When he left before you left at
5    NOAA, did he not?
6    A   **I don't remember where he was.  I**
7    **don't remember when he left.  I don't really**
8    **remember a whole lot about him, other than the**
9    **fact that he just didn't seem to want to be**
10   **supervised.**
11   Q   He was the same grade level as you,
12   wasn't he?
13   A   **I don't know.  I don't remember.**
14   Q   Okay.  Why did you leave NOAA?
15   A   **I was -- initially, Brooks Dickerson**
16   **talked to me about coming to work for him at**
17   **the RTC.**
18   Q   Oh, he had now moved over from HUD
19   to the RTC?
20   A   **That's correct.  And he was in**
21   **charge of IT at the RTC.**
22   Q   Approximately when was that?

Page 373

1    A   I think that was around January or
2    February of 1991.  And he offered me a job,
3    and gave me a weekend to think about it.  And
4    I decided that I was happy where I was.  And
5    I decided to stay at NOAA.  And subsequent to
6    that, Dennis Gear went to RTC, I believe it
7    was January of 1991, and then John Lynn went
8    to the RTC, I believe in May of 1991.  And
9    then he contacted me and asked me if I would
10   be interested in coming to work at the RTC.
11       Q   He being?
12       A   John Lynn.
13       Q   And is that when you finally went to
14   the RTC?
15       A   Yes.  I went to the RTC in August.
16       Q   And why did you leave - why would
17   you make a choice to go to NOAA - go to RTC
18   from NOAA?
19       A   There were several reasons.  One, I
20   was still in an acting position, and I didn't
21   sense that the job - that I was going to be
22   there permanently, or that they were ever

Page 374

1    going to decide whether to fill the job,
2    because it hadn't been advertised, and I
3    wasn't sure what was going to happen with that
4    particular job.  That was one issue.  The
5    other issue was that the job at the RTC
6    offered much better benefits, and a much
7    higher pay scale.
8        Q   And you started at a Grade 14 at
9    RTC?
10       A   That's correct.
11       Q   But because it was on the pay scale,
12   it was a raise.
13       A   Significant.
14       Q   Okay.  And was the job at RTC that
15   you went to a managerial job?
16       A   No.
17       Q   What was the job that you started
18   at?
19       A   The job I started at, I think it
20   might have been management analyst, and
21   initially, I was working pretty much for John
22   Lynn and Dennis Gear, kind of doing management

Page 375

1    analysis/special assistant kinds of duties.
2    And then a job was posted for a Grade 15
3    supervisory job, and I applied for the job,
4    and I was competitively selected.
5        Q   And what was the name of that job?
6        A   It was the -- I was the head of the
7    Office of Organization and Resource
8    Management.
9        Q   Okay.
10       A   I think it was -- yes, the acronym
11   was OORM.
12       Q   And what did you do in that job?
13       A   I had two supervisors reporting
14   directly to me.
15       Q   Who were they?
16       A   Joseph Buccolo.  I'm not sure how
17   you spell his name.  I think it was B-U-C-C-O-
18   L-O.  And Paul Sherman.
19       Q   So by that point, Paul Sherman had
20   left NOAA, and gone to RTC?
21       A   I got to NOAA - I got to the RTC
22   before he did, and I brought him over.

Page 376

1        Q   So he came over to work with you at
2    OORM.
3        A   That's correct.
4        Q   Okay.  And was Vijay Deshpande
5    working at RTC by that point?
6        A   No.
7        Q   Okay.
8        A   He came at the point where it was no
9    longer possible to get a permanent position.
10   And when he came to the RTC, he was offered a
11   temporary position.
12       Q   When was that?
13       A   No, he was offered a permanent
14   position, but a temporary promotion, I
15   believe.  I don't know.
16       Q   Okay.  But it wasn't working with
17   you.
18       A   No, he did not - I don't know where
19   he was working.  I didn't see him.
20       Q   All right.  Now while you were at
21   OORM, what were your responsibilities?
22       A   Management analysis, organizational

Page 377

1  analysis, and budget.
2      Q   How did -- where was Mr. Peddicord
3  at that point?
4      A   He worked for Brooks Dickerson, who
5  was in charge of Information Technology for
6  the RTC, and Tom was a manager responsible for
7  budget and  administration, and I believe
8  procurement.
9      Q   How did that compare to what you
10 were doing?  I mean, were you in the same
11 organization, or were you in separate
12 organizations within RTC?
13     A   We were in separate organizations.
14 He was in an office that was located in
15 Rosslyn, Virginia, and my office was in the
16 801 Building downtown.
17     Q   Did he ultimately report to Mr.
18 Gear?
19     A   He reported to Brooks Dickerson, and
20 when Brooks left, I believe he reported to
21 John Cusack.
22     Q   Not to be confused with the actor.

Page 378

1      A   Right.
2      Q   And what was John Cusack's position?
3      A   John Cusack was in charge of IT, a
4  piece of IT.  At one point, I think it's after
5  Brooks left, IT got broken up into two pieces.
6  One part of it reported to Dennis Gear, and
7  the other piece, which was application
8  development, reported to Bill Rolle.
9      Q   So it would be fair to say that
10 during the period that you were at RTC, there
11 was - would you say there was constant
12 reorganization?
13     A   That's correct.
14     Q   And that was typical at the RTC?
15     A   Yes.
16     Q   People were moving around?
17     A   Constantly.
18     Q   And organizations were shifting.
19     A   Yes.
20     Q   The work you were doing in OORM,
21 what division of RTC that go up through, or
22 office?  Did that report up to Mr. Gear,

Page 379

1  eventually?
2      A   Yes.
3      Q   Okay.  And what was Mr. Gear's
4  position at the time?
5      A   I think he was the head of
6  administration, or something maybe broader
7  than that.  I don't remember what his title
8  was.
9      Q   Okay.  Who did he report to?
10     A   Initially, he reported to the man
11 who is currently the Chief Learning Officer
12 here at the FDIC.
13     Q   Dave Cook?
14     A   Yes.  He reported to David Cook.
15     Q   And David Cook was in what position
16 at RTC?
17     A   David Cook was at the top.  I don't
18 know what his title was, but he ran the RTC.
19     Q   Okay.
20     A   And when he retired, someone else
21 came in, and I think that Dennis - and I can't
22 remember his name either.

Page 380

1      Q   Bill Rolle?
2      A   No.  It was someone who had run an
3  airline company at some point.
4      Q   And you don't remember his name.
5      A   I can't think of it right now.
6      Q   Okay.
7      A   There were two other people who ran
8  the RTC after Dave Cook, and I just - Casey,
9  Albert Casey is one of them.
10     Q   Yes.
11     A   And I can't remember the name of the
12 third person.
13     Q   Okay.  But somewhere along the line,
14 you were reporting, ultimately, to David Gear
15 - excuse me - to Dennis Gear.  And what was
16 your relationship with John Lynn at this
17 point?  How did he fit in?
18     A   When I was promoted to my first
19 supervisory, permanent supervisory position,
20 John Lynn was my immediate supervisor.
21     Q   Okay.  Now you were there for almost
22 four years, or a little over four years.  We

Page 381

1  talked earlier in a different context about
2  how that relationship may have soured for you
3  with Mr. Lynn.
4    A  Yes.
5    Q  Okay.  And is that the
6  organizational, the only organizational change
7  that took place for you professionally when
8  you moved over to JoAnn Henry?  It was around
9  that time in 1993?
10   A  Yes.
11   Q  Okay.  And would you characterize
12  when you worked for Mr. Lynn, he was
13  supportive, for the most part, of your career?
14   A  Initially.
15   Q  And then when you worked for JoAnn
16  Henry, how would you characterize your working
17  relationship with her?
18   A  I would characterize it as very
19  positive.
20   Q  Okay.  During the time that you had
21  this crew of 10 people you supervised, what
22  were their jobs?

Page 382

1    A  Some of them did management analysis
2  work, they did studies, they were involved in
3  the field restructuring, some of them did
4  budget.
5    Q  What grade levels were those people?
6    A  The two supervisors, first line
7  supervisors who reported to me --
8    Q  Sherman and Buccolo?
9    A  Yes.  They were both 14s.  And they
10  had staff at various grade levels reporting to
11  them.  I think towards the end of the RTC,
12  most of the analysts were 13s.
13   Q  Okay.  Do you remember the names of
14  any of your analysts that were 13s?
15   A  Mary Kreuzberger, Bob Gardner, Jim
16  Baugher, Beth Wilt, Donna Mitchell, Paul
17  Sanner, Joan Grigg.
18   Q  The same Joan Grigg that you're
19  still friends with.
20   A  Yes.  Susan - I can't remember her
21  maiden name, but her married name now is
22  Koepp.  Becky Castle, Terrence Burns, Linda -

Page 383

1  and I can't think of her last name.
2    Q  Okay.  And these were people that
3  were primarily analysts at the Grade 13 level,
4  they reported to 14s, Buccolo and Sherman.
5  And Buccolo and Sherman reported directly to
6  you.
7    A  At the beginning, some of the
8  employees were lower grade levels, because
9  they were very junior.  Some of them had not
10  been out of college that long, and they
11  probably were Grade 9, Grade 11, Grade 12.
12  There was also a program assistant who
13  reported directly to me.
14   Q  So you had the two first level
15  managers.
16   A  Yes.
17   Q  And then you had a program
18  assistant.
19   A  That's correct.
20   Q  Who was the program assistant?
21   A  Pamela Brownfield.
22   Q  And what grade was she?

Page 384

1    A  I think when I first hired her, she
2  might have been a 5, and she was a secretary,
3  I think, or a program assistant.  And then I
4  advertised a career ladder position to
5  encourage her, hopefully her, to bridge
6  between a clerical job and a professional job,
7  and she - I can't remember whether we did that
8  as a - we had to.  We did a competitive job
9  announcement, and she was selected, and I
10  think it was a 5, 6, 7 career ladder position.
11   Q  Now was that an administrative job?
12   A  Yes.
13   Q  During the time that you were
14  supervising these people, had you been given
15  any supervisory training prior to taking that
16  job as a Grade 15?
17   A  I recall taking a U.S. OPM class,
18  which consisted of a couple of different
19  segments, because it was an SES program,
20  Senior Executive Service program.  But I don't
21  recall any first line supervisory classes.
22   Q  Did you have any problems when you

Page 385

1  were managing people in that organization at
2  RTC?
3      A   Yes, I did.
4      Q   How would you describe those
5  problems?
6      A   I had some problems during about the
7  first year that I had that organization.  One
8  of the employees, Terence Burns, who was a
9  fairly recent college graduate, became unhappy
10  when I decided that he had had enough training
11  classes, and that it was time to start hitting
12  the ground running.  And he was quite - I
13  think I would characterize it as bitter - that
14  I was not going to continue to send him to
15  training.  He had already been through several
16  classes, and I believe he was supposed to be
17  working in budget, but I'm not positive about
18  that.  He became very disenchanted, and he
19  spent much of his day going from office to
20  office complaining about my treatment of him.
21  He also told one of the employees, Susan
22  Koepp, that I had been telling people that she

Page 386

1  was having an affair with my boss, John Lynn,
2  which was not true.  I don't believe that that
3  happened, and even if I - I had never even
4  heard of that from anyone.  And while I was in
5  a training class, Terence Burns went to Dennis
6  Gear and complained about me.  When I came
7  back from my training class, John Lynn told me
8  that Terence had talked to Dennis, and that
9  Dennis had also talked with Susan about the
10  allegation that I was spreading rumors that
11  she was having a relationship with my boss.
12  And John Lynn said that he had talked with
13  Dennis about all of this, and that I needed to
14  get things on a better track.  And John had
15  proposed that we bring in a consultant from
16  U.S. OPM to do team building with the group.
17  And, subsequently, we brought someone from
18  U.S. OPM, whose name is Marilyn Bott, and she
19  came in and conducted team building.
20      One of the provisions that I
21  requested in order for the team building to be
22  successful was to move Terence Burns out of my

Page 387

1  office, to another office, so that we would
2  have a good chance of being successful with
3  the team building.
4      Q   Was Terence Burns a white male, or
5  was he a minority?
6      A   He was a white male.
7      Q   And how old was he?
8      A   I would say he was in his 20s.
9      Q   Was there anybody other than Terence
10  Burns who was complaining about you in that
11  office?
12      A   That's what John Lynn told me, that
13  it was Terence Burns, and that Susan Koepp
14  also was concerned that I was saying something
15  negative about her.
16      Q   Is that the only problem that you
17  had with personnel in that office, in terms of
18  your working well with other people?
19      A   I believe that when we had the team
20  building, that it was a very positive.  It was
21  a very difficult experience, but at the end of
22  the team building, I feel that we came out

Page 388

1  with a very successful outcome, and I think
2  the group worked very well together following
3  that.
4      Q   Okay.  My question was, other than
5  this experience that you've described, were
6  there any other problems you had when you were
7  working at the RTC getting along with staff?
8      A   I can't think of any.
9      Q   And there were no other people that
10  complained about you?
11      A   Not that I'm aware of.
12      Q   And nobody ever brought any
13  complaints to you?
14      A   Not that I can think of.
15      Q   How did it come about that you went
16  from the RTC to the FDIC?
17      A   Dennis Gear asked me to work on a
18  project for him, and when I met with him to
19  talk about the project, he mentioned that
20  there was no equivalent position for me at the
21  FDIC.
22      Q   Because of the sunset.

Page 389

1    A    Yes.  And this was in the fall of
2  1995, and the sunset was due to occur at the
3  end of the year.  And he asked me - he said it
4  was totally at my option to work on a travel
5  study that Chairman Helfer, Ricki Helfer had
6  requested.  She felt that some of our travel
7  policies and I think she referred to them as
8  benefits, were too costly for the corporation,
9  and she wanted someone to look at the travel
10  program at the FDIC, and make recommendations
11  for changes.
12    Q    So did you work on this project?
13    A    Dennis Gear offered me the
14  opportunity to work on it, and I agreed to do
15  so.
16    Q    And for whom were you working on
17  this project?
18    A    For Dennis Gear.
19    Q    That was still at the RTC, or was
20  that at the FDIC at that point?
21    A    At this point, I was still an RTC
22  employee, but Dennis Gear was, at that point,

Page 390

1  working at the FDIC.
2    Q    And in what division was this
3  project being supervised?  Was it part of
4  Division of Administration, or was it
5  something as part of the transition?
6    A    It wasn't related to the transition
7  at all.  I don't remember what Dennis'
8  position was when he went to the FDIC.
9    Q    Well, at this point, you were in a
10  job, and there was no equivalent for you three
11  months before sunset.  You take a project.
12  You're still an RTC employee, although on loan
13  from the FDIC, because technically, all RTC
14  employees were employees of FDIC.  Right?
15    A    That's correct.
16    Q    Okay.  And then what was to happen
17  to you in January of 1996?
18    A    Well, when Dennis talked to me about
19  the project, he said he wanted to - if I took
20  the project, he would assess how things were
21  going, and he would try to find a good fit for
22  me at the FDIC.

Page 391

1    Q    By assess -- I'm sorry, go ahead.
2    A    But I did not -- he did not tell me
3  specifically where I would be placed.
4    Q    Okay.  So Dennis helped you to find
5  something at the FDIC, and ultimately, did you
6  get a permanent job at the FDIC?
7    A    Well, Dennis asked me to work on
8  this detail assignment for him on travel.
9    Q    Which was not a permanent job.
10    A    That's correct.  It was a detail
11  from my permanent job of record at the RTC.
12    Q    My question is, did you ultimately
13  get a permanent job?
14    A    And subsequently, I believe - I
15  can't remember exactly when, but at some point
16  in 1995,  Donald Demitros had come from HUD to
17  work at the FDIC, and he was put in charge of
18  the Information Technology area.  And Dennis
19  asked me if I would go work for Don, if I
20  would talk to Don Demitros about an assignment
21  with him.  So I talked to Don, I didn't really
22  know him very well at HUD, but I made an

Page 392

1  appointment, I talked with Don Demitros.  He
2  asked me if I would be interested in being his
3  special assistant, and I said yes.  And Dennis
4  asked me if I would work for him, because Don
5  was fairly new, and didn't know very many
6  people, and Dennis thought it would be helpful
7  for someone who had been around for a while to
8  help Don get acclimated, so I accepted the job
9  with Donald Demitros.
10    Q    And was that a permanent job?
11    A    Yes, it was.
12    Q    And was that a job that was posted?
13    A    The job was not posted.
14    Q    So it was just sort of created, and
15  you went over there.
16    A    It was a lateral transfer.
17    Q    A Grade 15.
18    A    That's correct.
19    Q    Was it supervisory when you first
20  started working for Mr. Demitros?
21    A    No.
22    Q    And then subsequent to that, just

Page 393

1  long story short, you competed for the job as
2  Assistant Director?
3      A   No.  I did down the road, but after
4  I had been a special assistant to Don Demitros
5  for a number of months, maybe four months, six
6  months, I don't remember how long - he asked
7  me - he called me into his office, and he told
8  me that JoAnn Henry and Mike Rubino had both
9  recommended to him that he put me in charge of
10  Administration in the Division of Information
11  Resources Management.  And so he asked me if
12  I would be interested in taking over that
13  area, and moving out of the special assistant
14  position.
15      Q   So Mike Rubino recommended you for
16  that job.
17      A   That's correct.
18      Q   And how did he know of your skills?
19      A   I first met Mike Rubino at the
20  Department of Labor, when he was a management
21  analyst.  I subsequently worked with him on
22  occasion at HUD, when he was manager there.

Page 394

1      Q   So he helped you get your first
2  management job at FDIC.
3      A   Yes, he did.  I did quite a few
4  management studies for him when we worked
5  together at HUD, and he was very helpful in my
6  career.
7      Q   Was that management job, that was
8  the E1?
9      A   It was not an E1.  It wasn't - as a
10  matter of fact, I don't even believe that a
11  position description existed for that job.
12      Q   Okay.
13      A   I believe that I continued on paper
14  to be a special assistant, but in reality, Don
15  had several people reporting to me to run the
16  administration area.
17      Q   When you say several people, how
18  many?
19      A   I had - and they changed over time -
20  but I remember that I had Daniel Mahoney, who
21  was in charge of contracts for DIRM; Charlotte
22  Craig, who was responsible for Personnel and

Page 395

1  Facilities; Tim Taylor, who was in charge of
2  Internal Controls, and I think that was it.
3      Q   What grade levels were these people
4  at the time?
5      A   Dan Mahoney was a 15, Tim Taylor was
6  a 15, and when I first met Charlotte Craig, I
7  think she was on a temporary promotion at the
8  13 level.
9      Q   Okay. So those were the people
10  reporting to you when you first were helping
11  Mr. Demitros out with administration.
12      A   That's correct.
13      Q   How, eventually, did you become
14  Assistant Director for Administration, which
15  was an E1 position?
16      A   A position was advertised, I think
17  in 1998, and I was competitively selected as
18  an E1.
19      Q   Okay.  Now on your resume, it
20  reflects in Block A on Exhibit 2 that that was
21  a Grade 301-15 job.
22      A   That's correct.

Page 396

1      Q   Was that the same as an E1, or is
2  that slightly different?
3      A   No.  I was - when I applied for the
4  job as an E1, I was Grade 15.
5      Q   Okay.  You were 15.  Okay, but it
6  also indicates - this grade - this is the
7  application for that job, isn't it?
8      A   Yes.
9      Q   Okay.  So the Assistant Director for
10  Administration is the job you were applying
11  from - I mean, you're saying the Assistant
12  Director of Administration is the job you were
13  having when you first started working for Mr.
14  - the second job you had working for Mr.
15  Demitros, but that morphed into an E1
16  position.  You were sort of acting in that job
17  at the time, or is that not correct?
18      A   The job wasn't - I don't think that
19  a PD was established for the administrative
20  work until the E1 was created, and I think Don
21  had some challenges getting the E level
22  created, because there was - I don't think

Page 397

1  they like to create a lot of E level jobs at
2  that time, and still.
3      Q   Or now.
4      A   Or now (laughing), certainly even
5  more now.  But I remember that he had to go
6  through quite a process to try to formalize
7  that job, and then post the job, and make a
8  selection.
9      Q   Okay.  And so, essentially, that
10  became - you were doing a lot of that job
11  already as a Grade 15.
12     A   That's correct.
13     Q   And then it became an official
14  executive job.  You applied for it, you got
15  the job.
16     A   That's correct.
17     Q   And at the time you - you indicate
18  on your resume that you were supervising 24
19  employees when you were in the 15 job.
20     A   That's probably right.  I don't know
21  the exact number off the top of my head today,
22  but that's --

Page 398

1      Q   Were they direct reports?
2      A   No.  The direct reports were
3  Charlotte Craig, Daniel Mahoney, Tim Taylor,
4  and I think there was a secretary.
5      Q   Okay.  So they were, in turn,
6  supervising --
7      A   People.
8      Q   -- another 20 people.  Okay.  And
9  then you applied for that and became an E1.
10     A   Correct.
11     Q   The Assistant Director job.  And
12  then as Assistant Director, were you required
13  to take any SES-type training, or executive
14  level training?
15     A   At some point, I took the FDIC
16  Executive Training class.
17     Q   Do you remember when that was?
18     A   I remember that I was in the class
19  with Wayne Gooding, who was one of the other -
20  one of the deputies in DIRM.
21     Q   Well, do you remember when it was?
22     A   Somewhere between 1998 and 2003.  I

Page 399

1  don't remember exactly when.
2      Q   Was there any other executive level
3  training you took in that period of time,
4  prior to 2003?
5      A   I can't - none of it stands out.  I
6  don't remember any.
7      Q   Okay.  In the interim, were there
8  any times when you were working at the FDIC
9  that you did any stints working either in
10  administration, Division of Administration, or
11  for the Ombudsman.  Do you remember anything
12  like that?
13     A   I'm sorry?
14     Q   During that early period when you
15  first came over to the FDIC --
16     A   Yes.
17     Q   -- you said you were working on a
18  project for Dennis Gear, were there - I
19  realize that in the way you're describing
20  this, and it probably was true, there was a
21  lot of amorphous job shifting going on until
22  everybody was settled - but were there any

Page 400

1  stints during which you were working for
2  Administration, or for the Ombudsman?
3      A   I don't recall ever working for the
4  Division of Administration.
5      Q   Did you ever work for Carmen
6  Sullivan?
7      A   I did work for Carmen Sullivan for
8  maybe two months.
9      Q   In what capacity did you work for
10  her?
11     A   As an analyst.
12     Q   And what was she doing at the time?
13     A   She was trying to establish the
14  Office of the Ombudsman.  It was a new office.
15     Q   Okay.  And how did that work out?
16     A   I was not very happy being there.
17     Q   And would you say that she was happy
18  having you there?
19     A   I don't think she was happy having
20  me there.
21     Q   Okay.  So you didn't get along with
22  her.

Page 401

1    A    Well, she - it was really kind of
2  unfortunate, but I really don't like to say
3  this, but she's gone, so I will. I think that
4  she had some problems with alcohol, and I
5  learned that it was better to talk to her in
6  the morning, than to talk to her in the
7  afternoon.  And I can remember one occasion
8  when I came into her office after lunch to
9  talk to her, and she was just sitting there
10  crying, and just emotional.  And I think it
11  was just really embarrassing that I happened
12  to see her in that state.  And it made it very
13  uncomfortable.
14    Q    So you're saying the reason you
15  didn't get along with her was because she was
16  an alcoholic, or had problems with alcohol?
17    A    I don't want to characterize her as
18  an alcoholic, but I think she did have some
19  problems with alcohol.  And I think that it
20  made our relationship a little uncomfortable,
21  that I had come in and seen her in a very
22  emotional state.

Page 402

1    Q    And you think it was your seeing her
2  in an emotional state that made your
3  relationship uncomfortable?
4    A    That certainly made it very
5  uncomfortable.
6    Q    At what stage of the 60 days or so
7  that you were working with her did you see her
8  crying?
9    A    It wasn't at the very beginning when
10  I got there.  I can't remember.  I wasn't
11  there that long.
12    Q    Well, prior to your coming in upon
13  her crying, did you have problems working with
14  her?
15    A    I didn't really see her very much.
16    Q    Did you have problems working with
17  her prior to the time when you saw her crying?
18    A    I can't remember having problems
19  with her.
20    Q    Were you unhappy working with her
21  prior to the time that you saw her crying?
22    A    I didn't really - I didn't think she

Page 403

1  was a very good manager.  I thought that we
2  spent a lot of time in meetings that didn't
3  get anywhere.  We just didn't seem to ever
4  make any progress. It didn't seem that the
5  program was ever going to get off the ground.
6  It was very frustrating watching things circle
7  around, and around, and around.
8    Q    And is that why you were unhappy
9  working with her?
10    A    I just didn't really think she was a
11  very good manager.
12    Q    And I realize she's not around today
13  to tell any of us what she was thinking, but
14  do you think she would have said that you were
15  not a very easy person to deal with either?
16    A    She may have.  And I think you
17  probably know, since you've been here for a
18  long time, that she certainly was not a very
19  easy person to work with.  And she had a
20  reputation as someone who was not very easy to
21  work with.
22    MS. BIBLIN:  Okay.  It's already

Page 404

1  6:20, so we're close to our seven hours.
2    MR. SHAPIRO:  We're over our seven
3  hours, but if you have some more questions to
4  wrap-up, I'm happy to hear your wrap-up
5  questions.
6    THE WITNESS:  I would like to take a
7  brief break, if we could.
8    MS. BIBLIN:  Let's take a brief
9  break.  And then, Mr. Shapiro, do you need to
10  take a break, or can you and I go off the
11  record and just discuss housekeeping.
12    MR. SHAPIRO:  Let me run to the rest
13  room.
14    MS. BIBLIN:  Okay.  All right.  Off
15  the record.
16    (Whereupon, the proceedings went off
17  the record at 6:18:31 p.m. and went back on
18  the record at 6:34:38 p.m.)
19    MS. BIBLIN:  Okay.  We had a
20  conversation off the record, and I indicated
21  to Mr. Shapiro that I was unable to complete
22  Ms. Roberson's deposition today, and he did

Page 405

1  offer to produce documents that were not
2  produced to me today, and allow me to depose
3  Ms. Roberson about those documents at a future
4  date. But I told him even if we were to do
5  that, I need a full day to complete her
6  deposition because of the many issues in this
7  case.
8      MR. SHAPIRO: I thought we weren't
9  going to argue this.
10     MS. BIBLIN: I'm not arguing it.
11 I'm just saying that I've indicated to Mr.
12 Shapiro that I'll have to file a motion, and
13 I understand he opposes that.
14     MR. SHAPIRO: I won't consent.
15     MS. BIBLIN: He won't consent to it.
16     MR. SHAPIRO: That's all I have to
17 say right now.
18     MS. BIBLIN: Okay. And --
19     MR. SHAPIRO: We should also say
20 that you told me from the court reporter that
21 you've gone running time six hours and 50
22 minutes of th is deposition.

Page 406

1      MS. BIBLIN: That's correct. So I
2  have 10 minutes left for my seven-hour day.
3      MR. SHAPIRO: And I've offered to
4  allow you to do the 10 extra minutes.
5      MS. BIBLIN: You did, and that was
6  very big of you.
7      MR. SHAPIRO: Yes. Well, it's
8  within the rules. And I've also offered, in
9  addition to that, if we produce these
10 documents, and you have specific questions
11 about the documents --
12     MS. BIBLIN: I've said that.
13     MR. SHAPIRO: -- I'll be happy to
14 allow that further.
15     MS. BIBLIN: I've said that.
16     MR. SHAPIRO: And we've also talked
17 about my depositions.
18     MS. BIBLIN: Yes, and prior to this
19 today, we have to talk about the fact that I
20 still haven't received an expert report under
21 Rule 26, so we'll --
22     MR. SHAPIRO: I've given you what

Page 407

1  the expert has provided me, what her treating
2  physician. And it's unclear whether I should
3  tell you that in the Federal Rules, to be
4  technical about this - treating physicians are
5  entitled to testify. They're not technically
6  experts, but they testify as treating
7  physicians.
8      MS. BIBLIN: David, I understand
9  this, but you were asked to designate your
10 "experts", and you identified her as an
11 expert.
12     MR. SHAPIRO: Yes, treating
13 physicians can also testify, so - and she's a
14 treating physician.
15     MS. BIBLIN: Well, are you bringing
16 her on as a fact witness, or are you bringing
17 her on as an expert?
18     MR. SHAPIRO: Well, she is in a
19 certain sense a fact witness, because she's a
20 treating physician, as well.
21     MS. BIBLIN: Why don't we argue this
22 at another time off the record?

Page 408

1      MR. SHAPIRO: I'm happy to. I
2  didn't bring up the expert report, you did.
3      MS. BIBLIN: For now we're
4  adjourning, and --
5      MR. SHAPIRO: Not at our request.
6      MS. BIBLIN: And we're adjourning
7  because we're reaching the end of our --
8      MR. SHAPIRO: Seven hours.
9      MS. BIBLIN: -- seven-hour day. And
10 in my opinion, this deposition is not
11 concluded, and we will have to go to the court
12 to get additional time.
13     MR. SHAPIRO: Actually, my opinion
14 is the deposition is not concluded either.
15 You have 10 minutes. So I agree with you,
16 that the deposition is not concluded, if you
17 haven't concluded it. You have 10 minutes
18 more.
19     MS. BIBLIN: Let's not waste any
20 more time on this, Mr. Shapiro.
21     MR. SHAPIRO: I'm not trying to
22 waste time.

Page 409

1        MS. BIBLIN:  Of course not.  Thank
2  you very much.
3        THE WITNESS:  Thanks.
4        COURT REPORTER:  You have the right
5  to review the transcript, and correct any
6  errors.
7        MR. SHAPIRO:  Yes, we'll read and
8  sign.
9        COURT REPORTER:  Okay.  I just need
10  you to --
11        MR. SHAPIRO:  Never did this before.
12  I have to say we're reading and signing?
13        COURT REPORTER:  No, she needs to
14  sign it, and indicate the preference in the
15  appropriate box.
16        (Whereupon, the proceedings went off
17  the record at 6:37 p.m.)
18            (SIGNATURE NOT WAIVED.)
19
20
21
22